******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* EDUARDO SANTIAGO*
(SC 17413)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh,
McDonald and Espinosa, Js.**

*Argued April 23, 2013—officially released August 25, 2015*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom were *Matthew A. Weiner*, deputy assistant state's attorney, and, on the brief, *Kevin T. Kane*, chief state's attorney, *Gail P. Hardy*, state's attorney, *Susan C. Marks*, supervisory assistant state's attorney, and *Marjorie Allen Dauster*, *Donna Mambrino* and *John F. Fahey*, senior assistant state's attorneys, for the appellee (state).

*Constance de la Vega*, pro hac vice, and *Hope R. Metcalf* filed a brief for experts on international human

rights and comparative law as amicus curiae.

*Alex V. Hernandez* and *Brian W. Stull* filed a brief for legal historians and scholars as amicus curiae.

*Sandra J. Staub*, *David J. McGuire* and *Lauren R. Masotta* filed a brief for the American Civil Liberties Union Foundation of Connecticut as amicus curiae.

*Kent S. Scheidegger*, pro hac vice, and *Judith Rossi* filed a brief for the Criminal Justice Legal Foundation as amicus curiae.

TABLE OF CONTENTS

*Page*

I.   STATE CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND UNUSUAL PUNISH-MENT . . . . . . . . . . . . . . . . . . . . . .
- A.   Federal Constitutional Standards. . . .
  - 1. Inherently Barbaric Punishments . .
  - 2. Excessive and Disproportionate Pun-ishments . . . . . . . . . . . . . . . .
  - 3. Arbitrary or Discriminatory Punish-ments . . . . . . . . . . . . . . . . .
- B.   Relevant State Constitutional History .
  - 1. Preconstitutional Legal Traditions. .
  - 2. 1818 . . . . . . . . . . . . . . . . .
- C.   Relevant Constitutional Text . . . . . .
- D.   Relevant Connecticut Precedents . . .
- E.   Persuasive Sister State Precedents. . .
- F.   Conclusion . . . . . . . . . . . . . . .

II.  THE DEATH PENALTY FAILS TO COM-PORT WITH CONTEMPORARY STAN-DARDS OF DECENCY. . . . . . . . . . . . .
- A.   Historical Development . . . . . . . . .
- B.   Legislative Enactments . . . . . . . . .
- C.   Current Practice . . . . . . . . . . . . .
- D.   Laws and Practices of Other Jurisdic-tions . . . . . . . . . . . . . . . . . . . .
- E.   Opinions and Recommendations of Pro-fessional Associations . . . . . . . . . .
- F.   Conclusion . . . . . . . . . . . . . . . .

III. THE DEATH PENALTY IS DEVOID OF ANY LEGITIMATE PENOLOGICAL JUSTIFICA-TIONS . . . . . . . . . . . . . . . . . . . . . .
- A.   Deterrence. . . . . . . . . . . . . . . . .
- B.   Retribution . . . . . . . . . . . . . . . .
  - 1. Legislative Judgments. . . . . . . . .
  - 2. Delays. . . . . . . . . . . . . . . . . .
  - 3. Possibility of Error . . . . . . . . . .
  - 4. Caprice and Bias. . . . . . . . . . . .
- C.   Vengeance. . . . . . . . . . . . . . . . . .
- D.   Conclusion . . . . . . . . . . . . . . . .

IV. RESPONSE TO THE DISSENTING JUS-TICES . . . . . . . . . . . . . . . . . . . . . .
- A.   Whether the Questions Decided Are Properly before the Court. . . . . . . .
  - 1. Arguments Allegedly Not Raised by the Defendant . . . . . . . . . . . . .
  - 2. Opportunity for Briefing . . . . . . .
  - 3. Extra-Record Materials . . . . . . . .
- B.   Connecticut's Historical Acceptance of Capital Punishment. . . . . . . . . . . .
- C.   Whether Deference to the Legislature Requires That We Uphold P.A. 12-5 . .

V.   CONCLUSION . . . . . . . . . . . . . . . . . .

PALMER, J. Although the death penalty has been a fixture of Connecticut's criminal law since early colonial times, public opinion concerning it has long been divided. In 2009, growing opposition to capital punishment led the legislature to enact Public Acts 2009, No. 09-107 (P.A. 09-107), which would have repealed the death penalty for all crimes committed on or after the date of enactment but retained the death penalty for capital felonies committed prior to that date. Then Governor M. Jodi Rell vetoed P.A. 09-107, however, and it did not become law. Three years later, in 2012, the legislature passed a materially identical act that prospectively repealed the death penalty; see Public Acts 2012, No. 12-5 (P.A. 12-5); and, this time, Governor Dannel P. Malloy signed it into law. During the public hearings on both P.A. 09-107 and P.A. 12-5, supporters argued that the proposed legislation represented a measured and lawful approach to the issue. Others raised serious concerns, however, as to whether, following a prospective only repeal, the imposition of the death penalty would violate the state constitutional prohibition against cruel and unusual punishment. Perhaps most notably, Chief State's Attorney Kevin T. Kane, who serves as this state's chief law enforcement officer and represents the state in the present case, testified before the legislature that such a statute could not pass constitutional muster.[1] Additionally, the Division of Criminal Justice submitted written testimony, in which it advised the legislature that a prospective only repeal would be a "fiction" and that, "[i]n reality, it would effectively abolish the death penalty for anyone who has not yet been executed because it would be untenable as a matter of constitutional law . . . . [A]ny death penalty that has been imposed and not carried out would effectively be nullified."[2] In the present appeal, the defendant, Eduardo Santiago, raises similar claims, contending that, following the decision by the elected branches to abolish capital punishment for all crimes committed *on or after* April 25, 2012, it would be unconstitutionally cruel and unusual to execute offenders who committed capital crimes before that date. Upon careful consideration of the defendant's claims in light of the governing constitutional principles and Connecticut's unique historical and legal landscape, we are persuaded that, following its prospective abolition, this state's death penalty no longer comports with contemporary standards of decency and no longer serves any legitimate penological purpose. For these reasons, execution of those offenders who committed capital felonies prior to April 25, 2012, would violate the state constitutional prohibition against cruel and unusual punishment.

Following a trial on charges that included capital felony in violation of General Statutes (Rev. to 1999) § 53a-54b (2)[3] and General Statutes § 53a-8, a jury found

the defendant guilty as charged, and the trial court, *Lavine, J.*, rendered judgment accordingly.[4] The court then conducted a penalty phase hearing pursuant to General Statutes (Rev. to 1999) § 53a-46a, at which the jury found the existence of an aggravating factor, one or more jurors found the existence of one or more mitigating factors, and the jury found that the aggravating factor outweighed the mitigating factor or factors. The trial court thereupon imposed a sentence of death,[5] and the defendant appealed to this court from both the judgment of conviction and the death sentence. See *State* v. *Santiago*, 305 Conn. 101, 117–18, 49 A.3d 566 (2012) (*Santiago I*). While the appeal was pending, the legislature repealed the death penalty for all crimes committed on or after the effective date of the repeal, April 25, 2012. See P.A. 12-5. On June 12, 2012, this court ultimately affirmed the judgment of conviction but reversed the sentence of death and remanded the case for a new penalty phase hearing on the ground that the defendant had been deprived of the opportunity to review and use certain potentially mitigating evidence. See *State* v. *Santiago*, supra, 215, 308. Thereafter, the defendant filed a motion for reconsideration in which he asked this court to consider, among other things, whether the prospective repeal leads inexorably to the conclusion that capital punishment has ceased to comport with state constitutional requirements. The adoption of P.A. 12-5, when considered in light of the history of capital punishment in our state and other recent legal developments, compels us to conclude that the death penalty now constitutes cruel and unusual punishment, in violation of the state constitution. Consequently, we reverse the judgment of the trial court with respect to the sentence of death on the capital felony count and remand the case to that court with direction to sentence the defendant to life imprisonment without the possibility of release on that count.[6]

The underlying facts of this case, which are set forth in detail in *Santiago I*, may be summarized briefly as follows. In December, 2000, Mark Pascual agreed to give the defendant a snowmobile from Pascual's repair shop if the defendant would kill the victim, Joseph Niwinski, for whose girlfriend Pascual had developed romantic feelings. Id., 121. That same month, with the assistance of Pascual and another friend, the defendant entered the victim's apartment and shot and killed the victim as he slept. Id., 123. The defendant was charged with, among other things, the capital felony of "murder committed by a defendant who is hired to commit the same for pecuniary gain," in violation of § 53a-54b (2).

In his original appeal to this court, the defendant raised numerous challenges to his conviction of capital felony and his conviction on other charges, as well as his death sentence. Id., 142–46. This court affirmed the defendant's conviction on all counts; see id., 118, 143, 308; and declined his invitation to revisit our prior deci-

sions holding that the death penalty is not a per se violation of the Connecticut constitution.[7] Id., 307. We also concluded, however, that the trial court, *Solomon, J.*, improperly had failed to disclose to the defendant certain confidential records in the possession of the Department of Children and Families that were mitigating in nature. Id., 215, 239–41. Accordingly, we reversed the trial court's judgment with respect to the sentence of death and remanded the case to the trial court for a new penalty phase hearing. Id., 241, 308.

While the defendant's appeal was pending in this court, the legislature passed and the governor signed P.A. 12-5, which repealed the death penalty for all crimes committed on or after the date of passage, April 25, 2012. See generally P.A. 12-5. Shortly before we released our opinion in *Santiago I*, the defendant filed a motion for permission to file a supplemental brief in support of his argument that the prospective abolition of capital punishment barred the state from seeking the death penalty at his new penalty phase hearing. See *State* v. *Santiago*, supra, 307–308 n.167. Specifically, the defendant sought review of what we characterized as four "new appellate claims," the first of which was that, "although his crimes were committed prior to the effective date of [P.A. 12-5], that legislation nevertheless 'represents a fundamental change in the contemporary standard[s] of decency in Connecticut and a rejection of the penological justifications for the death penalty,' rendering the death penalty now cruel and unusual punishment . . . ." Id., 308 n.167.

We denied the defendant's motion, concluding that his new appellate claims would be more appropriately addressed in the context of a postjudgment motion. See id. Thereafter, the defendant filed such a motion, in which he sought reconsideration of our decision in *Santiago I*. In support of his motion, he again maintained, among other things, that P.A. 12-5 "represents a fundamental change in the contemporary standard[s] of decency in Connecticut and a rejection of the penological justifications for the death penalty, eliminating the constitutional prerequisites to the validity of the death penalty, such that it is now cruel and unusual punishment forbidden by . . . article first, §§ 8 and 9, of the [state] constitution . . . ." The defendant also urged this court to order supplemental briefing and further oral argument on this and related issues, particularly in light of the fact that the constitutionality of imposing the death penalty following a prospective only repeal presents a question of first impression in Connecticut and one that, to our knowledge, no jurisdiction has addressed comprehensively in the modern era. See *State* v. *Santiago*, Conn. Supreme Court Records & Briefs, April Term, 2013, Amicus Brief of the American Civil Liberties Union Foundation of Connecticut p. 2. We granted the defendant's motion for reconsideration and request for supplemental briefing and further oral

argument without limitation.[8]

On reconsideration, although the defendant focuses on the claim that P.A. 12-5 creates an impermissible and arbitrary distinction between individuals who committed murders before and after April 25, 2012, in light of the prospective abolition of capital punishment, he also asks this court to "exercise its independent judgment as to the current acceptability of the death penalty in Connecticut." Specifically, he argues that the enactment of P.A. 12-5 means that "the death penalty is no longer consistent with standards of decency in Connecticut and does not serve any valid penological objective." That claim is the sole issue that we address herein.[9]

Public Act 12-5 not only reflects this state's long-standing aversion to carrying out executions, but also represents the seminal change in the four century long history of capital punishment in Connecticut. Accompanying this dramatic departure are a host of other important developments that have transpired over the past several years. Historians have given us new chronicles of the history and devolution of the death penalty in Connecticut. Legal scholars have provided new understandings of the original meaning of the constitutional prohibition against cruel and unusual punishments. Social scientists repeatedly have confirmed that the risk of capital punishment falls disproportionately on people of color and other disadvantaged groups. Meanwhile, nationally, the number of executions and the number of states that allow the death penalty continue to decline, and convicted capital felons in this state remain on death row for decades with every likelihood that they will not be executed for many years to come, if ever. Finally, it has become apparent that the dual federal constitutional requirements applicable to all capital sentencing schemes—namely, that the jury be provided with objective standards to guide its sentence, on the one hand, and that it be accorded unfettered discretion to impose a sentence of less than death, on the other—are fundamentally in conflict and inevitably open the door to impermissible racial and ethnic biases. For all these reasons, and in light of the apparent intent of the legislature in prospectively repealing the death penalty and this state's failure to implement and operate a fair and functional system of capital punishment, we conclude that the state constitution no longer permits the execution of individuals sentenced to death for crimes committed prior to the enactment of P.A. 12-5.

In part I of this opinion, we review the scope, nature, and history of the protections from cruel and unusual punishment afforded by article first, §§ 8 and 9, of the constitution of Connecticut, both as a general matter and as applied to capital punishment in particular. In part II of this opinion, we explain why, in view of the adoption of P.A. 12-5, and the state's near total morato-

rium on carrying out executions over the past fifty-five years, capital punishment has become incompatible with contemporary standards of decency in Connecticut and, therefore, now violates the state constitutional prohibition against excessive and disproportionate punishments. In part III of this opinion, we explain why the prospective repeal also means that the death penalty now fails to satisfy any legitimate penological purpose and is unconstitutionally excessive on that basis as well. Finally, in part IV of this opinion, we address certain general objections raised by the dissenting justices, and we explain why their arguments are unpersuasive.[10]

## I

## STATE CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND UNUSUAL PUNISHMENT

Since this court first considered the constitutionality of capital punishment, we have recognized that, "in the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due."[11] (Internal quotation marks omitted.) *State* v. *Ross*, 230 Conn. 183, 247–48, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); accord *State* v. *Mikolinski*, 256 Conn. 543, 547, 775 A.2d 274 (2001).

It is by now well established that the constitution of Connecticut prohibits cruel and unusual punishments under the auspices of the dual due process provisions contained in article first, §§ 8 and 9.[12] Those due process protections take as their hallmark principles of fundamental fairness rooted in our state's unique common law, statutory, and constitutional traditions. See *State* v. *Ross*, supra, 230 Conn. 246–47; *State* v. *Lamme*, 216 Conn. 172, 178–79, 184, 579 A.2d 484 (1990). Although neither provision of the state constitution expressly references cruel or unusual punishments, it is settled constitutional doctrine that both of our due process clauses prohibit governmental infliction of cruel and unusual punishments. See *State* v. *Rizzo*, 266 Conn. 171, 206, 833 A.2d 363 (2003) (*Rizzo I*); *State* v. *Ross*, supra, 246.

In this part of the opinion, we examine the freedoms from cruel and unusual punishment traditionally enjoyed by the citizens of this state. Because we have not previously undertaken a comprehensive review of these constitutional liberties, we first consider their scope and nature in full, before considering how they apply to the defendant's specific challenge to Connecticut's current capital punishment scheme. In parts II and III of this opinion, we turn to that issue, namely,

whether, in light of the enactment of P.A. 12-5, the Connecticut constitution now forbids the imposition of the death penalty.

In *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992), we identified six nonexclusive tools of analysis to be considered, to the extent applicable, whenever we are called on as a matter of first impression to define the scope and parameters of the state constitution: (1) persuasive relevant federal precedents; (2) historical insights into the intent of our constitutional forebears; (3) the operative constitutional text; (4) related Connecticut precedents; (5) persuasive precedents of other states; and (6) contemporary understandings of applicable economic and sociological norms, or, as otherwise described, relevant public policies.[13] See id., 684–85; see also *State* v. *Rizzo*, supra, 266 Conn. 208. These factors, which we consider in turn, inform our application of the established state constitutional standards—standards that, as we explain hereinafter, derive from United States Supreme Court precedent concerning the eighth amendment—to the defendant's claims in the present case.[14]

## A

### Federal Constitutional Standards

The eighth amendment to the federal constitution establishes the minimum standards for what constitutes impermissibly cruel and unusual punishment.[15] See, e.g., *State* v. *Rizzo*, supra, 266 Conn. 206. Specifically, the United States Supreme Court has indicated that at least three types of punishment may be deemed unconstitutionally cruel: (1) inherently barbaric punishments; (2) excessive and disproportionate punishments; and (3) arbitrary or discriminatory punishments.[16] In *Ross*, we broadly adopted, as a matter of state constitutional law, this federal framework for evaluating challenges to allegedly cruel and unusual punishments.[17] See *State* v. *Ross*, supra, 230 Conn. 252.

### 1

### Inherently Barbaric Punishments

First, the eighth amendment categorically prohibits the imposition of inherently barbaric punishments. *Graham* v. *Florida*, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). This prohibition is directed toward manifestly and unnecessarily cruel punishments, such as torture and other wanton infliction of physical pain. See, e.g., *Gregg* v. *Georgia*, 428 U.S. 153, 170–72, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (opinion announcing judgment); *In re Kemmler*, 136 U.S. 436, 447, 10 S. Ct. 930, 34 L. Ed. 519 (1890). In the context of capital punishment, the eighth amendment also bars particular modes of execution that present a substantial or objectively intolerable risk of inflicting severe pain. *Baze* v. *Rees*, 553 U.S. 35, 50, 52, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008) (opinion announcing judgment).

Excessive and Disproportionate Punishments

Second, the eighth amendment mandates that punishment be proportioned and graduated to the offense of conviction. See *Graham* v. *Florida*, supra, 560 U.S. 59. In the capital punishment context, the United States Supreme Court has held, for example, that the death penalty is categorically excessive and disproportionate when imposed on certain classes of offenders. See, e.g., *Roper* v. *Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (prohibiting execution of individuals who were under eighteen years of age when they committed capital crimes); *Atkins* v. *Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (execution of intellectually disabled individuals was held to be unconstitutional). The court also has concluded that capital punishment is never warranted for nonhomicide crimes against individuals. See, e.g., *Kennedy* v. *Louisiana*, 554 U.S. 407, 446, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008) (death penalty was held to be disproportionate punishment for child rape); *Enmund* v. *Florida*, 458 U.S. 782, 797, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982) (eighth amendment does not permit execution of defendant who did not kill or intend to kill but who played minor role in felony in course of which murder was committed by others); *Coker* v. *Georgia*, 433 U.S. 584, 592 and n.4, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977) (plurality opinion) (sentence of death for rape of adult woman was held to be grossly disproportionate and excessive punishment).

A reviewing court engages in a two stage analysis in determining whether a challenged punishment is unconstitutionally excessive and disproportionate. *Enmund* v. *Florida*, supra, 458 U.S. 788–89. First, the court looks to "objective factors" to determine whether the punishment at issue comports with contemporary standards of decency. (Internal quotation marks omitted.) Id., 788. These objective indicia include "the historical development of the punishment at issue," legislative enactments, and the decisions of prosecutors and sentencing juries. Id.; see also *Roper* v. *Simmons*, supra, 543 U.S. 563; *Thompson* v. *Oklahoma*, 487 U.S. 815, 821–22, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988).

This objective evidence of contemporary social mores, however, does not wholly determine the issue. "Although legislative measures adopted by the people's chosen representatives provide one important means of ascertaining contemporary values, it is evident that legislative judgments alone cannot be determinative of [e]ighth [a]mendment standards since that [a]mendment was intended to safeguard individuals from the abuse of legislative power." *Gregg* v. *Georgia*, supra, 428 U.S. 174 n.19 (opinion announcing judgment). Because the eighth amendment imposes "a restraint

[on] the exercise of legislative power"; id., 174; the United States Supreme Court repeatedly has emphasized that courts must conduct a second stage of analysis in which they bring their own independent judgments to bear, giving careful consideration to the reasons why a civilized society may accept or reject a given penalty. See, e.g., *Hall* v. *Florida*, U.S. , 134 S. Ct. 1986, 1993, 1999–2000, 188 L. Ed. 2d 1007 (2014); *Atkins* v. *Virginia*, supra, 536 U.S. 312; *Thompson* v. *Oklahoma*, supra, 487 U.S. 822–23. "Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for [the court] ultimately to judge whether the [constitution] permits imposition of the death penalty . . . ." *Enmund* v. *Florida*, supra, 458 U.S. 797. Our independent analysis must be informed not only by judicial precedents, but also by our own understanding of the rights secured by the constitution. *Kennedy* v. *Louisiana*, supra, 554 U.S. 434. This analysis necessarily encompasses the question of whether the penalty at issue promotes any of the penal goals that courts and commentators have recognized as legitimate: deterrence, retribution, incapacitation, and rehabilitation.[18] E.g., *Graham* v. *Florida*, supra, 560 U.S. 71. A sentence materially lacking any legitimate penological justification would be nothing more than the "gratuitous infliction of suffering" and, by its very nature, disproportionate. *Gregg* v. *Georgia*, supra, 183 (opinion announcing judgment).

3

Arbitrary or Discriminatory Punishments

Third, the eighth amendment prohibits punishments that are imposed in an "arbitrary and unpredictable fashion . . . ." (Citations omitted; internal quotation marks omitted.) *Kennedy* v. *Louisiana*, supra, 554 U.S. 436. In the context of capital punishment, the United States Supreme Court has indicated that there are two dimensions to this rule.

On the one hand, in *Furman* v. *Georgia*, 408 U.S. 238, 239–40, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), in which the court held, in a per curiam opinion, that capital punishment as then applied violated the eighth amendment, and four years later in *Gregg* v. *Georgia*, supra, 428 U.S. 153, in which the court held that Georgia's revamped capital punishment statute did *not* offend the United States constitution; id., 206–207 (opinion announcing judgment); the court established the principle that a capital sentencing scheme must provide the sentencing authority sufficient guidance as to which crimes and criminals are death worthy to ensure that the death penalty is not imposed in an arbitrary or freakish manner. Id., 192–95 (opinion announcing judgment). "To pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence

on the defendant compared to others found guilty of murder." (Internal quotation marks omitted.) *Lowenfield* v. *Phelps*, 484 U.S. 231, 244, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). "This means that if a [s]tate wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a [s]tate's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates standardless [sentencing] discretion. . . . It must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death."[19] (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Godfrey* v. *Georgia*, 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980) (plurality opinion).

It goes without saying, moreover, that the eighth amendment is offended not only by the random or arbitrary imposition of the death penalty, but also by the greater evils of racial discrimination and other forms of pernicious bias in the selection of who will be executed. See, e.g., *Tuilaepa* v. *California*, 512 U.S. 967, 973, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994) (guarding against bias or caprice in sentencing is "controlling objective" of court's review); see also *Graham* v. *Collins*, 506 U.S. 461, 484, 113 S. Ct. 892, 122 L. Ed. 2d 260 (1993) (Thomas, J., concurring) (racial prejudice is "the paradigmatic capricious and irrational sentencing factor"); *Furman* v. *Georgia*, supra, 408 U.S. 242 (Douglas, J., concurring) (one aim of English Declaration of Rights of 1689, in which eighth amendment language originated, was to forbid discriminatory penalties); *Furman* v. *Georgia*, supra, 310 (Stewart, J., concurring) ("if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race"). The eighth amendment, then, requires that any capital sentencing scheme determine which defendants will be *eligible* for the death penalty on the basis of legitimate, rational, nondiscriminatory factors.

On the other hand, the United States Supreme Court also has insisted that, at the *sentencing* stage, juries must have unlimited discretion to assess "the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson* v. *North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (opinion announcing judgment). The court in *Woodson* held that this sort of individualized sentencing determination is necessary to arrive at a just and appropriate sentence and to honor the eighth amendment's "fundamental respect for humanity . . . ." Id. The court also has consistently indicated that the government has broad dis-

cretion as to whom to prosecute and what charge to file. See, e.g., *Hartman* v. *Moore*, 547 U.S. 250, 263, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006); *McCleskey* v. *Kemp*, 481 U.S. 279, 296–97, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987); *Wayte* v. *United States*, 470 U.S. 598, 607, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985). As currently construed, then, the federal constitution simultaneously requires that states narrowly limit and carefully define which offenders are eligible for capital punishment, while, paradoxically, also giving prosecutors and juries, respectively, virtually unfettered discretion whether actually to charge defendants with capital crimes and whether to sentence convicted offenders to death.

In response to *Furman* and *Gregg*, a majority of the states, including Connecticut, drafted new capital punishment statutes in the 1970s that attempted to define with greater precision that small subset of felonies the commission of which could subject an offender to the ultimate punishment. During the ensuing four decades, a majority of the United States Supreme Court has continued to hold—in the face of persistent dissent—that capital punishment comports with contemporary American standards of decency, satisfies legitimate penological objectives, and is not imposed in an impermissibly arbitrary or discriminatory manner. See, e.g., *Kansas* v. *Marsh*, 548 U.S. 163, 181, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); *McCleskey* v. *Kemp*, supra, 481 U.S. 291–92. That court, however, never has addressed the specific issue raised by the present appeal, namely, whether a state's prospective only repeal of its capital felony statutes renders its continued imposition of the death penalty unconstitutionally excessive and disproportionate punishment. Indeed, the parties have not brought to our attention any case in which a federal court has addressed that question.

### B

### Relevant State Constitutional History

We next consider our state's constitutional and preconstitutional history with respect to the freedom from cruel and unusual punishment.[20] We consider, first, the preconstitutional era and the legal traditions that inform the meaning of the Connecticut constitution and, second, the period leading up to the adoption of the Connecticut constitution of 1818.[21]

### 1

### Preconstitutional Legal Traditions

We first consider the preconstitutional roots of the freedom from cruel and unusual punishment in Connecticut. As early as 1672, our colonial code, which incorporated a quasi-constitutional statement of individual liberties, provided that, "for bodily punishment, none shall be inflicted that are Inhumane, Barbarous or Cruel."[22] The Book of the General Laws for the People within the Jurisdiction of Connecticut (1672) p. 58

(Laws of Connecticut); see also W. Holdsworth, Law and Society in Colonial Connecticut, 1636–1672 (1974) p. 484 (unpublished doctoral dissertation, Claremont Graduate School) (explaining that 1672 code incorporated what were, in essence, constitutional statutes). The 1672 code also differed from prior Connecticut statutes in that it (1) forbade the use of torture to extract confessions, (2) placed new restrictions on the use of corporal punishment, and (3) afforded novel procedural rights to criminal defendants, especially in capital cases.[23] See Laws of Connecticut, supra, p. 65; W. Holdsworth, supra, pp. 513–14, 527, 539, 581. Many of these protections, in turn, derived from the Massachusetts Body of Liberties of 1641; see C. Collier, "The Common Law and Individual Rights in Connecticut Before the Federal Bill of Rights," 76 Conn. B.J. 1, 12 (2002); a declaration of rights that was far more progressive[24] than English law at that time.[25] See A. Granucci, " 'Nor Cruel and Unusual Punishments Inflicted:' The Original Meaning," 57 Calif. L. Rev. 839, 851 (1969).

In perhaps the most substantial scholarly account of the early legal traditions of the Connecticut colony, William K. Holdsworth offers a window into the original meaning of Connecticut's inceptive prohibition of cruel punishment. Holdsworth describes the years leading up to the adoption of the 1672 code as a key formative period in the colony's legal history. W. Holdsworth, supra, p. x. "The decade [of 1662 through 1672] was a watershed in the early history of Connecticut," he explains, "a period of profound intellectual, social, economic, and political change that set the colony on a course of its own." Id., p. 582. During this period of "extraordinarily rapid and vital change"; id., p. 479; a new generation of leaders restructured the colony's political and judicial systems. See id., pp. 479–80, 547–48. The legislature "made fairer use of its juries . . . gave formal recognition to numerous civil liberties, displayed a greater awareness of individual rights, dealt less severely with most criminal offenders than before, and, either formally or in practice, reduced the penalties for several capital crimes." Id., pp. 547–48. In the process, Connecticut's new leaders bequeathed to its citizens a "legacy of moderation . . . ." Id., p. 545.

During the decade, dramatic shifts in public, judicial, and executive attitudes toward crime and punishment resulted in fundamental changes in how the criminal law was applied, changes that directly foreshadowed the prohibition against cruel punishment and other freedoms that the legislature enshrined in the 1772 code. "[N]ew social conditions and new attitudes on the part of the people and their leaders" that emerged during the decade of 1662 through 1672 were mirrored by a growing judicial leniency.[26] Id., p. 537. Magistrates enjoyed considerable latitude in enforcing the nascent criminal code during this period, and Holdsworth suggests that the penalties that were actually imposed may

provide a more accurate picture of Connecticut's early legal landscape, and particularly of public attitudes regarding what constituted acceptable punishment, than the first legal codes themselves provided. See id., pp. 353–54. Although the punishments prescribed often were severe, the criminal law generally was enforced without "needless cruelty" in the 1660s; id., p. 286; and, over the course of the decade, courts became increasingly lenient in the sanctions they imposed. See id., pp. 286–87, 363, 576. Whipping began to fall out of favor, for example, with fines—and, in the case of fornication, mandatory marriage—emerging as the primary sanction for many sexual crimes and crimes against property. See id., pp. 292, 295–300, 313–17. More brutal forms of corporal punishment "all but disappeared . . . ." Id., p. 364. Christopher Collier, Connecticut's state historian, observed that, "through the imposition of lenient punishments outside of statutory specifications, nonenforcement of restrictive statutes, a tendency to let local consensus be their guide, and a punctilious regard for due process . . . Connecticut's jurists lightened the load of ancient oppressive laws . . . ." C. Collier, supra, 76 Conn. B.J. 49–50.

"[This unmistakable] tendency toward judicial moderation in the use of physical punishments in the years [1662 through 1675] . . . is all the more pronounced when we consider capital crimes and capital punishment." W. Holdsworth, supra, p. 365. As public attitudes evolved, magistrates grew more reluctant to inflict capital punishment and came to believe that the death penalty should be reserved for only the most heinous and universally condemned offenses. See id., pp. 382, 431. Before adultery was demoted from a capital offense to a lesser crime in 1672; C. Collier, supra, 76 Conn. B.J. 19; for example, "magistrates displayed marked reluctance to inflict death for the offense"; W. Holdsworth, supra, p. 533; and courts found ways to avoid imposing the statutory death penalty on adulterers. C. Collier, supra, 19 n.42. By the 1670s, courts also were demonstrating less willingness "to exact the full measure of retribution" for sodomy and other capital crimes. W. Holdsworth, supra, p. 418; see also id., pp. 371, 519. In 1677, for example, a jury declined to convict Nicholas Sension of capital sodomy, despite what Holdsworth suggests was clear evidence of his guilt. See id., pp. 418–19.

Even more than the courts, however, it was Connecticut's forward thinking governor, John Winthrop, Jr., a leading colonial physician and scientist, who was responsible for the restraint that the colony began to exercise in the 1660s with respect to capital crimes ranging from witchcraft and blasphemy, on the one hand, to adultery, sodomy, and rape, on the other. See id., pp. 522–25, 579–80. Governor Winthrop's "legendary toleration and the force of his moderating influence over the affairs of his colony" effectively extinguished

the colony's hysteria over witchcraft, and ultimately resulted in the delisting of adultery as a capital crime in 1672.[27] Id., p. 580. Holdsworth concludes that this dramatic evolution in public and judicial attitudes toward crime and penology during the 1660s directly influenced the decision in 1672 to adopt key freedoms that Massachusetts afforded its criminal defendants, including the freedoms from inhumane, barbarous and cruel punishments, in addition to torture, when formulating the new colonial statutes. See id., pp. 513, 537, 539, 582. "The [c]ode of 1672 expounded in the language of law the new ideal of a new generation, a more moderate, more explicit, more progressive conception" of crime and punishment. Id., p. 582. "By giving formal legal recognition to many of the changes that had transpired during the preceding decade," Holdsworth explains, "the [c]ode of 1672 reflected to a greater extent than its predecessor the essential institutional character that was to mark Connecticut for the remainder of the colonial period." Id., p. 583.

In addition to abolishing such brutal forms of capital punishment as flogging to death and breaking on the wheel, the 1672 code lessened the severity of many criminal sanctions, reducing the maximum number of lashes that could be imposed for noncapital crimes and replacing whipping with imprisonment as the penalty for others. See id., pp. 513, 537–39, 576. Moreover, although legislators did retain severe corporal punishments such as branding, which replaced death as the penalty for those crimes that were decapitalized in 1672, court records indicate that such punishments were rarely if ever inflicted. See id., pp. 535, 576.

It is apparent from this history that, long before the adoption of either the federal or state constitution, Connecticut citizens enjoyed a quasi-constitutional freedom from cruel punishment, one that reflected our unique social and political traditions and that far exceeded the protections recognized in England at the time. These protections were enshrined in Connecticut's early constitutional statutes and common law, and, from the start, were intimately tied to the principles of due process.

2

1818

We next consider the historical circumstances leading up to the adoption of the state constitution in 1818. The late eighteenth and early nineteenth centuries witnessed the twilight of a premodern system of criminal justice in the United States. See generally note, "The Eighth Amendment, Proportionality, and the Changing Meaning of 'Punishments,'" 122 Harv. L. Rev. 960 (2009). The rapid evolution in penology that occurred in the decades following the founding was especially pronounced in Connecticut. The late eighteenth and

early nineteenth centuries in Connecticut witnessed a pronounced liberalization in public, legislative, and judicial attitudes toward crime and punishment. The period has been described as one characterized by penological reform, a broader commitment to human rights, and the first serious public questioning of the moral legitimacy of capital punishment. See L. Goodheart, The Solemn Sentence of Death: Capital Punishment in Connecticut (2011) pp. 69–70. This time between the adoption of the federal and state constitutions also saw an emerging awareness of and compassion for "the fate of the condemned perpetrator." Id., p. 85. These changes coincided with the reopening of the newly established Newgate Prison (Newgate) in 1790, which provided the opportunity to impose incarceration as an alternative to more severe traditional punishments. See id., p. 75.

During this period, Connecticut's legislators, jurists, and citizens refined their understanding of what constituted cruel and unusual punishment. Nowhere was this more apparent than in the repudiation of corporal punishment as a legitimate penal sanction. "With the establishment of a [s]tate prison, many of the barbarous punishments [began] to disappear from the statute book, replaced by confinement for a term of years." Judicial and Civil History of Connecticut (D. Loomis & J. Calhoun eds., 1895) p. 98. In 1808, for instance, "legislators crafted a less draconian statute for the regulation of female sexuality"; L. Goodheart, supra, p. 77; and, by the middle of the next decade, a broad consensus had emerged in the state that corporal punishment of any sort was degrading and debasing. See id., pp. 77–78. When the criminal code was revised in 1821 to comport with the state constitution of 1818, bodily punishment was largely abolished. See Judicial and Civil History of Connecticut, supra, pp. 98–99. The last vestige of the old system, the whipping post, survived only one decade more as a punishment for theft.[28] Id., p. 99.

Connecticut's earliest reported judicial decisions indicate that the courts, like the legislature, had begun to adopt a broader conception of cruel and unusual punishment in the years leading up to the adoption of the 1818 constitution. In *State* v. *Smith*, 5 Day (Conn.) 175 (1811), for example, the defendant argued that imposing successive terms of imprisonment in Newgate for multiple incidents of counterfeiting was "novel, without precedent, cruel and illegal." Id., 178. A majority of this court ultimately denied the requested relief, but only because it concluded that "[n]o injustice [was] done to the prisoner; and this proceeding [was] neither new, nor without precedent; such [had] been the usage of our courts, for many years past, in this state." Id., 179. Indeed, the majority went out of its way to note that courts "are bound to become acquainted with the situation and circumstances of the prisoner, when they pronounce the sentence. If through infirmity, it should appear to be inhuman or improper to confine him to

hard labor, in Newgate, immediately upon conviction, it would be the duty of the court to postpone the commencement of his confinement, to a future day." Id.

That Connecticut had developed by the turn of the nineteenth century a more expansive conception of what constituted impermissibly cruel punishment is further revealed in the writings of former Chief Justice Zephaniah Swift. Swift did not hesitate to condemn as "cruel and illiberal" not only corporal punishment and the like, but also what he saw as outmoded and unjust common-law traditions. 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 398. Practices ranging from false imprisonment, to the denial of defense counsel in capital cases, to punishing a parent for harboring a fugitive child were all, to Swift, examples of cruelties that the law ought not countenance. See id., pp. 58, 371–72, 398–99. Swift was especially troubled by the traditional English punishment for suicide—forfeiture of the deceased's estate and burial on a public highway with a stake driven through the body—which he characterized as the product of a "barbarous period of superstition, and cruelty." Id., p. 304.[29]

Nor was capital punishment immune from these broader currents in Connecticut's criminal justice system. Opposition to capital punishment gained traction in the decade before the adoption of the 1818 state constitution. In 1808, then Judge Swift instructed a grand jury that courts were adopting a "milder practice" in applying the capital law. (Internal quotation marks omitted.) L. Goodheart, supra, p. 76; see also id., p. 71. The following year, in a speech to the legislature, Lieutenant Governor John Treadwell shared his view that "[c]onfinement in Newgate . . . [was] terrible, but not cruel; and it [was] probably more effectual to prevent [atrocious] crimes, than capital punishment . . . ." J. Treadwell, "Lieutenant Governor Treadwell's Speech to the Legislature of Connecticut: October, 1809," The American Register, January 1, 1810, p. 6. Although he lamented that there were few penitents among the inmates housed at Newgate, Treadwell proposed that providing them with Bibles and religious instruction might have a beneficial effect. See id.

Finally, in a series of events that culminated in the decision to convene a constitutional convention, the legislature voted in 1816 to grant a new trial for Peter Lung, who had been condemned to die for the murder of his wife. J. Zeldes, "Connecticut's Most Memorable 'Good for Nothing Rascal' in This 'Land of Steady Habits,'" 80 Conn. B.J. 367, 380–81, 393–94 (2006). The deciding vote in favor of a retrial was cast by a member of the governing council who "was not willing that a man should be [hanged as a result of] his vote."[30] (Internal quotation marks omitted.) Id., 394. Following his conviction upon retrial, Lung was in fact hanged. The following week, the Middlesex Gazette published an

article remarking on the "infrequency of capital punishment" and observing that the "[behavior] of this unfortunate sufferer on this trying occasion, was such as to attract the tenderest sympathy of every rational beholder." "Execution," Middlesex Gazzette, reprinted in The Weekly Recorder: A Newpaper Conveying Important Intelligence and Other Useful Matter Under the Three General Heads of Theology, Literature and National Affairs, July 31, 1816, p. 8.

In summary, it is clear that, from the earliest days of the colonies, and extending until the adoption of the state constitution in 1818,[31] the people of Connecticut saw themselves as enjoying significant freedoms from cruel and unusual punishment, freedoms that were safeguarded by our courts and enshrined in our state's preconstitutional statutory and common law. That our history reveals a particular sensitivity to such concerns warrants our scrupulous and independent review of allegedly cruel and unusual practices and punishments, and informs our analysis thereof.

### C

#### Relevant Constitutional Text

We next consider the relevant provisions of the state constitution. In light of our state's firm and enduring commitment to the principle that even those offenders who commit the most heinous crimes should not be subjected to inhumane, barbarous, or cruel punishment, the question naturally arises why the framers of the 1818 constitution decided to embed these traditional liberties in our dual due process clauses; see Conn. Const. (1818), art. I, §§ 9 and 10; rather than in an express punishments clause. Although there is no indication that that question was debated during the 1818 constitutional convention, we find guidance in the broader legal history of turn of the century Connecticut.

Connecticut was among three of the original thirteen states that chose not to officially ratify the eighth amendment or, indeed, any of the first ten amendments to the federal constitution.[32] C. Leedham, Our Changing Constitution (1964) p. 41. In 1787, the state's representatives to the federal constitutional convention had argued vehemently against the need for a bill of rights. See C. Collier, supra, 57, 67. "In Connecticut, unlike those states that had recently been under the domination of royal and proprietary governors and appointed upper houses, limited government was taken for granted. Calvinist theory described limited government, [Connecticut's] Fundamental Orders [of 1639] proclaimed it, the [Connecticut] Charter [of 1662] established it, tradition demanded it, common law enforced it, and frequent elections guaranteed it." Id., 53. During the late eighteenth and early nineteenth centuries, for example, Connecticut courts routinely safeguarded the basic rights enshrined in the federal Bill of Rights on

the basis of natural rights or common law, without the need for any formal constitutional sanction. See id., 31, 65. Moreover, there was a particular fear in Connecticut that the adoption of a written bill of rights would imply, by negative inference, that citizens were no longer entitled to unenumerated protections long enshrined in the state's common law.[33] See id., 56–59. "A strong statewide consensus, then, held that no bill of rights was necessary and, indeed, might even limit individual liberty." Id., 57.

Although this viewpoint had become less prevalent by 1818, when Connecticut adopted its first formal constitution; see id., 68–69; it retained many "influential adherents . . . ." Id., 69. This likely accounts for the fact that certain protections long entrenched in the state's constitutional common law were not expressly enumerated in the new written constitution. Indeed, in an 1821 speech, Governor Oliver Wolcott called on Connecticut's courts to articulate and protect the many natural rights that remained unenumerated by either constitution or statute. See id., 37–38.

Accordingly, in *Moore* v. *Ganim*, 233 Conn. 557, 660 A.2d 742 (1995), we "assume[d] that the framers believed that individuals would continue to possess certain natural rights even if those rights were not enumerated in the written constitution. On the basis of this assumption, we [would] not draw firm conclusions from the silence of the constitutional text. . . . Rather, in determining whether unenumerated rights were incorporated into the constitution, we must focus on the framers' understanding of whether a particular right was part of the natural law, i.e., on the framers' understanding of whether the particular right was so fundamental to an ordered society that it did not require explicit enumeration. We can discern the framers' understanding, of course, only by examining the historical sources." (Emphasis omitted.) Id., 601.

In her dissenting opinion, Chief Justice Rogers cites to *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 60, 469 A.2d 1201 (1984), for the proposition that, by the time the 1818 constitution was adopted, the view that the basic liberties of the people should be enshrined in a written constitution had come to prevail in Connecticut. See footnote 6 of Chief Justice Rogers' dissenting opinion. Chief Justice Rogers, however, neglects to consider an adjacent passage in *Cologne* that recognizes that "[a]n opposing view was expressed that such a detailed specification of individual rights was superfluous and tended to abridge them, because all governmental powers not granted by the constitution were reserved to the people." *Cologne* v. *Westfarms Associates*, supra, 60. In fact, history reveals that article first of the 1818 constitution was born of and reflected a compromise between these two constitutional philosophies. See R. Purcell, Connecticut in Transition: 1775–

1818 (New Ed. 1963) pp. 241–42 (discussing opposition to bill of rights at constitutional convention and implying that ultimate decision of which freedoms to enshrine and which to exclude was somewhat haphazard); J. Trumbull, Historical Notes on the Constitutions of Connecticut and on the Constitutional Convention of 1818 (1873) p. 53 (identifying prominent delegates to convention who opposed incorporation of any bill of rights in state constitution); J. Trumbull, supra, p. 56 (recognizing ultimate compromise). For these reasons, we find little merit in the argument that the decision of the framers of the Connecticut constitution not to include an express bar on cruel and unusual punishment somehow suggests that this liberty was uncherished.

D

Relevant Connecticut Precedents

Turning to the next *Geisler* factor, namely, relevant Connecticut precedents, we write on a relatively blank slate with respect to cruel and unusual punishment. Nevertheless, since this court first recognized in *Ross* that our due process clauses independently prohibit cruel and unusual punishment; see *State* v. *Ross*, supra, 230 Conn. 246–47; we have begun to carve out the broad contours of that prohibition. In *Ross* itself, as we have noted, we adopted the aforementioned federal framework for evaluating challenges to allegedly cruel and unusual punishments. See id., 252. Specifically, we recognized that, under the state constitution, whether a challenged punishment is cruel and unusual is to be judged according to the "evolving standards of human decency"; id., 251; and that those standards are reflected not only in constitutional and legislative text, but also "in our history and in the teachings of the jurisprudence of our sister states as well as that of the federal courts." Id. In *Ross*, we also rejected the theory that "article first, § 9, confers the authority to determine what constitutes cruel and unusual punishment solely on the Connecticut legislature and not on the courts." Id., 248. "Although we should exercise our authority with great restraint," we explained, "this court cannot abdicate its nondelegable responsibility for the adjudication of constitutional rights." Id., 249.

Subsequently, in *Rizzo I*, we characterized it as "settled constitutional doctrine that, independently of federal constitutional requirements, our due process clauses, because they prohibit cruel and unusual punishment, impose constitutional limits on the imposition of the death penalty." *State* v. *Rizzo*, supra, 266 Conn. 206. In that case, we recognized that there is an "overarching concern for consistency and reliability in the imposition of the death penalty" under our state constitution. (Emphasis omitted.) Id., 233. Accordingly, in order to avoid having to resolve the state constitutional question raised in that case, we construed General Stat-

utes (Rev. to 1997) § 53a-46a to require that a jury must find beyond a reasonable doubt that the death penalty is the appropriate penalty.[34] See id., 234.

Most recently, in *State* v. *Rizzo*, 303 Conn. 71, 184–201, 31 A.3d 1094 (2011) (*Rizzo II*), cert. denied, U.S.  , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012), we engaged in a full analysis of the constitutionality of the death penalty pursuant to the state constitution. At that time, we reiterated that, "in determining whether a particular punishment is cruel and unusual in violation of [state] constitutional standards, we must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society."[35] (Internal quotation marks omitted.) Id., 187–88. We also "recognize[d] that assessing the propriety of [a punishment] is not exclusively the domain of the legislature, and that this court has an independent duty to determine that the penalty remains constitutionally viable as the sensibilities of our citizens evolve." Id., 197. We return to these well established principles in parts II and III of this opinion.

E

Persuasive Sister State Precedents

The unique structure and text of the Connecticut constitution of 1965, in which the freedom from cruel and unusual punishment is embedded in our dual due process clauses rather than in a distinct punishments clause, mean that sister state authority is less directly relevant than in cases in which we have construed other constitutional provisions. We do agree with our sister courts, however, that, under the state constitution, the pertinent standards by which we judge the fairness, decency, and efficacy of a punishment are necessarily those of Connecticut. Although regional, national, and international norms may inform our analysis; see, e.g., *State* v. *Rizzo*, supra, 303 Conn. 188–96; the ultimate question is whether capital punishment has come to be excessive and disproportionate *in Connecticut*. Cf. *Fleming* v. *Zant*, 259 Ga. 687, 690, 386 S.E.2d 339 (1989) ("[t]he standard of decency that is relevant to the interpretation of the prohibition against cruel and unusual punishment found in the Georgia [c]onstitution is the standard of the people of Georgia, not the national standard" [internal quotation marks omitted]); *District Attorney* v. *Watson*, 381 Mass. 648, 661, 664–65, 411 N.E.2d 1274 (1980) (holding that death penalty violated state constitution on basis of contemporary standards of decency in Massachusetts);[36] J. Acker & E. Walsh, "Challenging the Death Penalty under State Constitutions," 42 Vand. L. Rev. 1299, 1325 (1989) ("[e]ven if state courts are guided by the doctrinal analysis now associated with the eighth amendment, their frame of reference for measuring evolving standards of decency must be within state borders" [internal quotation marks omitted]); cf. also *Kerrigan* v. *Commissioner of Public*

*Health*, 289 Conn. 135, 188–213, 957 A.2d 407 (2008) (in context of determining whether gay persons are entitled to heightened protection for equal protection purposes under state constitution, court assessed their political power or lack thereof in Connecticut). Justice Zarella's arguments to the contrary notwithstanding, we also agree with those courts that have determined that it is perfectly reasonable to apply the federal evolving standards of decency rubric to cruel and unusual punishment claims brought under a state constitution. See, e.g., *People* v. *Anderson*, 6 Cal. 3d 628, 647–48, 493 P.2d 880, 100 Cal. Rptr. 152, cert. denied, 406 U.S. 958, 92 S. Ct. 2060, 32 L. Ed. 2d 344 (1972);[37] *Fleming* v. *Zant*, supra, 689–90; *District Attorney* v. *Watson*, supra, 661–62. Indeed, we are not aware of any court that has concluded that the federal evolving standards of decency rubric is inapplicable to state constitutional claims.

### F

### Conclusion

To summarize our analysis of the first five *Geisler* factors, when construing the state constitutional freedom from cruel and unusual punishment, we broadly adopt the framework that the federal courts have used to evaluate eighth amendment challenges. We apply this framework, however, with respect to the constitutional facts as they exist in Connecticut and mindful of our state's unique and expansive constitutional and preconstitutional history. To the extent that the sixth *Geisler* factor—economic and sociological norms and policy considerations—is relevant, we take such considerations into account in parts II and III of this opinion, in which we address the defendant's specific constitutional challenge.[38]

### II

### THE DEATH PENALTY FAILS TO COMPORT WITH CONTEMPORARY STANDARDS OF DECENCY

We next consider whether the death penalty, as currently imposed in Connecticut, and following the enactment of P.A. 12-5, is so out of step with our contemporary standards of decency as to violate the state constitutional ban on excessive and disproportionate punishment. We conclude that it is.

As we previously noted, both the federal and state constitutions prohibit the imposition of any punishment that is not proportioned and graduated to the offense of conviction. Whether a punishment is disproportionate and excessive is to be judged by the contemporary, "evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, supra, 356 U.S. 101 (plurality opinion); accord *State* v. *Rizzo*, supra, 303 Conn. 187–88. In other words, the constitutional guarantee against excessive punishment is "not fas-

tened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems* v. *United States*, 217 U.S. 349, 378, 30 S. Ct. 544, 54 L. Ed. 793 (1910); see also *Hall* v. *Florida*, supra, 134 S. Ct. 1992 ("[t]he [e]ighth [a]mendment's protection of dignity reflects the [n]ation we have been, the [n]ation we are, and the [n]ation we aspire to be"). Because the legal standard is an evolving one, it is both necessary and appropriate for us to consider the issue anew, in light of relevant recent developments, when it is raised.[39] See *State* v. *Rizzo*, supra, 303 Conn. 187–88.

On only two prior occasions has this court considered in any depth whether capital punishment violates the state constitutional ban on cruel and unusual punishment. See *State* v. *Rizzo*, supra, 303 Conn. 184–201; *State* v. *Ross*, supra, 230 Conn. 248–52. In those cases, we considered—and at times blurred the lines between—two distinct constitutional challenges: (1) the claim that capital punishment is inherently barbaric punishment and, therefore, offends the constitution at all times and under all circumstances; and (2) the claim that, although capital punishment may once have comported with constitutional requirements, our state's standards of decency have evolved such that execution now constitutes excessive and disproportionate punishment. See *State* v. *Rizzo*, supra, 303 Conn. 187–88; *State* v. *Ross*, supra, 248, 250. The dissenting justice in *Ross* likewise challenged capital punishment along both parameters. Compare *State* v. *Ross*, supra, 298 (*Berdon, J.*, dissenting in part) ("[t]he punishment of death is inherently degrading to the dignity of a human being"), with id., 301–313 (*Berdon, J.*, dissenting in part) (arguing that, inter alia, public no longer supports death penalty, penalty is unfairly applied, and recent evidence does not bear out deterrent effect).

The majority in *Ross*—consisting of two members of this court and two Appellate Court judges sitting by designation—focused its attention on the per se question of whether the "imposition of the death penalty invariably constitutes cruel and unusual punishment." Id., 245. The majority evaluated the constitutionality of the death penalty under the rubric of the six *Geisler* factors. Id., 249–52. Dispensing with five of the factors in a single paragraph, the majority in *Ross* afforded each consideration no more than one sentence of attention.[40] See id., 249–50. The sixth *Geisler* factor, which encompasses the full panoply of economic and sociological norms and policy considerations, received only slightly more attention. See id., 251–52.

With respect to the contention that the death penalty is fundamentally offensive to evolving standards of decency, the majority dismissed the claim of the defendant, Michael B. Ross, with a one sentence quote from the New Jersey Supreme Court: "When, in the course of a decade, thirty-seven states call for the death pen-

alty, the probability that the legislature of each state accurately reflects its community's standards approaches certainty." (Internal quotation marks omitted.) Id., 251, quoting *State* v. *Ramseur*, 106 N.J. 123, 173, 524 A.2d 188 (1987). In his lengthy dissent, Justice Berdon lamented that the majority had given so novel and weighty a question such "cursory analysis . . . ."[41] *State* v. *Ross*, supra, 230 Conn. 295 (*Berdon, J.*, dissenting in part).

Subsequently, this court reiterated the holding of, or merely cited to *Ross*, without any further elaboration, in one-half dozen cases presenting facial challenges to the death penalty under the state constitution. See *State* v. *Colon*, 272 Conn. 106, 383, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Breton*, 264 Conn. 327, 418, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); *State* v. *Reynolds*, 264 Conn. 1, 236, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Cobb*, 251 Conn. 285, 497, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb*, 238 Conn. 389, 402–405, 680 A.2d 147 (1996);[42] *State* v. *Breton*, 235 Conn. 206, 217–18, 663 A.2d 1026 (1995). Accordingly, it was not until 2011, in *Rizzo II*, that we first seriously explored the scope of the state constitutional ban on cruel and unusual punishment with regard to the modern death penalty. See *State* v. *Rizzo*, supra, 303 Conn. 184–201.

In *Rizzo II*, as in *Ross*, we had no difficulty rejecting the defendant's facial challenge, reasoning that a penalty that is referenced explicitly in the state constitution cannot have been unconstitutional at all times and under all circumstances. See id., 188. In that case, however, we also recognized that the fact that capital punishment has been practiced throughout much of our state's history and was considered constitutional in 1818 says little about its legal status two centuries later. See id., 187–88. Rather, under the governing legal framework, "we must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society. . . . This is because [t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." (Internal quotation marks omitted.) Id.; see also *People* v. *Anderson*, supra, 6 Cal. 3d 637–39 (incidental references to death penalty in state constitution merely acknowledge that penalty was in use at time of drafting and do not enshrine its constitutional status as standards of decency evolve); *District Attorney* v. *Watson*, supra, 381 Mass. 660–62 (interpretation of state constitutional prohibition against cruel and unusual punishment is not static and depends on contemporary moral standards).

In *Rizzo II*, we also recognized that whether the death penalty constitutes excessive and disproportionate punishment is a subtler and more nuanced question than the majority in *Ross* had acknowledged. Our understanding of what constitutes excessive punishment is informed not only by the laws on the books, both in Connecticut and elsewhere, but also by developments in how those laws are applied by prosecutors and sentencing juries. See *State* v. *Rizzo*, supra, 303 Conn. 188–98. Accordingly, we undertook a more sweeping review of contemporary social mores and the actual implementation of capital punishment at the state, national and even international levels. See id. We ultimately concluded, however, that "there remain[ed] powerful evidence of strong public support for the death penalty in the form of long-standing laws enacted by the democratically elected representatives of this state and other jurisdictions within the United States . . . ." Id., 198. Notwithstanding various indications that there had been a drop off in support for the death penalty, we perceived no "dramatic shift" in the constitutional or legislative landscape. (Internal quotation marks omitted.) Id., 191.

We first take this opportunity to clarify that, although a sudden sea change in public opinion would be sufficient to demonstrate a constitutionally significant shift in contemporary standards of decency, such a dramatic shift is not necessary for us to recognize that a punishment has become repugnant to the state constitution. If the legally salient metaphor is the *evolution* of our standards of decency, then a gradual but inexorable extinction may be as significant as the sociological equivalent of the meteor that, it is believed, suddenly ended the reign of the dinosaurs. In any event, new insights into the history of capital punishment in Connecticut, in tandem with the legislature's 2012 decision to abolish the death penalty prospectively, persuade us that we now have not only a clear picture of the long, steady devolution of capital punishment in our state, and, indeed, throughout New England, but also a dramatic and definitive statement by our elected officials that the death penalty no longer can be justified as a necessary or appropriate tool of justice.

This court and the United States Supreme Court have looked to five objective indicia of society's evolving standards of decency: (1) the historical development of the punishment at issue; (2) legislative enactments; (3) the current practice of prosecutors and sentencing juries; (4) the laws and practices of other jurisdictions; and (5) the opinions and recommendations of professional associations.[43] See, e.g., *Graham* v. *Florida*, supra, 560 U.S. 61–67; *Atkins* v. *Virginia*, supra, 536 U.S. 311–16; *Thompson* v. *Oklahoma*, supra, 487 U.S. 830; *Enmund* v. *Florida*, supra, 458 U.S. 788–89; *State* v. *Rizzo*, supra, 303 Conn. 187–96. We consider each

factor in turn.

## A

### Historical Development

We begin by considering "the historical development of the punishment at issue . . . ." *Enmund* v. *Florida*, supra, 458 U.S. 788. The history of capital punishment in Connecticut is especially important both because substantial new historical information has become available in recent years and because the ultimate legal question—whether the death penalty remains consonant with our evolving standards of decency following the enactment of P.A. 12-5—necessarily requires that we consider the broader historical perspective. We cannot ascertain how our moral standards have *evolved* without first understanding what they once were.[44]

Our task in this regard has been greatly facilitated by Professor Lawrence B. Goodheart, who recently published the first comprehensive history of capital punishment in Connecticut in "The Solemn Sentence of Death: Capital Punishment in Connecticut." Beginning with the founding of the Connecticut and New Haven colonies in the 1600s, and proceeding methodically through the first decade of the current millennium, Goodheart's award winning[45] book traces nearly 400 years of the state's implementation and public perception of the death penalty. Two recurring themes emerge from this survey. First, the acceptability of imposing death as a form of judicial punishment has declined steadily over Connecticut's nearly 400 year history. Secularization, evolving moral standards, new constitutional and procedural protections, and the availability of incarceration as a viable alternative to execution have resulted in capital punishment being available for far fewer crimes and criminals, and being imposed far less frequently, with a concomitant deterioration in public acceptance. Second, what has *not* changed is that, throughout every period of our state's history, the death penalty has been imposed disproportionately on those whom society has marginalized socially, politically, and economically: people of color, the poor and uneducated, and unpopular immigrant and ethnic groups. It always has been easier for us to execute those we see as inferior or less intrinsically worthy.

Beginning with the seventeenth century, Goodheart explains that early Connecticut penal statutes reflected the Puritans' deep-seated commitment to the Mosaic legal code of the Old Testament. See L. Goodheart, supra, pp. 10–12. In 1656, the New Haven colony recognized twenty-three different capital crimes. Id., p. 12. An individual could be executed for conduct offending the colony's strict religious sensibilities (e.g., idolatry, witchcraft, blasphemy, cursing or smiting a parent, defiance by a rebellious son, profaning the Sabbath); for behavior deemed to be sexually deviant (adultery, mas-

turbation, bestiality, heterosexual and homosexual sodomy, incest); for repeated incidents of burglary or robbery; as well as for rape, rebellion, and killing of various sorts. See id. From the founding of the colonies through the end of the seventeenth century, more people were executed in Connecticut for witchcraft (eleven) and for sexual infractions, such as bestiality and sodomy (eleven, including one rape), than for homicide (ten). See id., pp. 17, 22, 33.

Even in that era, however, judges and juries often hesitated to enforce the capital laws as written. See, e.g., C. Collier, supra, 76 Conn. B.J. 19 n.42. In many adultery cases, for example, courts avoided imposing the ultimate punishment by finding the parties not guilty but "highly suspicious," and thus imposing a sentence of something other than death. Id.

Commencing with the Age of Enlightenment in the late 1600s, and continuing for the next three plus centuries, Connecticut's courts and elected officials have steadily pared back the number and types of crimes deemed worthy of the ultimate punishment. See generally L. Goodheart, supra, cc. 2–7. By the early 1660s, juries, magistrates, and the governor himself all were taking steps to, in essence, decapitalize crimes such as sodomy, blasphemy, and witchcraft, in keeping with the public's increasingly secular attitudes toward crime and punishment. See part I B 1 of this opinion. The last executions for bestiality and witchcraft were carried out in 1662 and 1663, respectively. L. Goodheart, supra, pp. 33, 97. Adultery was delisted as a capital offense in 1672, the same year Thomas Rood was executed for incest, and, since then, no one has been executed in Connecticut for any nonviolent sexual crime. See id., p. 31. The revised Connecticut laws of 1750 removed the capital crimes of idolatry, man stealing, and various offenses of rebellious offspring from the books; id., pp. 38, 45–49; and, two years later, the General Assembly blocked an execution for the crime of blasphemy, effectively decapitalizing that crime. Id., pp. 49, 68. The last execution in Connecticut for infanticide, a charge under which married and unmarried mothers were treated differently,[46] took place in 1753; id., p. 57; followed in 1768 by the last hanging for burglary or any purely economic crime. Id., pp. 65–66.

The colonialists' commitment to Mosaic eye for an eye justice had been grounded not only in their religious convictions, but also in the fact that they lacked any viable alternatives to execution. See W. Holdsworth, supra, pp. 356–57. That changed with the advent of modern correctional facilities. Although one dozen capital crimes remained on the books through the end of the eighteenth century, after Newgate opened in East Granby in 1773, no one was executed in Connecticut for any crime other than homicide or rape. See L. Goodheart, supra, pp. 68, 75. Moreover, the last execution

for rape, in 1817; id., p. 94; was carried out just one decade before the opening of the state prison in Wethersfield; id., p. 101; which Goodheart characterizes as reflecting "more hopeful, even utopian, assumptions about penology." Id. With the ideal and means of achieving rehabilitation well established, in 1846, the legislature, for the first time, created a distinction between first and second degree murder to further limit the application of the death penalty. Id., pp. 104–105. One century later, "[i]n 1951, the legislature enacted a statute that allowed the jury to recommend life imprisonment rather than death for individuals convicted of first degree murder, making it even easier for the jury to avoid imposing the death penalty. See Public Acts 1951, No. 369." *State* v. *Ross*, supra, 230 Conn. 303 (*Berdon, J.*, dissenting in part).

Connecticut's steadily waning commitment to capital punishment also has been evidenced in the narrowing range of offenders who have been subject to the ultimate punishment. No female has been executed in the state since 1786, and no male under the age of eighteen at the time of the offense since 1904. See L. Goodheart, supra, pp. 81–82, 136. Indeed, our legislature has "acted ahead of the United States Supreme Court"; *State* v. *Rizzo*, supra, 303 Conn. 189; in prohibiting the execution of persons with intellectual disabilities; Public Acts 1973, No. 73-137, § 4; of offenders who committed their capital crimes when they were under eighteen; Public Acts 1973, No. 73-137, § 4; and for any crime not involving the death of a victim. *State* v. *Rizzo*, 303 Conn. supra, 189.

Although the past 380 years have witnessed an ongoing decline in our state's commitment to the death penalty as a legitimate form of punishment, it is noteworthy that Connecticut's two constitutions, adopted in 1818 and 1965, were drafted during periods of particularly dramatic change. As we previously discussed, the late eighteenth and early nineteenth centuries were characterized by penological reform, an emerging commitment to human rights, and the first widespread public questioning of the moral legitimacy of capital punishment in Connecticut. See L. Goodheart, supra, pp. 69–70. Throughout the first half of 1786, the New Haven Gazette had reprinted Cesare Beccaria's entire 1764 treatise "On Crimes and Punishments," a seminal Enlightenment era work that condemned torture and the death penalty, and that led to widespread questioning of the latter throughout Europe and the United States. See id., pp. 67–70. The impact of Beccaria's progressive approach to penology may be seen in the case of Henry Wilson, a convicted rapist whose death sentence the General Assembly commuted in 1822. See id., pp. 96–97. Goodheart implies that the decision reflected the fact that neighboring states, such as Rhode Island, already had decapitalized that crime. See id., p. 97.

One hundred and fifty years later, when Connecticut adopted the 1965 constitution, there was an "unofficial moratorium" on the death penalty in the state. Id., p. 196. The last execution in the state had taken place in 1960, and that only after the condemned man, Joseph Taborsky, "volunteered to die . . . ." Id., p. 193. Goodheart attributes the unofficial moratorium that began in the early 1960s to a myriad of factors: the expansion of defendants' federal constitutional rights; declining popular support for the death penalty; opposition from organized religion, which originally had championed capital punishment in Connecticut; and research indicating that, since 1930, "the death penalty [had fallen] inordinately on those at the bottom of society," including the poor, uneducated, and mentally disabled. Id., p. 202.

Another Connecticut execution would not occur until forty-five years later, in 2005, when Ross, like Taborsky, waived his right to further appeals and habeas remedies. Id., pp. 228, 230–31, 244–46. No capital sentences have been carried out in the decade since Ross was executed. Over the past fifty-five years, then, during which time thousands of murders have been committed in the state, our criminal justice system has conducted but a single execution, and that only after the condemned man all but forced the state to carry out his sentence. See id., pp. 230–31. The eleven men currently on death row in Connecticut are, at the least, many years, and most likely decades, away from exhausting all of their state and federal appeals and habeas remedies. Even if the legislature never had enacted P.A. 12-5, if past is prologue, there simply is no reason to believe that any Connecticut executions would be carried out in the foreseeable future.

As Justice Berdon observed in his dissent in *Ross*, this "whole state history demonstrates a reluctance to impose the death penalty." *State* v. *Ross*, supra, 230 Conn. 302 (*Berdon, J.*, dissenting in part). "[O]ur early capital laws were seldom enforced, and, indeed, the cases in which capital punishment has been inflicted have been exceedingly rare, some counties hardly having known an execution." (Internal quotation marks omitted.) Id., 303 (*Berdon, J.*, dissenting in part). "There have been, it is believed, within the last [220] years, fewer executions in Connecticut for crime, than in any other state of equal size in the world. The records of our courts have scarcely the stain of blood upon them . . . ." (Internal quotation marks omitted.) Id.

Connecticut's historical ambivalence toward the death penalty also has manifested in persistent efforts to abolish capital punishment. As we previously discussed, the first serious organized opposition to the death penalty emerged in the early nineteenth century, and, by the mid-1800s, two governors and a majority of the state Senate had signed petitions for its repeal.

L. Goodheart, supra, pp. 130–31. Abolition efforts persisted throughout the nineteenth and twentieth centuries. See id., pp. 163–64, 178, 191, 195. In 2009, the General Assembly passed P.A. 09-107, which would have repealed the death penalty for crimes committed after the passage of that act. See *State* v. *Rizzo*, supra, 303 Conn. 198. Governor Rell vetoed P.A. 09-107, however, and the legislature did not muster the two thirds vote necessary to override the governor's veto. Id. Similar legislation was introduced in 2011, which advanced through the Judiciary Committee but failed to achieve a full vote in either the House or the Senate. See id., 199. Finally, on April 25, 2012, Governor Malloy signed P.A. 12-5, which abolished the death penalty for all crimes committed on or after that date. Connecticut's history, then, evinces a steady, inexorable devolution in the popularity and legitimacy of the death penalty, culminating in its prospective abolition in 2012.

B

Legislative Enactments

With respect to the second indicator of our evolving standards of decency, both this court and the United States Supreme Court have stated that "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures."[47] (Internal quotation marks omitted.) *Atkins* v. *Virginia*, supra, 536 U.S. 312; accord *State* v. *Rizzo*, supra, 303 Conn. 191. We last examined the constitutionality of the death penalty in *Rizzo II*. See *State* v. *Rizzo*, supra, 303 Conn. 184–201. At that time, we recognized that, during the preceding decade, (1) the United States Supreme Court had imposed additional restrictions on the range of offenses and offenders constitutionally subject to capital punishment; id., 188; (2) several additional sister states had abolished the death penalty; id., 190; and (3) the number of death sentences imposed and executions carried out in the United States had continued to decline. Id., 192–93. Nevertheless, we concluded "that, as long as there remains powerful evidence of strong public support for the death penalty in the form of long-standing laws enacted by the democratically elected representatives of this state and other jurisdictions within the United States, we will not attempt to discern a contrary view of the public will, or to answer complex policy questions best answered by the legislative process . . . ." Id., 198.

Public Act 12-5 pulled that linchpin out of our decision in *Rizzo II*. For the first time in our state's history, the governor and a majority of both legislative chambers have now rejected state sanctioned killing and agreed that life imprisonment without the possibility of release is a just and adequate punishment for even the most horrific crimes. For any future crimes, the death penalty has been removed from the list of acceptable punishments that may be imposed in accordance with law.

Public Act 12-5 thus represents the terminus of the four century long devolution of the death penalty in Connecticut. Although the prospective nature of P.A. 12-5 reflects the intent of the legislature that capital punishment shall die with a whimper, not with a bang, its death knell has been rung nonetheless. Our elected representatives have determined that the machinery of death[48] is irreparable or, at the least, unbecoming to a civilized modern state. As a ranking member of the Judiciary Committee recognized in 2012, "this law is the best and most recent indication of evolving standards in our society of human decency."[49] 55 S. Proc., Pt. 2, 2012 Sess., p. 574, remarks of Senator John A. Kissel. The prospective abolition of the death penalty thus provides strong support for the conclusion that capital punishment no longer comports with contemporary standards of decency and, therefore, constitutes cruel and unusual punishment.

In her dissenting opinion, Chief Justice Rogers takes issue with the conclusion that the prospective repeal of the death penalty indicates that capital punishment no longer comports with our state's evolving standards of decency. She argues that, as a matter of common sense, legislators would not have voted to retain capital punishment on a retroactive basis if they had believed such punishment to be immoral, indecent, or unnecessary. Rather, she speculates that "the reason for the prospective repeal was not that a majority of legislators found the death penalty morally repugnant even for the worst crimes, or that they found life imprisonment an adequate substitute for the death penalty, but that they had determined that the death penalty simply had become impracticable." Text accompanying footnote 19 of Chief Justice Rogers' dissenting opinion. The most reasonable interpretation of P.A. 12-5, Chief Justice Rogers posits, is that the legislature continues to believe that death is the appropriate punishment for certain crimes but that, for financial and other pragmatic reasons, our elected representatives were forced to accept a less severe form of punishment for the future.

We begin by observing that the United States Supreme Court, in *Atkins* v. *Virginia*, supra, 536 U.S. 304, considered and rejected Chief Justice Rogers' argument that a prospective only repeal of a punishment does not indicate that the punishment no longer comports with society's evolving values. See id., 313–16 (recognizing emergence of national consensus against executing intellectually disabled, based on decisions of eighteen states to amend their death penalty statutes to exempt such persons from capital punishment, even though majority of those states had done so prospectively only); see also id., 342–43 (Scalia, J., dissenting) (criticizing majority for counting among those jurisdictions that no longer permitted execution of intellectually disabled eleven states that had abolished practice

only prospectively). Similarly, in *Fleming* v. *Zant*, supra, 259 Ga. 687, the Supreme Court of Georgia concluded that a statute that prohibited the death penalty for mentally disabled individuals on a prospective only basis nevertheless evidenced an evolving societal consensus that the execution of such individuals was inappropriate. See id., 690 and n.3. Accordingly, that court concluded that execution of mentally disabled individuals sentenced prior to the effective date of the Georgia statute would be cruel and unusual punishment, in violation of the Georgia constitution. Id., 690; see also *Van Tran* v. *State*, 66 S.W.3d 790, 805 (Tenn. 2001) (concluding that statute prohibiting execution of mentally disabled offenders was not intended to apply retroactively but also concluding, under Tennessee constitution, in light of *Fleming*, that statute evidenced evolving consensus that carrying out any such executions would be cruel and unusual).

More importantly, the voluminous legislative history of P.A. 12-5 simply does not bear out Chief Justice Rogers' interpretation of that act. During the legislative debates, of the three dozen senators and representatives who spoke in favor of P.A. 12-5, nearly every legislator stated that he or she had come to oppose capital punishment as a matter of conscience or principle. Notwithstanding the solely prospective application of P.A. 12-5, numerous legislators declared that they categorically opposed state sanctioned killing or, in a few cases, that they had concluded that life imprisonment without the possibility of release is a more appropriate punishment for capital felons.[50] They cited a range of principled objections to the death penalty. Many found unacceptable the possibility that the state might mistakenly execute an innocent person.[51] Others condemned capital punishment as incurably arbitrary and discriminatory,[52] or came to believe that death sentences retraumatize the families of murder victims.[53] In his own remarks, one of the cochairmen of the Judiciary Committee left little doubt as to the primary rationale for the legislation: "This was a matter of conscience for me and I think it's a matter of conscience for everyone in this body, proponents and opponents alike. I want to make that very clear." 55 S. Proc., Pt. 3, 2012 Sess., pp. 791–92, remarks of Senator Eric D. Coleman. Indeed, many of the senators and representatives who opposed P.A. 12-5 acknowledged that its supporters voted out of a conscientious and moral rejection of capital punishment.[54]

Notably, although Chief Justice Rogers repeatedly chides the majority for failing to afford adequate deference to the legislative process, she herself is dismissive of legislators' own characterizations of their votes, favoring instead a narrative that is contradicted by the legislative record. It is certainly true, as Chief Justice Rogers emphasizes, that some proponents of the repeal also expressed concerns over monetary or practical

challenges facing our state's capital punishment system. The fact that supporters voted to abolish capital punishment for *both moral and practical* reasons, however, in no way demonstrates that the death penalty continues to comport with contemporary standards of decency in Connecticut. An indecent punishment is no less indecent for the fact that it is also costly and ineffectual.

To our knowledge, not a single legislator has publicly indicated that the decision to repeal the death penalty prospectively while retaining it for those who offended prior to April 25, 2012, embodied the sort of grand financial and pragmatic agreement suggested by Chief Justice Rogers. In fact, comments by Senator Kissel, a ranking member of the Judiciary Committee, directly refute Chief Justice Rogers' theory that the legislative history of the act could support such an interpretation: "[T]his isn't being driven by cost savings. There [is] . . . ample testimony, year in and year out, that say[s] we for moral, philosophical, religious reasons, because it doesn't deter crime and all these other factors, say[s] that people stridently oppose this penalty in Connecticut. People will stand up on the floor of the House and the floor of the [Senate] and say, if we had a bill in front of us with complete abolition, I'd support it, but for political reasons or expediency or for whatever reason, that's not the bill the Judiciary Committee gave us. But because this gets us one step closer to full abolition, I'm going to support this at this time."[55] Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2766–67. Ultimately, of the three dozen legislators who spoke in favor of P.A. 12-5 during the legislative hearings and debates, only two indicated that they personally supported the repeal primarily for pragmatic reasons.[56]

Why, then, did a legislature committed to abolishing the death penalty vote to retain it for the handful of inmates already on death row? It is clear from the legislative history of P.A. 12-5, as well as the record of other recent attempts to abolish capital punishment in Connecticut, that, as Senator Kissel indicated, the vast majority of those legislators who voted for P.A. 12-5 would have supported a full repeal but were forced at that time to accept half a loaf because there were not enough votes to pass a full repeal. With regard to the handful of legislators whose support for a repeal was contingent on retaining the death penalty for previous capital felons, the legislative record strongly suggests that they insisted on a prospective only repeal not for the pragmatic and financial reasons offered by Chief Justice Rogers but, rather, for one of two reasons.

First, some legislators opposed retroactive abolition out of a principled belief that the state had made a commitment to families of victims murdered before the passage of P.A 12-5 that the state would pursue the

death penalty in those cases. Those legislators felt that the state was morally obliged to honor that prior commitment, even if it had foresworn capital punishment going forward.[57] For such legislators, retaining the death penalty on a retroactive basis represented the lesser of two evils. Indeed, at least one legislator speculated that an unwillingness to "up end" victims' expectations was the primary rationale for enacting a prospective only repeal.[58] 55 S. Proc., Pt. 3, 2012 Sess., p. 720, remarks of Senator Andrew W. Roraback; see also K. Barry, "From Wolves, Lambs (Part II): The Fourteenth Amendment Case for Gradual Abolition of the Death Penalty," 35 Cardozo L. Rev. 1829, 1837 (2014) ("[p]rospective-only repeal grants the 'victim's mother' her pound of flesh and then bids her adieu"). Indeed, at oral argument before this court, the state acknowledged that the legislature indicated that "keeping a promise to the victims" was one of the primary rationales for enacting a prospective only repeal.

For other legislators, support for a prospective only repeal appears to have reflected a calculation that they could accommodate the public demand that certain notorious inmates remain on death row; see part III C of this opinion; with little concern that those death sentences ever would be carried out.[59] During the debates over P.A. 12-5, many legislators were of the opinion that, once the death penalty had been prospectively abolished, the official policy of the state would then disapprove capital punishment, and it would, therefore, become unconstitutional to execute offenders whose crimes were committed prior to the repeal. It was widely predicted that the individuals already on death row would immediately seek appellate or habeas relief upon passage of a prospective repeal, and that this court would bar all future executions.[60] Although not all legislators were in agreement on this point, it is noteworthy that Chief State's Attorney Kane, who heads the Division of Criminal Justice and represents the state in this matter, has himself publicly taken the position that, following a prospective repeal, any efforts to execute those already on death row would be unlikely to pass constitutional muster. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2601–2602 ("I can't imagine how we would be executing somebody who's on death row today"); id., pp. 2630–35 (indicating that, after prospective repeal, capital punishment would fail to comport with evolving standards of decency in Connecticut).[61]

Some legislators, then, may have seen a prospective repeal as an opportunity to retain the support of constituents committed to the execution of particular residents of death row, while leaving to this court the task of abolishing capital punishment retroactively. Professor Kevin Barry, on whose opinions Chief Justice Rogers repeatedly relies, has argued that adoption of a prospective only repeal represented precisely this sort of "stra-

tegic" decision on the part of legislators "to discard the death penalty going forward . . . while punting the hard political decisions about what to do with those on death row . . . ." K. Barry, supra, 35 Cardozo L. Rev. 1836; see also id., 1834 (noting that abolitionists adopted similar strategy of gradual abolition in movement to end slavery); id., 1836 (prospective only repeal is politically viable because it removes so-called " 'victim's mother' " effect). We do not consider such action to evidence legislative endorsement of the death penalty as a fitting and acceptable means of punishment in modern Connecticut.[62]

Lastly, we note that, if the primary concern of the legislature had been with the workability of the death penalty, as Chief Justice Rogers contends, then the legislature certainly could have implemented measures, short of abolition, aimed at removing some of the impediments in the state's capital punishment scheme.[63] That option was proposed on several occasions during the hearings and debates on P.A. 12-5 but ultimately rejected.[64] The only plausible reading of the legislative history, then, is that the legislature made a principled determination that capital punishment should no longer be the policy of Connecticut.

Turning our attention to the other elected branch of government, we also recognize that the meaning of a statute is revealed not only in the intent of the legislators who draft and enact it, but also in the aspirations of the governor who signs it. As Chief Justice Rogers, writing for the court in *Rizzo II*, recently explained: "The governor, like our legislators, is an elected representative of the people of the state. Additionally, executive approval . . . of legislation is an integral part of the legislative process . . . and it is axiomatic that when the governor exercises this power, he or she is acting in a substantive legislative role. . . . Thus . . . a governor's [signing statement issued upon] approval of legislation may provide evidence of the motivations underlying that legislation . . . ." (Citations omitted.) *State* v. *Rizzo*, supra, 303 Conn. 199–200. In fact, Chief Justice Rogers observed in this very context that "it may be, at some times, on some subjects, that the [governor] elected by all the people is rather *more representative* of them all than are the members of either body of the [l]egislature whose constituencies are local and not [statewide] . . . ." (Emphasis added; internal quotation marks omitted.) Id., 201. In the present case, Governor Malloy made clear, in signing P.A. 12-5, that *his* decision to approve legislation abolishing the death penalty was a principled one: "Many of us who have advocated for this position over the years have said there is a moral component to our opposition to the death penalty. For me, that is certainly the case. . . .

"I [have come] to believe that doing away with the death penalty [is] the only way to ensure it [will] not

be unfairly imposed."[65] Gov. Malloy on Signing Bill To Repeal Capital Punishment (April 25, 2012) (Governor's Statement).

In conclusion, although support for a legislative compromise as significant and complex as Connecticut's prospective abolition of the death penalty is bound to arise from and reflect a range of sentiments and concerns, the best evidence of legislative intent available to us strongly suggests that both of the elected branches were motivated in no small part by a principled belief that state sanctioned executions are no longer a necessary or appropriate form of punishment, even for the most heinous crimes.

## C

### Current Practice

"Although the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures . . . in assessing whether a punishment is constitutionally sound, it also is appropriate for us to consider what is occurring in actual practice." (Citation omitted; internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 191. "[T]he sentencing decisions that juries have made . . . [are] a significant and reliable objective index of contemporary values because [juries are] so directly involved" in the administration of criminal justice. (Internal quotation marks omitted.) *Enmund* v. *Florida*, supra, 458 U.S. 794. For example, "[s]tatistics about the number of executions may inform the consideration whether capital punishment . . . is regarded as unacceptable in our society." *Kennedy* v. *Louisiana*, supra, 554 U.S. 433; see id. (finding social consensus against capital punishment for crime of child rape); see also *Graham* v. *Florida*, supra, 560 U.S. 64, 74 (determining that sentence of life imprisonment without possibility of parole is cruel and unusual punishment for juvenile who had committed nonhomicide offense when only 123 people were serving such sentences in eleven jurisdictions nationwide). The number of death sentences actually imposed and carried out is a key barometer of social mores because, although "it is easy for the public to respond to the conviction of a vicious murderer or a serial killer by advocating the ultimate penalty of death, it is far more difficult for society to carry out that penalty by taking the life of that person." *State* v. *Ross*, supra, 230 Conn. 297; see also D. Garland, Peculiar Institution: America's Death Penalty in an Age of Abolition (2010) p. 60. "Although death penalty statutes do remain on the books of many jurisdictions, and public opinion polls show opinion to be divided as to capital punishment as an abstract proposition, the infrequency of its actual application suggests that among those persons called [on] to actually impose or carry out the death penalty it is being repudiated with ever increasing frequency." *People* v. *Anderson*, supra, 6 Cal. 3d 648;

see also *District Attorney* v. *Watson*, supra, 381 Mass. 662 (prolonged dearth of executions evidences current standards of decency).

In the post-*Furman* era, Connecticut has imposed sustained death sentences at a rate (taken as a percentage of capital eligible convictions) that is among the lowest in the nation. See J. Donohue, "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973: Are There Unlawful Racial, Gender, and Geographic Disparities?," 11 J. Empirical Legal Stud. 637, 638 (2014). Of the 205 capital eligible murders committed in Connecticut between 1973 and 2007, of which approximately two thirds were charged capitally, only 12 resulted in death sentences. Id., 641. Indeed, since 1973, whereas juries in states such as Texas and Florida have imposed death sentences at an average rate of approximately two per month, Connecticut juries on average have imposed a death sentence only approximately once every two years.[66]

Moreover, each of the capital sentences imposed in Connecticut has, in effect, become the equivalent of life imprisonment. As we discussed, there has been an almost complete moratorium on executions in the state since 1960. Connecticut has put only one offender to death over the past fifty-five years, and that was a serial killer who believed that he deserved to die and voluntarily waived his right to further appeals and habeas remedies. L. Goodheart, supra, pp. 228, 230–31, 244–46. Even then, it took the state more than two decades to carry out his sentence. See id., p. 248. Nor is there even the remotest likelihood that any of the inmates currently on death row in Connecticut will exhaust their federal and state appeals and habeas remedies any time in the foreseeable future.

The United States Supreme Court also has recognized that the willingness or reluctance of prosecutors to seek a particular punishment constitutes further objective evidence of whether society considers that punishment to be excessive or disproportionate. See *Enmund* v. *Florida*, supra, 458 U.S. 796. This is because prosecutors "represent society's interest in punishing crime . . . ." Id. In Connecticut, Chief State's Attorney Kane, testifying before the legislature prior to the enactment of P.A. 12-5, strongly suggested that, following the prospective repeal of the death penalty, he no longer would consider it appropriate to seek the death penalty for eligible crimes. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2602, 2633. At neither the charging nor the sentencing stages, then, have the key decision makers in our state's capital punishment system demonstrated that the death penalty continues to comport with contemporary standards of decency in Connecticut.

D

Laws and Practices of Other Jurisdictions

Although trends within Connecticut are the most direct and relevant indicators of contemporary standards of decency with respect to the state constitution, we also look to developments in our sister states, and even the international community, for additional input. See *State* v. *Rizzo*, supra, 303 Conn. 192–96; see also *Roper* v. *Simmons*, supra, 543 U.S. 578 ("[t]he opinion of the world community [opposing the death penalty for juveniles], while not controlling our outcome, does provide respected and significant confirmation for our own conclusions"). Globally, 98 countries have now formally abolished the death penalty for all crimes, up from just 16 countries in 1977, and 140 countries effectively have renounced the death penalty by law or practice.[67] "The 'age of abolition' . . . has made America an anomaly, the last remaining holdout in a historical period that has seen the [w]estern nations embrace abolitionism as a human rights issue and a mark of civilization." D. Garland, supra, p. 11.

Domestically, although capital punishment remains legal in a majority of jurisdictions within the United States, the number of states eschewing the death penalty continues to rise. The United States Supreme Court has explained that "[i]t is not so much the number of these [s]tates that is significant, but the consistency of the direction of change." *Atkins* v. *Virginia*, supra, 536 U.S. 315; see also *Hall* v. *Florida*, supra, 134 S. Ct. 1997. When Nebraska repealed its death penalty in May, 2015, it became the seventh state in just nine years to have abolished capital punishment either prospectively or completely.[68] In total, nineteen states and the District of Columbia no longer permit the imposition of new capital sentences.[69] And, significantly, no state or nation that has repealed the death penalty prospectively ever has carried out another execution. See, e.g., *State* v. *Santiago*, Conn. Supreme Court Records & Briefs, April Term, 2013, Amicus Brief of legal historians and scholars p. 1.

Even within those jurisdictions where it remains legal, "use of the death penalty (in terms of executions and especially death sentences) has declined significantly in recent years." C. Steiker & J. Steiker, Report to the American Law Institute Concerning Capital Punishment, in A.L.I., Report of the Council to the Membership of the American Law Institute on the Matter of the Death Penalty (April 15, 2009) annex B, p. 2. The total number of executions carried out nationally has fallen by more than 60 percent from the post-*Furman* peak of 1999, dropping from 98 in 1999 to 39 in 2013, and then falling again to 35—a 20 year low—in 2014.[70] Of the 35 executions carried out in 2014, approximately 90 percent occurred in just four states: Texas, Missouri, Florida, and Oklahoma.[71]

"Nationwide death sentences have dropped even more precipitously"; id.; falling from modern era highs of more than 300 annually in the mid-1990s to modern era lows of 85 or fewer since 2011.[72] The number of death sentences imposed in 2014, 73, was by far the lowest in the post-*Furman* era.[73] That same year, Governor Jay Inslee of the state of Washington imposed a moratorium on the carrying out of the death penalty in that state,[74] and Governor Martin O'Malley of the state of Maryland announced his intention to commute all remaining death sentences for those inmates in the state's prison system to life without parole.[75] The latter decision, reached after Maryland's attorney general called into question the legality of carrying out previously imposed death sentences, effectively transforms Maryland's prospective only repeal into a full abolition of the death penalty. Notably, by 2012, less than 2 percent of the nation's counties accounted for *all* of the death sentences imposed nationwide. *Glossip* v. *Gross*, U.S. , 135 S. Ct. 2726, 2761, 192 L. Ed. 2d 761 (2015) (Breyer, J., dissenting).

When we interpret the protections afforded under the state constitution, trends and norms in our neighboring New England states, with which Connecticut shares a cultural and historical affinity, can be especially pertinent. See, e.g., *State* v. *Rizzo*, supra, 303 Conn. 204 n.4 (*Norcott, J.*, dissenting) (emphasizing in 2011 that New Hampshire was only New England state other than Connecticut with death penalty); cf. *State* v. *James*, 237 Conn. 390, 452, 678 A.2d 1338 (1996) (*Berdon, J.*, dissenting) (noting that "[e]very state but one in the northeast ha[d] adopted a standard of proof in excess of the preponderance of the evidence to determine the voluntariness of a confession").

In the case of capital punishment, the regional disparities are both instructive in their character and striking in their magnitude. Of approximately 1400 executions carried out nationwide since 1976, nearly two thirds have been performed in just 5 states, and Texas alone accounts for more than 37 percent of the total.[76] Ten states have accounted for 83 percent of the post-*Furman* executions in the country.[77] The geographic concentration of those executions is remarkable. The thirteen states that comprised the Confederacy[78] have carried out more than 75 percent of the nation's executions over the past four decades.[79] Adding in Oklahoma and Arizona—not yet states at the time of the civil war— brings the total to nearly 90 percent.[80] In stark contrast, the six New England states have carried out a combined total of *one execution* since 1976.[81] Adding in New York, New Jersey, and Pennsylvania, the nine northeastern states have accounted for less than one-third of 1 percent of the nation's post-*Furman* executions.[82] Connecticut's execution of Ross has been the only execution in the entire Northeast in the new millennium.

In fact, only a few northeastern states still permit capital punishment. The death penalty was abolished by Maine in 1887, Vermont in 1964, Massachusetts and Rhode Island in 1984, and New York and New Jersey in 2007.[83] Following Connecticut's prospective abolition of the death penalty in 2012, New Hampshire is the only remaining New England state in which new death sentences may be imposed.[84] No one has been executed in New Hampshire since 1939, however, and it does not even have an operational death chamber.[85] Accordingly, Connecticut now stands as an outlier, the sole remaining New England state in which execution remains a legal and potentially viable option.[86]

E

Opinions and Recommendations of
Professional Associations

The United States Supreme Court also has looked to the opinions of "respected professional organizations," such as the American Law Institute, to help illuminate "civilized standards of decency" in the capital punishment context. *Thompson* v. *Oklahoma*, supra, 487 U.S. 830; accord *Hall* v. *Florida*, supra, 134 S. Ct. 1994–95 (relying on American Psychological Association). Indeed, when the United States Supreme Court effectively reinstated the death penalty in *Gregg*, it relied heavily on the American Law Institute's work in developing Model Penal Code § 210.6 for its determination that juror discretion can be sufficiently cabined to avoid arbitrary and capricious imposition of the death penalty. See *Gregg* v. *Georgia*, supra, 428 U.S. 193–95 (opinion announcing judgment); see also B. Newton, "The Slow Wheels of *Furman*'s Machinery of Death," 13 J. App. Prac. & Process 41, 47 (2012).

The American Law Institute no longer holds out such hopes. During the hearings on P.A. 12-5, the legislature heard testimony that, following a two year study commissioned by the American Law Institute, unequivocal conclusions were reached regarding the modern death penalty: "[A] review of the unsuccessful efforts to constitutionally regulate the death penalty, the difficulties that continue to undermine its administration, and the structural and institutional obstacles to curing those ills forms the basis of our recommendation to the [American Law] Institute. The [long-standing] recognition of these underlying defects in the capital justice process, the inability of extensive constitutional regulation to redress those defects, and the immense structural barriers to meaningful improvement all counsel strongly against the Institute's undertaking a law reform project on capital punishment, either in the form of a new draft of § 210.6 or a more extensive set of proposals. Rather, these conditions strongly suggest that the Institute recognize that *the preconditions for an adequately administered regime of capital punishment*

*do not currently exist and cannot reasonably be expected to be achieved.*" (Emphasis added.) C. Steiker & J. Steiker, supra, p. 49; see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2923, written testimony of Chief Public Defender Susan O. Storey. On the basis of those conclusions, and consistent with the recommendations to the American Law Institute, in 2009, § 210.6 was withdrawn. Members of the American Law Institute opted not to develop a revised or replacement model death penalty statute, in light of their concerns that "real-world constraints make it impossible for the death penalty to be administered in ways that satisfy norms of fairness and process." A.L.I., supra, p. 5.

We are compelled to agree. In his concurrence in *Furman*, Justice Brennan observed that the "acceptability of a severe punishment is measured, not by its availability, for it might become so offensive to society as never to be inflicted, but by its use." *Furman* v. *Georgia*, supra, 408 U.S. 279 (Brennan, J., concurring). In passing P.A. 12-5, the legislature simply has acknowledged and formalized what has become apparent in Connecticut, among our sister New England states, and throughout the industrialized world for more than one-half century. Although some opinion polls continue to reflect public support for the death penalty in theory, in practice, our state has proved increasingly unwilling and unable to impose and carry out the ultimate punishment.[87] "The evolution of this punishment," Justice Brennan observed, "evidences, not that it is an inevitable part of the American scene, but that it has proved progressively more troublesome to the national conscience." Id., 299 (Brennan, J., concurring).

### F

### Conclusion

In conclusion, we are aware that the issue of whether the death penalty is an appropriate punishment for the most heinous crimes is one about which people of good faith continue to disagree. Nevertheless, our review of the five objective indicia that have been deemed relevant under both the federal and state constitutions compels the conclusion that, following the enactment of P.A. 12-5, Connecticut's capital punishment scheme no longer comports with our state's contemporary standards of decency.[88] It therefore offends the state constitutional prohibition against excessive and disproportionate punishment.[89]

### III

### THE DEATH PENALTY IS DEVOID OF ANY LEGITIMATE PENOLOGICAL JUSTIFICATIONS

As the constitution requires, we next consider whether, on the basis of our independent review of the available evidence, executing those individuals who

committed capital felonies prior to the enactment of P.A. 12-5 would serve any legitimate penological purpose. In light of the history and desuetude of the death penalty in Connecticut over the past one-half century, culminating in its prospective abolition in 2012, we conclude that capital punishment no longer measurably contributes to any legitimate penological goal.

Enforcing the criminal law means marshaling the awesome coercive power of the state to deprive its own citizens of the life, liberty, or property to which they are otherwise naturally entitled. See, e.g., *Stutson* v. *United States*, 516 U.S. 193, 196, 116 S. Ct. 600, 133 L. Ed. 2d 571 (1996); *State* v. *Vumback*, 247 Conn. 929, 933, 719 A.2d 1172 (1998) (*Berdon, J.*, dissenting from the denial of certification to appeal). The death penalty represents the most extreme exercise of this power. See, e.g., *State* v. *Rizzo*, supra, 266 Conn. 227. Such a deprivation must, of course, be justified, and society traditionally has recognized four principal justifications for the imposition of criminal sanctions. Criminal penalties may be imposed (1) to deter the perpetrator and others from committing crimes (deterrence), (2) to punish the perpetrator and give voice to the moral outrage experienced by the victim and society at large (retribution), (3) to prevent the perpetrator from committing additional offenses (incapacitation), or (4) to transform the perpetrator into a better, more law-abiding citizen (rehabilitation). See, e.g., *Graham* v. *Florida*, supra, 560 U.S. 71–74. "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." Id., 71. Neither the federal nor the state constitution will permit the imposition of a sanction "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg* v. *Georgia*, supra, 428 U.S. 183 (opinion announcing judgment).

In the case of the death penalty, the punishment itself terminates any opportunity for rehabilitation. *Hall* v. *Florida*, supra, 134 S. Ct. 1992–93. Moreover, execution, as compared to life in prison without the possibility of release, offers minimal additional value by way of incapacitation.[90] See *Spaziano* v. *Florida*, 468 U.S. 447, 461, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984) (noting that "incapacitation has never been embraced as a sufficient justification for the death penalty"). Accordingly, it is generally accepted that, if capital punishment is to be morally and legally justified, it must be based on the deterrent or retributive value of executions. E.g., *Kennedy* v. *Louisiana*, supra, 554 U.S. 441; *Gregg* v. *Georgia*, supra, 428 U.S. 183 (opinion announcing judgment). Unless the imposition of the death penalty "*measurably* contributes to one or both of these goals, it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." (Emphasis added; internal quotation marks omitted.) *Atkins* v. *Virginia*, supra, 536 U.S. 319. "At the moment that [the death penalty] ceases realistically

to further these purposes . . . its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the [s]tate would be patently excessive and cruel and unusual . . . ." *Furman* v. *Georgia*, supra, 408 U.S. 312 (White, J., concurring).

We previously have acknowledged that "the value of [a criminal sanction], and its contribution to acceptable penological goals, typically is a complex factual issue the resolution of which properly rests with the legislatures . . . ." (Internal quotation marks omitted.) *State* v. *Rizzo*, supra, 303 Conn. 197. We also have recognized, however, that this assessment "is not exclusively the domain of the legislature, and that this court has an independent duty to determine that the penalty remains constitutionally viable as the sensibilities of our citizens evolve." Id.; see also part IV C of this opinion. Deference to legislative assessments is least warranted, and judicial scrutiny must be especially exacting, when, as in the present case, the policy judgments embodied in the relevant legislation are ambiguous.[91] Upon close consideration of the arguments and the available research, and particularly in light of the legislature's decision to abolish capital punishment for all future crimes, we conclude that the death penalty no longer measurably contributes to the penological goals of deterrence or retribution. We consider each in turn.

A

Deterrence

Turning first to deterrence, we observe that it is clear that, with the passage of P.A. 12-5, any deterrent value the death penalty may have had no longer exists. As Justice Harper explained in his dissent in *Santiago I*: "The ultimate test of this deterrence claim is whether the state, by executing some of its citizens, better achieves the unquestionably legitimate goal of discouraging others from committing similar crimes. As a general matter, the empirical evidence regarding deterrence is inconclusive. Following the abolition of the death penalty for all future offenses committed in Connecticut, however, it is possible to determine the exact number of potential crimes that will be deterred by executing the defendant in this case. That number is zero." (Emphasis omitted; footnote omitted.) *State* v. *Santiago*, supra, 305 Conn. 320–21 (*Harper, J.*, concurring in part and dissenting in part).

In her dissenting opinion, Chief Justice Rogers rejects Justice Harper's commonsense conclusion that once the legislature enacts a high profile repeal of a punishment, that punishment no longer serves as a deterrent. Rather, she contends, by maintaining capital punishment for offenders sentenced to death before the enactment of P.A. 12-5, the state can send a "message" to

potential offenders that the laws are stable and will be enforced as written. This, she believes, can strengthen the deterrent force of all penal laws.[92]

We very much doubt that the citizens of Connecticut, learning that the death penalty has been abolished, will somehow infer that they can now rape, pillage, and exceed the speed limits with impunity. In fact, during the legislative hearings on P.A. 12-5, a member of the Judiciary Committee rejected the suggestion that the legislature was adopting a prospective only repeal "to convince people that the government is really serious about carrying out its penalties." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2781–82, remarks of Representative Arthur J. O'Neill (responding to law student who proposed that solely prospective repeal could be justified on basis of deterrence).

In any event, the horse that Chief Justice Rogers seeks to corral has long since left the barn. Of the more than 4000 individuals who have committed murder in Connecticut since the death penalty was reinstated four decades ago, only one has been executed, and then only after he demanded that the state carry out his death sentence. L. Goodheart, supra, pp. 228, 230–31. The overwhelming majority of killers are not sentenced to death. As we discuss more fully hereinafter, those who are sentenced to death routinely spend decades on death row, and there is every reason to believe that they would die there, outlived by their various appeals and habeas petitions. Chief Justice Rogers fails to explain how it is that this system of unexecuted capital punishment promotes a respect for the law or leads our citizens to expect that the state will carry out prescribed punishments as written.

Even if the legislature had not prospectively abolished the death penalty, it would appear that capital punishment, as administered in Connecticut in the post-*Furman* era, has failed to demonstrate a sufficient deterrent effect to justify continued state imposed killing. Although some studies have purported to document a deterrent effect,[93] "the majority of social science research on the issue concludes that the death penalty has no effect on the homicide rate."[94] D. Beschle, "Why Do People Support Capital Punishment? The Death Penalty as Community Ritual," 33 Conn. L. Rev. 765, 768 (2001). A principal reason for this failure of deterrence appears to be the substantial delays involved in actually carrying out a sentence of death. The number of potential state and federal postconviction remedies available, the range and complexity of legal issues involved in capital appeals, and the multiple stages of review mean that at least one decade typically passes from capital crime to execution, and delays of twenty years or more are not at all uncommon. See, e.g., A. Kozinski & S. Gallagher, "Death: The Ultimate Run-On Sentence," 46

Case W. Res. L. Rev. 1, 10–11, 17 (1995). The delays, moreover, appear to be getting longer. Of the thirty-five offenders executed in the United States in 2014, only one had been on death row for less than one decade, and the average time from sentencing to execution exceeded seventeen years.[95] The situation is no different in Connecticut. Of the eight men sentenced to death in the state between 1987 and 2007 whose sentences were not later overturned, only one has been executed. Ross was executed by lethal injection in 2005, eighteen years after sentencing, and then only after he voluntarily abandoned further legal challenges. L. Goodheart, supra, pp. 228, 230–31, 246. Of the eleven men currently on death row in Connecticut, one has been awaiting execution for twenty-five years, two others for nearly that long, and one for twenty years.

"The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted." *Coleman* v. *Balkcom*, 451 U.S. 949, 952, 101 S. Ct. 2031, 68 L. Ed. 2d 334 (1981) (Stevens, J., concurring in the denial of certiorari); see also *Gomez* v. *Fierro*, 519 U.S. 918, 918, 117 S. Ct. 285, 136 L. Ed. 2d 204 (1996) (Stevens, J., dissenting) ("[d]elay in the execution of judgments imposing the death penalty frustrates the public interest in deterrence and eviscerates the only rational justification for that type of punishment"); *Furman* v. *Georgia*, supra, 408 U.S. 302 (Brennan, J., concurring) ("[a] rational person contemplating a murder or rape is confronted, not with the certainty of a speedy death, but with the slightest possibility that he will be executed in the distant future"); *Jones* v. *Chappell*, 31 F. Supp. 3d 1050, 1064 (C.D. Cal. 2014) (law and common sense dictate that "long delays preceding execution frustrate whatever deterrent effect the death penalty may have"); *People* v. *Anderson*, supra, 6 Cal. 3d 652 ("capital punishment can have a significant deterrent effect only if the punishment is swiftly and certainly exacted"); L. Powell, commentary, "Capital Punishment," 102 Harv. L. Rev. 1035, 1035 (1989) ("years of delay between sentencing and execution . . . [undermine] the deterrent effect of capital punishment and [reduce] public confidence in the criminal justice system"). Even prior to the enactment of P.A. 12-5, the fact that one who commits the most heinous of crimes can expect to spend decades in prison prior to any execution suggests that capital punishment promises little if any deterrence over and above life imprisonment.[96] The legislature heard extensive expert testimony to this effect when considering P.A. 12-5, and numerous legislators cited the lack of a deterrent effect as a justification for their decision to abolish the death penalty.[97] Indeed, Chief State's Attorney Kane, who represents the state in this and all other death penalty cases, acknowledged in public testimony that there is insufficient evidence to conclude that capital punishment deters crime. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8,

2012 Sess., p. 2623 ("I don't know if I'd even go so far as to say [the death penalty] might well be a deterrent because the studies are mixed. I'm not ready [to say that the] . . . answer is clear enough to justify that as a reason for having the death penalty.").

In addition, aside from the inevitable delays, the sheer rarity with which death sentences are imposed and carried out in Connecticut—and, indeed, the entire northeastern United States—suggests that any conceivable deterrent value will be far less than in a state like Texas, for example, which carries out executions on a regular basis. "[C]ommon sense and experience tell us that seldom-enforced laws become ineffective measures for controlling human conduct and that the death penalty, unless imposed with sufficient frequency, will make little contribution to deterring those crimes for which it may be exacted." *Furman* v. *Georgia*, supra, 408 U.S. 312 (White, J., concurring). Judge Alex Kozinski of the Ninth Circuit Court of Appeals puts the problem most plainly: "Rather than go through the competing considerations, let's cut to the meat of the coconut. The death penalty, as we now administer it, has no deterrent value because it is imposed so infrequently and so freakishly. To get executed in America these days you have to be not only a truly nasty person, but also very, very unlucky . . . ." A. Kozinski & S. Gallagher, supra, 46 Case W. Res. L. Rev. 25.

Our legislature's adoption of P.A. 12-5 underscores this state's historical and profound ambivalence with respect to the death penalty, and is further reason to believe that, even if we were to sustain its constitutionality, the delays in the administration of our capital sentencing scheme would not abate. On the contrary, as we previously noted, no state or nation ever has executed someone after a prospective only repeal of the death penalty. See, e.g., *State* v. *Santiago*, Conn. Supreme Court Records & Briefs, April Term, 2013, Amicus Brief of legal historians and scholars p. 1. Whether death has been belayed by executive clemency or simple public aversion, it universally has been considered unseemly to carry out an execution after the people's representatives have expressed their will that the sentence of death no longer shall be imposed. Accordingly, Connecticut's prospective repeal of capital punishment provides strong reason to believe that those persons currently on death row never will be executed. In any event, in light of the passage of P.A. 12-5, and in the absence of any indication that the death penalty, as administered in this state, has forestalled the commission of capital crimes, it is apparent that capital punishment no longer serves any meaningful deterrent function in Connecticut.[98]

B

Retribution

The second commonly articulated rationale for the death penalty is that, regardless of whether capital punishment provides any tangible benefits such as deterrence, incapacitation, or rehabilitation, it is a justified moral response to a heinous crime such as the one committed by the defendant in the present case. This retributive function of the criminal law has been expressed in varying terms: giving the offender his "just deserts"; providing a sense of restoration and closure to victims and their families; expressing society's outrage at the crime and denunciation of the perpetrator; and, more philosophically, restoring balance to the moral order.

Both this court and the federal courts have recognized that, as society has evolved and matured, the erstwhile importance of retribution as a goal of and justification for criminal sanctions has waned. See, e.g., *State* v. *Corchado*, 200 Conn. 453, 463, 512 A.2d 183 (1986) (agreeing with observation of United States Supreme Court that reformation and rehabilitation of offenders, rather than retribution, has become primary goal of criminal jurisprudence). Over time, "our society has moved away from public and painful retribution toward ever more humane forms of punishment." *Baze* v. *Rees*, supra, 553 U.S. 80 (Stevens, J., concurring in the judgment). In addition, the United States Supreme Court has cautioned that, of the valid justifications for punishment, "retribution . . . most often can contradict the law's own ends. This is of particular concern . . . in capital cases. When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." *Kennedy* v. *Louisiana*, supra, 554 U.S. 420. Accordingly, "[r]etribution is no longer the dominant objective of the criminal law." *Williams* v. *New York*, 337 U.S. 241, 248, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949).

Critics of the death penalty have articulated in passionate and persuasive terms why, in their view, it can never be morally appropriate for the state to kill one of its own. See, e.g., *District Attorney* v. *Watson*, supra, 381 Mass. 677–86 (Liacos, J., concurring). On the other hand, we are sympathetic to the view, expressed by Justice Scalia, among many others, that, however barbaric a modern execution may seem, it pales in comparison to the suffering and trauma experienced by the victims and their families. See *Callins* v. *Collins*, 510 U.S. 1141, 1143, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994) (Scalia, J., concurring in the denial of certiorari) ("How enviable a quiet death by lethal injection compared with that!"). Regardless of one's general beliefs about the morality of the death penalty, however, there are four reasons why capital punishment, as administered in Connecticut, simply does not serve a meaningful retributive purpose.

Legislative Judgments

First, as we previously discussed; see part II B of this opinion; the passage of P.A. 12-5 reflects a legislative judgment that capital punishment no longer serves a necessary moral function in our state. The retributive rationale for capital punishment always has been that the worst of the worst, those who commit especially heinous crimes, have thereby cut themselves off from the human community. See *Roper* v. *Simmons*, supra, 543 U.S. 568 ("[c]apital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution" [internal quotation marks omitted]). In other words, execution is the ultimate form of ostracism. "[T]he decision that capital punishment may be the appropriate sanction in [such] extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the *only adequate response* may be the penalty of death." (Emphasis added.) *Gregg* v. *Georgia*, supra, 428 U.S. 184 (opinion announcing judgment).

By prospectively repealing the death penalty, however, the legislature necessarily has made a determination that he who lives by the sword need not die by it; that life imprisonment without the possibility of release is an adequate and sufficient penalty even for the most horrific of crimes; and that we can express our moral outrage, mete out justice, bring some measure of solace to the families of the victims, and purge the blemish of murder on our community whilst the offender yet lives. If this is true, then, although the death penalty still might serve some minimal retributive *function* in Connecticut, it lacks any retributive *justification*. In other words, to whatever limited extent capital punishment may still further these retributive purposes, the legislature has determined that the death penalty is no longer *necessary* to achieve them. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2638, remarks of Representative Gary A. Holder-Winfield (if justice can be achieved in capital eligible case without death penalty, then it is unnecessary). Lacking such necessity, the death penalty in Connecticut has become unconstitutionally excessive. Cf. *Furman* v. *Georgia*, supra, 408 U.S. 342 (Marshall, J., concurring) (capital punishment unjustified when less severe penalties satisfy legitimate legislative goals). As Justice Brennan explained in his concurrence in *Furman*, "[w]hen the overwhelming number of criminals who commit capital crimes go to prison, it cannot be concluded that death serves the purpose of retribution more effectively than imprisonment. The asserted public belief that murderers and rapists deserve to die is flatly inconsistent with the execution of a random few." Id., 304–305 (Brennan, J., concurring).

Delays

The second reason the death penalty has lost its retributive mooring in Connecticut is that the lengthy if not interminable delays in carrying out capital sentences "do not just undermine the death penalty's deterrent effect; they also spoil its capacity for satisfying retribution." D. Garland, supra, p. 45; see also *Jones* v. *Chappell*, supra, 31 F. Supp. 3d 1064. Of the eleven individuals awaiting execution in Connecticut, four have been there for more than twenty years, and several others for well over one decade. Nor is there any reasonable probability that anyone will be executed in this state for many years to come, given the availability of various appellate and postconviction remedies, as well as the historical reluctance—indeed, unwillingness— of our sister states and other countries to carry out executions after prospectively abolishing capital punishment. See *State* v. *Santiago*, Conn. Supreme Court Records & Briefs, April Term, 2013, Amicus Brief of legal historians and scholars p. 1. "[W]hen imposition of the [death] penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied. . . . Nor could it be said with confidence . . . that community values are measurably reinforced by authorizing a penalty so rarely invoked." *Furman* v. *Georgia*, supra, 408 U.S. 311–12 (White, J., concurring); see also *Valle* v. *Florida*, U.S. , 132 S. Ct. 1, 2, 180 L. Ed. 2d 940 (2011) (Breyer, J., dissenting from the denial of stay of execution) ("I would ask how often [the] community's sense of retribution would forcefully insist [on] a death that comes only several decades after the crime was committed"); *Lackey* v. *Texas*, 514 U.S. 1045, 1045–46, 115 S. Ct. 1421, 131 L. Ed. 2d 304 (1995) (mem. respecting the denial of certiorari) (expressing doubt whether execution following extended imprisonment satisfies state's interest in retribution); B. Newton, supra, 13 J. App. Prac. & Process 65 ("systemic delays have undermined the legitimate purposes of capital punishment"); L. Powell, supra, 102 Harv. L. Rev. 1041 (observing that retributive value of capital punishment diminishes as imposition of sentence becomes even farther removed from time of offense). As one federal court recently observed in holding that California's capital punishment scheme violates the eighth amendment, "for most [individuals on death row], systemic delay has made their execution so unlikely that the death sentence carefully and deliberately imposed by the jury has been quietly transformed into one no rational jury or legislature could ever impose: life in prison, with the remote possibility of death. As for the random few for whom execution does become a reality, they will have languished for so long on [d]eath [r]ow that their execution[s] will serve no retributive or deterrent purpose

and will be arbitrary." (Emphasis omitted.) *Jones* v. *Chappell*, supra, 1053.

After such lengthy delays, scholars have questioned whether there can be any true retribution when the middle aged inmate who goes to the gallows bears little resemblance to the individual who offended years before: "The man you wanted to kill was the abusive robber, high on crack, who pistol-whipped and shot two customers at a [7-Eleven] store in 1984. Instead, in 1990, the state electrocutes a balding, religious, model prisoner in a neat blue-denim uniform." (Internal quotation marks omitted.) D. Garland, supra, pp. 45–46, quoting S. Gross, "The Romance of Revenge: Capital Punishment in America," 13 Stud. L. Pol. & Society 71, 82 (1993); see also L. Powell, "Unraveling Criminal Statutes of Limitations," 45 Am. Crim. L. Rev. 115, 130 (2008) ("[t]he passage of time may . . . lead to profound changes in . . . identity, arguably making punishment less deserved" [footnote omitted; internal quotation marks omitted]). Even such staunch advocates of capital punishment as the German philosopher Immanuel Kant, the deacon of retributive justice, have recognized that the retributive value of the death penalty is not realized unless and until the actual execution is carried out. See, e.g., I. Kant, The Metaphysics of Morals (1991) p. 142; see also *Coleman* v. *Balkcom*, supra, 451 U.S. 960 (Rehnquist, J., dissenting from the denial of certiorari) ("[t]here can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution").

What then remains of retribution when one who commits a heinous crime is not executed until after he has spent half a lifetime or more on death row, if ever? Unlike with deterrence, the retributive value of an execution defies easy definition and quantification, shrouded as retribution is in metaphysical notions of moral restoration and just deserts. What is clear, however, is that the most tangible retributive fruit of capital punishment—providing victims and their families with a sense of respite, empowerment, and closure—is grievously undermined by the interminable delays in carrying out the sentence imposed. "[I]n reality, rather than affording them a quick and final disposition of the case against the murderer, so that they may finalize the tragedy and begin rebuilding their lives, the capital punishment process often creates a second victimization of survivors. They must contend with repeated reminders about the murder during the protracted proceedings in which the death penalty's implementation is—usually unsuccessfully—sought." R. Tabak & J. Lane, "The Execution of Injustice: A Cost and Lack-of-Benefit Analysis of the Death Penalty," 23 Loy. L.A. L. Rev. 59, 129 (1989); see also *Nichols* v. *Heidle*, 725 F.3d 516, 559 (6th Cir. 2013) (Martin, J., concurring) (noting, inter alia, protracted nature of death penalty cases, which, in turn, provides "no closure for the families of the victims"),

cert. denied,    U.S.    , 135 S. Ct. 704, 190 L. Ed. 2d 438 (2014). Psychologically, the capital punishment system actually may impede the healing process. R. Tabak & J. Lane, supra, 131.

Legislators heard substantial testimony to this effect when considering P.A. 12-5, with both mental health professionals and the relatives of individual murder victims speaking about the retraumatization that our capital punishment scheme often inflicts on victims' families.[99] Many legislators cited such testimony as a basis for their decision to support the repeal of the death penalty, while at the same time recognizing that there are, of course, families who continue to seek the death penalty for the offenders who murdered their loved ones. Governor Malloy, upon signing the bill, shared the sentiments of one victim's survivor: "Now is the time to start the process of healing, a process that could have been started decades earlier with the finality of a life sentence. We cannot afford to put on hold the lives of these secondary victims. We need to allow them to find a way as early as possible to begin to live again." (Internal quotation marks omitted.) Governor's Statement, supra.

### 3

### Possibility of Error

The third reason that capital punishment fails to satisfy the demands of retributive justice is the ever present danger of irreversible error. It is axiomatic that "the execution of a legally and factually innocent person would be a constitutionally intolerable event." *Herrera* v. *Collins*, 506 U.S. 390, 419, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (O'Connor, J., concurring). Indeed, "[t]he execution of a person who can show [that] he is innocent comes perilously close to simple murder." (Internal quotation marks omitted.) *State* v. *Cobb*, supra, 251 Conn. 549 (*Norcott, J.*, dissenting), quoting *Herrera* v. *Collins*, supra, 446 (Blackmun, J., dissenting).

Unfortunately, numerous studies have found that "[e]rrors can and have been made repeatedly in the trial of death penalty cases because of poor representation, racial prejudice, prosecutorial misconduct, or simply the presentation of erroneous evidence." *State* v. *Ross*, supra, 230 Conn. 315 (*Berdon, J.*, dissenting in part). A study of all death sentences in the United States in the two decades following *Furman* found "extremely high error rates"; A. Gelman et al., "A Broken System: The Persistent Patterns of Reversals of Death Sentences in the United States," 1 J. Empirical Legal Stud. 209, 261 (2004); with at least two thirds of capital sentences eventually overturned on appeal. Id., 209; see also D. Benson et al., "Executing the Innocent," 3 Ala. C.R. & C.L. L. Rev., no. 2, 2013, 9 (placing number of exonerations since reinstatement of death penalty at 140); R. Tabak, "Finality Without Fairness: Why We Are Moving

Towards Moratoria on Executions, and the Potential Abolition of Capital Punishment," 33 Conn. L. Rev. 733, 748 (2001) (capital punishment system is "collapsing under the weight of its own mistakes" [internal quotation marks omitted]). Statistical analyses have demonstrated to a near certainty that innocent Americans have been and will continue to be executed in the post-*Furman* era. See *Glossip* v. *Gross*, supra, 135 S. Ct. 2756 (Breyer, J., dissenting) (citing "convincing evidence" that, "in the past three decades, innocent people have been executed"); id., 2758 (Breyer, J., dissenting) (citing evidence that "about [4 percent] of those sentenced to death are actually innocent"); see also H. Bedau & M. Radelet, "Miscarriages of Justice in Potentially Capital Cases," 40 Stan. L. Rev. 21, 36 (1987) (citing high rate of error in death penalty cases); D. Benson et al., supra, 3 Ala. C.R. & C.L. L. Rev. 3 ("We know . . . that [the] intolerable event [of executing an innocent person] takes place with some regularity in . . . death penalty jurisdictions" [emphasis omitted]); U. Bentele, "Does the Death Penalty, by Risking Execution of the Innocent, Violate Substantive Due Process?," 40 Hous. L. Rev. 1359, 1365 (2004) ("[s]ince capital punishment was given a renewed seal of approval in 1976, more than [100] people have been sentenced to death [and have been] subsequently found to be innocent" [footnote omitted]).

From a retributive standpoint, the problem is simple: "[m]istakes cannot be corrected after a person is executed." *State* v. *Ross*, supra, 230 Conn. 314 (*Berdon, J.*, dissenting in part). "We know that persons have been condemned who were innocent; we know that future scientific evidence can overturn the seemingly most safe of convictions; and we know that we could easily avoid such problems in adopting an alternative sanction, such as life imprisonment. Therefore, we knowingly, foreseeably, and avoidably sentence innocent people to death . . . if we continue to endorse capital punishment . . . ." T. Brooks, "Retribution and Capital Punishment," in Retributivism: Essays on Theory and Practice (M. White ed., 2011) p. 238. Of course, all punishment is tainted by the possibility of error. Capital punishment, however, "is especially problematic. When we impose capital punishment on a convicted murderer, there cannot be any room for error since the murderer can never be brought back to life afterward if error is discovered at some later date. If there remains a substantial risk of error, as demonstrated by advances in scientific testing in cases [in which] a person has been sentenced beyond a reasonable doubt in a fair trial, then we have good reason on retributivist grounds to reject capital punishment in favor of an alternative sanction." Id., p. 237.

It was this risk of error that led Illinois Governor George Ryan in 2003 to commute the death sentences of that state's 167 death row inmates to life imprisonment

without the possibility of parole. See J. Wilgoren, "Citing Issue of Fairness, Governor Clears Out Death Row in Illinois," N.Y. Times, January 12, 2003, p. 1. Governor Ryan concluded that "[o]ur capital system is haunted by the demon of error . . . ." (Internal quotation marks omitted.) Id. The possibility of executing an innocent person was also a principal concern voiced by both of Connecticut's elected branches in their support of P.A. 12-5.[100] We do not suggest that anyone currently on death row in Connecticut has a potentially viable claim of actual innocence.[101] In concluding that the death penalty is unconstitutional, however, we recognize that the legal and moral legitimacy of any future executions would be undermined by the ever present risk that an innocent person will be wrongly executed.[102]

### 4

### Caprice and Bias

The fourth reason that our state's capital punishment system fails to achieve its retributive goals is that the selection of which offenders live and which offenders die appears to be inescapably tainted by caprice and bias. "[T]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." (Internal quotation marks omitted.) *Graham* v. *Florida*, supra, 560 U.S. 71. In other words, the death penalty must be equally available for similarly culpable offenders if a capital sentencing scheme is to fulfill a valid retributive purpose. To the extent that the ultimate punishment is imposed on an offender on the basis of impermissible considerations such as his, or his victim's, race, ethnicity, or socio-economic status, rather than the severity of his crime, his execution does not restore but, rather, tarnishes the moral order. See generally O. Londono, "A Retributive Critique of Racial Bias and Arbitrariness in Capital Punishment," 44 J. Soc. Phil. 95 (2013); D. McDermott, "A Retributivist Argument against Capital Punishment," 32 J. Soc. Phil. 317 (2001); S. Nathanson, "Does It Matter if the Death Penalty Is Arbitrarily Administered?," 14 Phil. & Pub. Aff. 149 (1985).

The problem is that, as we previously noted, there is an inherent conflict in the requirements that the eighth amendment's ban on cruel and unusual punishment, as interpreted by the United States Supreme Court, imposes on any capital sentencing scheme. On the one hand, *Furman* and its progeny stand for the proposition that any capital punishment statute, to avoid arbitrariness and pass constitutional muster, must cabin the discretion of prosecutors, judges, and juries by providing clear guidelines as to what specific types of crimes are eligible for the punishment of death. In the context of capital murder—the sole remaining crime against an individual for which capital punishment may be imposed under the eighth amendment—that requirement has been interpreted to mean that statutes must

identify specific aggravating factors that the fact finder must find before imposing the death penalty. See *Tuilaepa* v. *California*, supra, 512 U.S. 971–73. The ultimate punishment must be reserved for the very worst offenders, and may not be "wantonly [or] . . . freakishly imposed." *Furman* v. *Georgia*, supra, 408 U.S. 310 (Stewart, J., concurring). On the other hand, since it decided *Woodson* v. *North Carolina*, supra, 428 U.S. 280, and *Lockett* v. *Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), the United States Supreme Court has not wavered in its commitment to the principle of individualized sentencing: juries must be afforded unlimited discretion to consider any mitigating factor— any unique characteristic of the crime, the criminal, or the victim—before imposing the death penalty. See *Tuilaepa* v. *California*, supra, 972–73. In other words, the discretion of the jury to accord the capital defendant mercy may not be confined or restricted in any way.[103]

The question is whether this individualized sentencing requirement inevitably allows in through the back door the same sorts of caprice and freakishness that the court sought to exclude in *Furman*, or, worse, whether individualized sentencing necessarily opens the door to racial and ethnic discrimination in capital sentencing.[104] In other words, is it ever possible to eliminate arbitrary and discriminatory application of capital punishment through a more precise and restrictive definition of capital crimes if prosecutors always remain free *not* to seek the death penalty for a particular defendant, and juries not to impose it, for any reason whatsoever? We do not believe that it is.[105]

We begin by observing that the United States Supreme Court itself has expressed serious doubts as to whether its own commandments can be reconciled. In *Tuilaepa*, the court recognized that "[t]he objectives of these two inquiries can be in some tension . . . ." Id., 973. Fourteen years later, in *Kennedy*, the court again acknowledged that "[t]he tension between general rules and case-specific circumstances has produced results not altogether satisfactory." *Kennedy* v. *Louisiana*, supra, 554 U.S. 436. "Our response to this case law," the court frankly conceded, "is still in search of a unifying principle . . . ." Id., 437; see also *Turner* v. *Murray*, 476 U.S. 28, 35, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986) (plurality opinion) ("[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate").

In fact, in the four decades since the United States Supreme Court struck down the death penalty (as then applied) in *Furman* and then resuscitated it four years later in *Gregg*, at least one-half dozen members of that court—jurists of all jurisprudential stripes—have concluded that the demands of *Furman*, on the one hand, and of *Woodson* and *Lockett*, on the other, are, ulti-

mately, irreconcilable. In *Furman* itself, of the five concurring justices, two (Justices Brennan and Marshall) took the position that capital punishment is so inherently arbitrary as to constitute cruel and unusual punishment under all circumstances, and a third (Justice Douglas) opined that any nonmandatory capital sentencing scheme would be inherently subject to discrimination and hence unconstitutional. See *Furman* v. *Georgia*, supra, 408 U.S. 255 (Douglas, J., concurring) ("we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position"); id., 294 (Brennan, J., concurring) ("[n]o one has yet suggested a rational basis that could differentiate . . . the few who die from the many who go to prison"); id., 365 (Marshall, J., concurring) ("committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is . . . an open invitation to discrimination" [internal quotation marks omitted]).

Justice Marshall elaborated on this "fundamental defect" in the court's eighth amendment jurisprudence in *Godfrey* v. *Georgia*, supra, 446 U.S. 420: "[A]ppellate courts are incapable of guaranteeing the kind of objectivity and evenhandedness that the [c]ourt contemplated and hoped for in *Gregg*. The disgraceful distorting effects of racial discrimination and poverty continue to be painfully visible in the imposition of death sentences. . . . The task of eliminating arbitrariness in the infliction of capital punishment is proving to be one which our criminal justice system—and perhaps any criminal justice system—is unable to perform. . . .

"The . . . inability to administer . . . capital punishment . . . in an evenhanded fashion is . . . symptomatic of a deeper problem that is proving to be genuinely intractable. . . .

"[T]he task of selecting in some objective way those persons who should be condemned to die is one that remains beyond the capacities of the criminal justice system. For this reason, I remain hopeful that even if the [c]ourt is unwilling to accept the view that the death penalty is so barbaric that it is in all circumstances cruel and unusual punishment forbidden by the [e]ighth and [f]ourteenth [a]mendments, it may eventually conclude that the effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty—must be abandoned altogether." (Citations omitted; footnotes omitted.) Id., 439–42 (Marshall, J., concurring in the judgment). Both Justices Stevens and Blackmun have reached similar conclusions. See *Baze* v. *Rees*, supra, 553 U.S. 85 (Stevens, J., concurring in the judgment)

("[a] . . . significant concern is the risk of discriminatory application of the death penalty"); *Tuilaepa* v. *California*, supra, 512 U.S. 991–92 (Blackmun, J., dissenting) ("One of the greatest evils of leaving jurors with largely unguided discretion is the risk that this discretion will be exercised on the basis of constitutionally impermissible considerations—primary among them, race. . . . For far too many jurors, the most important 'circumstances of the crime' are the race of the victim or the defendant." [Citations omitted.]).

Justice Scalia, while drawing a different legal conclusion than his more liberal brethren, has been no less persuaded by the premise that the United States Supreme Court's *Furman* and *Woodson/Lockett* lines of jurisprudence are fundamentally incompatible: "Our cases proudly announce that the [c]onstitution effectively prohibits the [s]tates from excluding from the sentencing decision *any* aspect of a defendant's character or record, or *any* circumstance surrounding the crime: that the defendant had a poor and deprived childhood, or that he had a rich and spoiled childhood; that he had a great love for the victim's race, or that he had a pathological hatred for the victim's race; that he has limited mental capacity, or that he has a brilliant mind which can make a great contribution to society; that he was kind to his mother, or that he despised his mother." (Emphasis in original.) *Walton* v. *Arizona*, 497 U.S. 639, 663, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (Scalia, J., concurring in part and concurring in the judgment), overruled in part on other grounds by *Ring* v. *Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). "To acknowledge that there perhaps is an inherent tension between this line of cases and the line stemming from *Furman*," Justice Scalia continued, "is rather like saying that there was perhaps an inherent tension between the [a]llies and the Axis Powers in World War II. And to refer to the two lines as pursuing twin objectives . . . is rather like referring to the twin objectives of good and evil. They cannot be reconciled. . . . The latter requirement quite obviously destroys whatever rationality and predictability the former requirement was designed to achieve." (Citations omitted; internal quotation marks omitted.) *Walton* v. *Arizona*, supra, 664–65 (Scalia, J., concurring in part and concurring in the judgment). "In short, the practice which in *Furman* had been described as the discretion to sentence to death and pronounced constitutionally prohibited, was in *Woodson* and *Lockett* renamed the discretion not to sentence to death and pronounced constitutionally required." Id., 662 (Scalia, J., concurring in part and concurring in the judgment).

Since we decided *Ross* in 1994, four members of this court likewise have concluded that the degree of fact finder discretion required by the *federal* constitution means that the death penalty in Connecticut has been and inevitably will continue to be imposed with a degree

of discrimination that is impermissible under the *state* constitution. See *State* v. *Santiago*, supra, 305 Conn. 324 (*Harper, J.*, concurring in part and dissenting in part) ("invidious discrimination . . . pave[s] a smoother path to execution for a subset of the population"); *State* v. *Peeler*, 271 Conn. 338, 466, 857 A.2d 808 (2004) (*Katz, J.*, dissenting) ("[w]e have not eliminated the biases and prejudices that infect society generally; therefore, it should not be surprising that such problems continue to influence the determination of who is sentenced to death, even within the narrower pool of death-eligible defendants selected according to so-called objective standards"), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); *State* v. *Breton*, supra, 264 Conn. 447 (*Norcott, J.*, dissenting) ("[t]he passage of a few [years'] time has done nothing to blunt the pervasive and insidious influence of race and poverty in the administration of the death penalty"); *State* v. *Webb*, supra, 238 Conn. 557 (*Berdon, J.*, dissenting) ("the effort to eliminate arbitrariness in the infliction of that ultimate sanction is so plainly doomed to failure that it—and the death penalty—must be abandoned altogether" [internal quotation marks omitted]); *State* v. *Webb*, supra, 570 (*Norcott, J.*, dissenting) ("the continual legislative and judicial efforts to bring about a real sense of fairness in the imposition of the death penalty are delusional endeavors"); see also *State* v. *Breton*, 212 Conn. 258, 281, 562 A.2d 1060 (1989) (*Glass, J.*, dissenting) (expressing skepticism that state constitution "tolerates a certain amount of capriciousness in the application of the death penalty"). As Justice Norcott first put it nearly twenty years ago, there can be no death penalty scheme "adequate to cure the influence of arbitrariness and race in the overall equation that results in the imposition of death." *State* v. *Webb*, supra, 570 (*Norcott, J.*, dissenting).

Similar concerns also have been expressed by legal scholars. See, e.g., D. Garland, supra, p. 12 ("capital punishment in the United States subsists—inescapably—in a miasma of race" [internal quotation marks omitted]); S. Bright, "Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty," 35 Santa Clara L. Rev. 433, 434 (1995) ("race and poverty continue to determine who dies"); G. Dix, "Appellate Review of the Decision to Impose Death," 68 Geo. L.J. 97, 161 (1979) (concluding that *Gregg* and its companion cases "mandate pursuit of an impossible goal"). In 1973, former Yale Law School Dean Louis H. Pollak, testifying regarding the legislature's efforts to craft a new post-*Furman* capital murder statute, opined that "[t]he conclusion that this [b]ill is unconstitutional is not a criticism of the drafters, it is rather a recognition that they were undertaking a constitutional impossibility. Maintaining the idea of a death sentence while [e]nsuring that it would in practice almost never be imposed, the result necessarily is not

merely [that] death sentence[s] would be rarities but that those rarities would occur wantonly and freakishly and hence, unconstitutionally." (Internal quotation marks omitted.) 16 S. Proc., Pt. 4, 1973 Sess., p. 1892.

After thoroughly reviewing the operation of Connecticut's capital sentencing scheme over the past four decades, we are persuaded that these critiques are well founded and that the opportunity for the exercise of unfettered discretion at key decision points in the process has meant that the ultimate punishment has not been reserved for the worst of the worst offenders. There is no doubt that our death row has counted among its residents the perpetrators of some of the most heinous crimes in Connecticut history. It is equally clear, however, that the process of selecting offenders for execution has been both under inclusive and over inclusive. Many who commit truly horrific crimes are spared, whereas certain defendants whose crimes are, by all objective measures, less brutal are condemned to death. The defendant in the present case is, perhaps, the clearest example. He shot the sole victim, an adult white male, in his sleep, killing him instantly. The defendant had no prior criminal convictions. And yet, of the seventeen offenders convicted of committing capital eligible murders for hire in the state since 1973, Eduardo Santiago was the only one sentenced to death.[106] To the extent that the population of death row has been chosen on grounds other than the atrocity of the offenders' crimes, this would undermine all confidence that capital punishment, as applied, is morally proportionate and serves a legitimate retributive function in Connecticut.[107]

## C

### Vengeance

Finally, it bears emphasizing that, to the extent that the statutory history of P.A. 12-5 reveals anything with respect to the legislature's purpose in prospectively abolishing the death penalty while retaining it for the handful of individuals now on death row, it is that the primary rationale for this dichotomy was neither deterrence nor retribution but, rather, vengeance—the Hyde to retribution's Jekyll. Vengeance, unlike retribution, is personal in nature; it is motivated by emotion, and may even relish in the suffering of the offender. See R. Nozick, Philosophical Explanations (1981) p. 367. Accordingly, vengeance traditionally has not been considered a constitutionally permissible justification for criminal sanctions. See *Ford* v. *Wainwright*, 477 U.S. 399, 410, 106 S. Ct. 2595, 91 L. Ed. 2d 335 (1986) (finding no retributive value in "the barbarity of exacting mindless vengeance"). On the contrary, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner* v. *Florida*, 430 U.S. 349, 358, 97 S. Ct. 1197, 51 L.

Ed. 2d 393 (1977) (plurality opinion).

There are, no doubt, cases in which the line between a principled commitment to retributive justice and an impermissible acquiescence to private vengeance is a gray one. There is every indication, however, that P.A. 12-5 was crafted primarily to maintain the possibility of executing two particular offenders—the much reviled perpetrators of the widely publicized 2007 home invasion and murder of three members of Cheshire's Petit family. K. Barry, supra, 35 Cardozo L. Rev. 1837–38. In suggesting that the legislators who voted in favor of a solely prospective repeal of the death penalty were equally committed to executing the defendant in the present case and other inmates on Connecticut's death row, Chief Justice Rogers ignores the overwhelming evidence that the perpetrators in the Cheshire case, Joshua Komisarjevsky and Steven Hayes, were the principal targets of the decision to retain the death penalty retroactively.[108] There is certainly no question what motivated one state senator, who opined that " '[t]hey should bypass the trial [in the Cheshire case] and take that second animal and hang him by his penis from a tree out in the middle of Main Street . . . .' "[109]

It has been suggested that it would be a morally permissible "sacrifice" for Connecticut to allow those men currently on death row to be executed so as to hasten the abolition of capital punishment in other jurisdictions. K. Barry, "From Wolves, Lambs (Part I): The Eighth Amendment Case for Gradual Abolition of the Death Penalty," 66 Fla. L. Rev. 313, 325 (2014). Such judgments are not for us to make. We can say, however, that it would not be constitutionally permissible to execute the defendant in the present case, and others similarly situated, without any legitimate penological purpose, merely to achieve the politically popular end of killing two especially notorious inmates.

D

Conclusion

For all of these reasons, the death penalty no longer serves any legitimate penological goal in our state. As Judge Kozinski concludes, "we have little more than an illusion of a death penalty in this country. To be sure, we have capital trials; we have convictions and death sentences imposed; we have endless and massively costly reviews by the state and federal courts; and we do have a small number of people executed each year. But the number of executions compared to the number of people who have been sentenced to death is minuscule, and the gap is widening every year. Whatever purposes the death penalty is said to serve— deterrence, retribution, assuaging the pain suffered by victims' families—these purposes are not served by the system as it now operates." (Footnotes omitted.) A. Kozinski & S. Gallagher, supra, 46 Case W. Res. L. Rev.

3–4. We therefore conclude that, following the enactment of P.A. 12-5, capital punishment also violates article first, §§ 8 and 9, of the Connecticut constitution because it no longer serves any legitimate penological purpose.[110]

## IV

### RESPONSE TO THE DISSENTING JUSTICES

Lastly, we take this opportunity to address briefly certain general arguments that the dissenting justices have raised. Although we recognize and respect that their opinions are grounded in a principled and commendable commitment to judicial restraint, we find them to be unpersuasive and, in a few instances, somewhat troubling.

### A

### Whether the Questions Decided Are Properly before the Court

We first address Chief Justice Rogers' argument that some of the issues, evidence, and arguments considered in this opinion are not properly before this court. Specifically, she contends that (1) some of the arguments that we consider in this opinion never were raised by the defendant, (2) the parties were not afforded an adequate opportunity to brief the issues addressed in this opinion, and (3) the majority relies on research and statistics that are not properly the subject of judicial notice. We consider each argument in turn.

### 1

### Arguments Allegedly Not Raised by the Defendant

Chief Justice Rogers first contends that we improperly have considered certain arguments that the defendant himself has not raised. For example, she contends that the defendant did not adequately preserve the arguments that (1) the death penalty is rarely imposed in Connecticut, (2) the death penalty has slowly fallen out of use in Connecticut, and (3) other states recently have abolished the death penalty, while respected professional organizations, such as the American Law Institute, no longer support its use. We are not persuaded by this contention.

We begin by noting that the defendant indisputably preserved the claim that, following the enactment of P.A. 12-5, the death penalty now offends the state constitution in that it (1) fails to comport with contemporary standards of decency, and (2) is now devoid of any legitimate penological value.[111] We recognized as much in our initial decision in this case; see *State* v. *Santiago*, supra, 305 Conn. 307–308 n.167; and, on reconsideration, the defendant dedicates pages of discussion to this claim in his supplemental briefs. Indeed, his argument on reconsideration begins with the statement that "[P.A. 12-5] represents the considered judgment of our

legislature and governor that the death penalty is no longer consistent with standards of decency in Connecticut and does not serve any valid penological objective." That is precisely the issue that we have considered in parts II and III of this opinion.

Chief Justice Rogers' objection, then, is merely that the defendant did not brief the issue in sufficient depth, and, specifically, that he did not expressly address certain facts and factors—the accuracy of which is not reasonably in dispute—on which we rely in this opinion. Her view appears to be that, even though a significant change in the legal landscape, such as the prospective repeal of the death penalty, may warrant a full review of whether that punishment remains consistent with contemporary standards of decency, and even though that analysis necessarily encompasses the consideration of various factors and historical developments that this court and other courts have considered in past cases involving challenges to the death penalty on other grounds, we may take those factors into consideration in the present case only if the defendant fully briefs each of them anew. This makes little sense.

In the present case, the defendant, in his initial appeal, submitted an opening brief of nearly 300 pages, in which he raised more than twenty distinct legal claims. He also submitted a 122 page reply brief, as well as more than 2000 pages of appendices. Upon our grant of reconsideration, he submitted approximately 200 more pages of briefing and appendices, addressing new legal claims. The state, of course, responded with many hundreds of pages of its own briefing and appendices.

Rather than exhaustively brief every aspect of the question of whether capital punishment now offends the state constitution, the defendant chose instead to focus on the impact of the enactment of P.A. 12-5 on that question, and to incorporate by reference the other factors that this court has considered at length in previous capital appeals. The state, in rejecting the defendant's constitutional claim, likewise relied primarily on references to our prior cases. We can only assume that this choice represented a calculated decision, by both parties, that, with their briefs already taking up more than a ream of paper, resources—both natural and judicial—would be better addressed to the novel issues presented by the defendant's case, and that we had more than sufficient resources at our disposal to allow us to fully review the present constitutionality of capital punishment in a thorough and comprehensive manner. This decision was perfectly reasonable.

The approach that Chief Justice Rogers advocates would force counsel representing defendants in capital appeals to make a Hobson's choice. When, as in the present case, this court previously has rejected a constitutional claim, counsel either would have to (1) forgo

that and related claims for all subsequent capital defendants, or (2) fully brief each aspect of the issue in each capital appeal, repeatedly addressing every potential argument, legal theory, and constitutional fact that this court might find relevant or persuasive, on the mere possibility that we might agree that intervening developments warrant a fresh consideration of the issue or present novel grounds for finding a constitutional violation. If counsel followed the first path, we would be precluded from ever revisiting important constitutional questions, even those where, as in the case of cruel and unusual punishment, the legal standard itself envisions that punishments once permissible may over time come to offend the constitution. If counsel followed the second path, capital appeals, which are already deplorably prolonged, expensive, and resource intensive, would grow even more so. Forcing such a choice would be both unwise and unjust.

Rather, we believe that appellate counsel in the present appeal made a prudent and appropriate decision to raise, and thereby preserve, the constitutional claim; to submit thoughtful and informative supplemental briefing to address those novel questions and key developments for which we concluded that additional briefing would be helpful; and, with respect to paths already traveled, simply to direct our attention to prior cases in which potentially relevant factors have been more fully vetted.[112] Under the particular circumstances of this capital appeal, nothing more was required.

For the same reasons, it would be inappropriate to arbitrarily restrict our analysis of the constitutionality of capital punishment to those facts and circumstances that have been identified expressly by the parties. In fact, although we generally do not consider *claims or issues* that the parties themselves have not raised; see, e.g., *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 142, 84 A.3d 840 (2014); in cases too numerous to mention, we have considered *arguments or factors* pertaining to those claims or issues that were not expressly identified by the parties. See id., 148 ("when [a case] is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law" [internal quotation marks omitted]); cf. *Rowe* v. *Superior Court*, 289 Conn. 649, 661–63, 960 A.2d 256 (2008) (concluding that defendant had preserved issue for appeal because theories related to single legal claim even though defendant had not raised each theory at trial); *Vine* v. *Zoning Board of Appeals*, 281 Conn. 553, 569, 916 A.2d 5 (2007) (addressing alternative ground for affirmance that was not raised at trial because, inter alia, issue was "closely intertwined" with certified question); *Imperial Casualty & Indemnity Co.* v. *State*, 246 Conn. 313, 322–23, 714 A.2d 1230 (1998) (considering argument that defen-

dants raised because court already was obliged to perform full and thorough review of trial court's decision on contested issue of insurance coverage and defendants' argument did not raise entirely new issue). This is especially so when plenary consideration is necessary to thoroughly address and accurately decide constitutional claims and other matters of substantial public importance, our resolution of which will surely redound to the benefit or detriment of parties not presently before the court.

Furthermore, the critiques that Chief Justice Rogers levels are particularly ill suited to the present case. As Chief Justice Rogers herself acknowledges, it is well established that, before ruling on the constitutionality of a challenged mode of punishment, a court must conduct its own *independent* review to determine whether that punishment remains suitable to the crime and continues to serve any legitimate penological objective.[113] See, e.g., *State* v. *Rizzo*, supra, 303 Conn. 197; see also *Graham* v. *Florida*, supra, 560 U.S. 80; *Atkins* v. *Virginia*, supra, 536 U.S. 312. It would be difficult, if not impossible, for us to fulfill our constitutional duty in this regard if we were barred from considering basic factual questions such as how frequently the punishment is imposed or whether its ongoing use retains the approval of our sister states, legal scholars, and other sources of persuasive authority. We routinely look to such sources when deciding legal questions of first impression—often with regrettably sparse assistance from the parties' briefing—and we see no reason why the scope of our review should be more fettered when deciding significant constitutional questions. This is especially true in capital cases, in which courts routinely, and quite properly, provide accommodations not always afforded in other, less compelling circumstances. See *State* v. *Cobb*, 234 Conn. 735, 763, 663 A.2d 948 (1995) ("the nature of the defendant's claim of systemic racial bias, and the seriousness and finality of the death penalty, counsel against raising any undue procedural barriers to review of such a claim").

2

Opportunity for Briefing

Chief Justice Rogers next contends that it was improper for the court to consider the issues that we have decided without first affording the parties a full opportunity to brief them. We disagree. The truth is that the parties did have the opportunity to brief the issue of whether the death penalty now violates the state constitution. As we have explained, each party made what we presume to be a calculated and reasonable decision to focus its argument on the legal consequences of the enactment of P.A. 12-5 and the novel questions presented thereby, and, in essence, to incorporate by reference our prior decisions, both majority and dissenting opinions, that address, in the context of

either per se or as applied challenges, other constitutionally relevant factors. The purpose of our preservation requirements—"to ensure fair notice of a party's claims to both the trial court and opposing parties"—was thereby satisfied. *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 620, 99 A.3d 1079 (2014).

Nor do we believe that, in so doing, the parties deprived this court of the opportunity to perform its constitutionally mandated independent review of the death penalty in a fully informed manner. These are matters about which courts, historians, legal scholars, and social scientists have written extensively, both in Connecticut and nationally. The relevant legislative history and constitutional facts are properly subject to judicial notice. The legal arguments are well trodden and not unfamiliar to us. After a decade of appeals in this case, and several previous rounds of supplemental briefing, our priority now must be to provide the parties, the victims' families, and the people of Connecticut with some measure of clarity and resolution.

### 3

### Extra-Record Materials

Chief Justice Rogers also maintains that we have relied on extra-record materials that, she argues, are not properly the subject of judicial notice. Again, we disagree.

Although finding the adjudicative facts that concern the parties and events of a particular case is largely the province of the jury—or the trial court in cases tried to the court—appellate courts tasked with determining the content of law and policy may take notice of constitutional and legislative facts, such as historical sources and scientific and sociological studies. See footnote 44 of this opinion. It is well established that "[t]he intellectual legitimacy of [judicial decisions in which the court takes notice of legislative facts to ascertain constitutional norms] turns [on] the actual truth-content of the legislative facts taken into account by the judges who propound the decision. While not necessarily indisputably true, it would appear that these legislative facts must at least appear to be *more likely than not true* if the opinion is going to have the requisite intellectual legitimacy [on] which the authority of judge-made rules is ultimately founded." (Emphasis added.) 2 K. Broun, McCormick on Evidence (7th Ed. 2013) § 331, pp. 612–13. Although Chief Justice Rogers accuses the majority of relying on "cherry picked," extra-record materials; footnote 30 of Chief Justice Rogers' dissenting opinion; she never specifically explains why she thinks the sources on which the majority relies, taken together, fail to satisfy this "more likely than not true" standard. 2 K. Broun, supra, § 331, p. 613. She is unable to point to any methodological flaws in the social science and other research studies cited in this opinion, to challenge

the authors' qualifications, or to direct our attention to any conflicting research of equal quality and breadth. She fails to cite to any sources that undermine the meticulous historical research provided by Collier, Connecticut's state historian, or Holdsworth's voluminous review of early Connecticut legal history, or Professor Goodheart's award winning treatise. Nor is there any suggestion that the death penalty statistics that we have presented are inaccurate or misleading. In reality, the sociological research and historical facts on which we rely far exceed the governing more likely than not true standard, and they are not subject to reasonable dispute.

It is also noteworthy that the authorities on which Chief Justice Rogers relies for the proposition that legislative fact-finding by appellate courts is improper include a law review article that begins by lamenting that "[m]any of the [United States] Supreme Court's most significant decisions turn on questions of [legislative] fact." A. Larsen, "Confronting Supreme Court Fact Finding," 98 Va. L. Rev. 1255, 1255 (2012). To be clear, then, Chief Justice Rogers' complaint is not that the majority uses social science research in a manner that appellate courts ordinarily do not but merely that she and a handful of law professors personally disapprove of this common practice.

The sources on which Chief Justice Rogers relies contend that legislative fact-finding by appellate tribunals is subject to bias and error, and that it deprives the parties of the opportunity to participate fully in the adversarial truth seeking process. There is no doubt that appellate review of legislative facts, as with virtually every other form of truth seeking in which human beings engage, can be an imperfect process. Ultimately, however, the practice has been approved and adopted because there simply is no better alternative. Appellate courts frequently are called on to make quasi-legislative policy judgments, whether in crafting state common law, construing open-ended constitutional and statutory mandates, or simply determining whether a particular interpretation of a statute would "lead to absurd consequences or bizarre results." (Internal quotation marks omitted.) *Raftopol* v. *Ramey*, 299 Conn. 681, 703, 12 A.3d 783 (2011). These policy judgments often hinge on facts about the world in which we live, facts the study of which is the domain of natural and social scientists. See 2 K. Broun, supra, § 331, pp. 610–15. If we were to follow the counsel of Chief Justice Rogers, and submit every such question to the crucible of adversarial fact-finding in a trial court, the wheels of justice would quickly grind to a halt.[114]

Ultimately, and most importantly, Chief Justice Rogers, having criticized our consideration of extra-record materials, fails to identify so much as a single statistic or historical fact cited in this opinion that she believes

is subject to reasonable dispute. Accordingly, having carefully considered Chief Justice Rogers' arguments, we continue to have every confidence that the constitutional and legislative facts on which we rely are a proper subject of judicial notice, are more likely than not true, and paint an accurate picture of the historical and contemporary record of capital punishment in Connecticut and the United States.

## B

### Connecticut's Historical Acceptance of Capital Punishment

We next address the argument of the dissenting justices that capital punishment cannot now offend the constitution of Connecticut because (1) there are references to capital punishment in the text of both the 1818 and 1965 state constitutions, (2) the framers of the 1818 constitution believed that the death penalty was an appropriate punishment for the most serious crimes, and (3) in 1965, the constitutional convention declined to adopt a constitutional provision that would have prohibited capital punishment. The premises of the dissents' argument are undoubtedly true. The conclusion is not.

It is certainly the case that, although Connecticut has steadily reduced the number of crimes subject to capital punishment over the past four centuries, the death penalty has continued during that period to be authorized by statute, and it is referenced in our state constitution. There also is little doubt that the framers of the state constitution considered the death penalty to be an acceptable form of punishment, under certain circumstances and if properly applied. Although the dissenting justices reiterate these facts throughout their opinions, they fail to explain exactly how our state's historical acceptance of the death penalty answers the primary question presented by this appeal, namely, whether, following the enactment of P.A. 12-5, capital punishment *now* constitutes excessive and disproportionate punishment when viewed through the lens of our state's contemporary standards of decency.

As we have explained, the constitutionally relevant inquiry is whether the death penalty, as *currently* administered in Connecticut, and following the enactment of P.A. 12-5, offends our state's *evolving* standards of decency, and whether that punishment continues to satisfy any legitimate penological objective. Although the fact that the death penalty was considered acceptable 50 or 200 years ago might be relevant to a challenge contending that capital punishment is inherently unconstitutional; see *State* v. *Ross*, supra, 230 Conn. 249–50; it says little about whether capital punishment is constitutional *today*, in light of our legislature's most recent pronouncement on the issue, and given what we now understand and what our elected officials have deter-

mined regarding capital punishment's lack of deterrent value, the potential for irredeemable error, a pattern of persistently arbitrary and discriminatory application, and our state's inability to administer the death penalty in a way that affords closure and solace to the families of the victims.

As the Supreme Court of California has recognized, incidental references to the death penalty in a state constitution merely acknowledge that the penalty was in use at the time of drafting; they do not forever enshrine the death penalty's constitutional status as standards of decency continue to evolve: "It has been suggested that we are . . . restrained from considering whether capital punishment is proscribed by [the state constitutional prohibition against cruel and unusual punishment] since the death penalty is expressly or impliedly recognized in several other provisions of the California constitution. We perceive no possible conflict or repugnance between those provisions . . . however, for none of the incidental references to the death penalty purport to give its existence constitutional stature. They do no more than recognize its existence at the time of their adoption. Thus, the bail clause of [the California constitution] restricts the right to bail in capital cases . . . [and] the due process clause . . . ensures that life will not be taken without due process . . . . None of these provisions can be construed as an affirmative exemption of capital punishment from the compass of the cruel or unusual punishment clause of [the California constitution]." (Footnote omitted.) *People* v. *Anderson*, supra, 6 Cal. 3d 637–38. The United States Supreme Court likewise has indicated that the mere fact that the federal constitution makes reference to capital crimes does not mean that contemporary standards of decency may not evolve to the point that the death penalty is no longer constitutionally permissible. See *Gregg* v. *Georgia*, supra, 428 U.S. 176–82 (opinion announcing judgment).

It may well be that, at bottom, the opposition of the dissenting justices reflects their disapproval of the evolving standards of decency test itself, a legal standard according to which a penalty that once passed constitutional muster may, within a relatively brief span of time, come to be deemed cruel and unusual. See, e.g., *Roper* v. *Simmons*, supra, 543 U.S. 574–75, 578 (overruling *Stanford* v. *Kentucky*, 492 U.S. 361, 109 S. Ct. 2969, 106 L. Ed. 2d 306 [1989], in prohibiting execution of individuals who were under eighteen years old when they committed capital crime); *Atkins* v. *Virginia*, supra, 536 U.S. 321 (overruling *Penry* v. *Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 [1989], in holding that execution of intellectually disabled individuals is unconstitutional). But that is the law of the land, both federally and in Connecticut. In the case of the death penalty, the past several years have witnessed dramatic changes in the legal landscape,

most significant of which was the decision by the elected branches to abolish capital punishment for all future offenses. Whatever role the death penalty may once have played in our system of justice, it is clear that our elected representatives, acting on behalf of the people of this state, have repudiated the death penalty as a sentencing option unworthy of continued support.[115]

C

### Whether Deference to the Legislature Requires That We Uphold P.A. 12-5

We next address the argument of the dissenting justices that, in holding that the death penalty now violates the constitution of Connecticut, we have failed to pay adequate deference to the will of the legislature. Each of the dissenting justices argues, in essence, that a reviewing court is bound to accept what the dissenting justices maintain to be the judgment of the legislature— that the death penalty comports with contemporary standards of decency and serves legitimate penological interests—and that to do otherwise is to usurp the proper role of the legislature in order to advance judges' personal moral agendas.[116] We already have rejected this argument in *State* v. *Ross*, supra, 230 Conn. 248–49, however, recognizing that it fundamentally misunderstands the well established function and role of judicial review in the capital sentencing context.

We begin by reiterating that, although the legislature voted to abolish capital punishment on a solely prospective basis, this by no means reflects or embodies a determination that the death penalty remains consonant with contemporary standards of decency and continues to serve the goal of deterrence or retribution. The prospective nature of P.A. 12-5 instead appears to reflect a belief on the part of some legislators that prior commitments the state has made to relatives of murder victims justify the retention of capital punishment for use in those cases. Capital punishment may, in other words, simply be the lesser of two evils. Public Act 12-5 also likely reflects a purely political decision to placate the public's desire to exact vengeance on certain notorious inmates, while passing along to this court the task of finally decommissioning the state's machinery of death. There is abundant evidence in the legislative history to support both of these interpretations. See parts II B and III C of this opinion.

If we assume, for the sake of argument, however, that a majority of the legislature has in fact determined that capital punishment remains a morally acceptable punishment that serves legitimate penological interests, the question arises as to the proper scope of this court's review. It is well established that, under both the federal and state constitutions, a criminal sentence challenged as unconstitutionally excessive or disproportionate

must undergo two stages of judicial review. First, the reviewing court determines whether the punishment offends contemporary standards of decency, as evidenced by the various factors discussed in part II of this opinion. Legislative enactments are one of those considerations, but certainly not the only one. Second, the court is required to exercise its own *independent* judgment as to whether the punishment remains suitable to the crime and continues to serve any legitimate penological purpose. As the United States Supreme Court explained in *Atkins* v. *Virginia*, supra, 536 U.S. 304, although the current legislative judgment is of great importance, "the [c]onstitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the [e]ighth [a]mendment." (Internal quotation marks omitted.) Id., 312. A punishment, therefore, must satisfy *both* levels of review to survive constitutional scrutiny. Such scrutiny is especially critical in the present case because, to our knowledge, we are the first court in the modern era to comprehensively address the issue of whether the death penalty can remain consonant with society's evolving standards of decency and serve legitimate penological interests following a prospective only repeal.

Although Chief Justice Rogers concedes, as she must, that a challenged punishment is subject to this type of close judicial scrutiny, she nevertheless maintains that, because the constitutional authority to define crimes and to fix the degree and method of punishment belongs to the legislature, once the legislature has determined that a particular punishment is appropriate and morally acceptable, that determination is, essentially, dispositive. If that were the case, then judicial review would be a weak tea indeed. When an appellate court is asked to pass on the constitutionality of a mode of punishment, it is, almost invariably, after a defendant has been found guilty of a crime and sentenced in accordance with a duly enacted penal statute. If the fact that an elected legislature had authorized and enacted the punishment in question were enough to insulate it from judicial scrutiny, then the freedom from cruel and unusual punishment would be a hollow one. See *People* v. *Anderson*, supra, 6 Cal. 3d 640 ("[w]ere it otherwise, the [l]egislature would ever be the sole judge of the permissible means and extent of punishment and . . . the [c]onstitution would be superfluous" [citation omitted]). "We know that the [f]ramers did not envision so narrow a role for this basic guaranty of human rights." (Internal quotation marks omitted.) *District Attorney* v. *Watson*, supra, 381 Mass. 662.

In dismissing the United States Supreme Court's repeated statements as to the importance of this independent judicial review process, Chief Justice Rogers fails to explain why the high court would continue to emphasize that "[t]he [c]onstitution contemplates that

in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty''; (internal quotation marks omitted) *Hall* v. *Florida*, supra, 134 S. Ct. 1999; and that "[t]hat exercise of independent judgment is the [c]ourt's judicial duty''; id., 2000; if that were not the law. Instead, Chief Justice Rogers merely queries how truly independent judicial review of an allegedly cruel and unusual punishment can be reconciled with the observation by that court, in a 1989 decision, that, " '[i]n determining what standards have "evolved" . . . [the court has] looked not to [its] own conceptions of decency, but to those of modern American society as a whole.' " Footnote 33 of Chief Justice Rogers' dissenting opinion, quoting *Stanford* v. *Kentucky*, supra, 492 U.S. 369. Of course, we do not disagree with the cited language from *Stanford* insofar as independent judicial review must stand on the court's principled consideration of the available evidence regarding a punishment's penological merits, rather than the personal predilections of individual judges. The short answer to Chief Justice Rogers' question, however, is that *Stanford*, which was an outlier at the time it was decided, subsequently was overruled by *Roper* v. *Simmons*, supra, 543 U.S. 574–75, 578, and is no longer good law. See id., 574 (overruling holding of *Stanford* that persons under eighteen years of age at time of capital offense may be executed and explaining that, "to the extent *Stanford* was based on a rejection of the idea that [the] [c]ourt is required to bring its independent judgment to bear on the proportionality of the death penalty for a particular class of crimes or offenders . . . it suffices to note that this rejection was inconsistent with prior [e]ighth [a]mendment decisions" [citations omitted]). In fact, in *Roper*, the court took pains to reiterate that "[t]he *beginning point* is a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question. These data give us essential instruction. *We then must determine, in the exercise of our own independent judgment*, whether the death penalty is a disproportionate punishment . . . ." (Emphasis added.) Id., 564.

In reality, the United States Supreme Court has, on multiple occasions, held that punishments that were duly enacted by democratically elected legislatures were nevertheless unconstitutionally excessive and disproportionate under this standard. See, e.g., *Hall* v. *Florida*, supra, 134 S. Ct. 1990, 2001 (holding that Florida law foreclosing further exploration of capital defendant's intellectual disability if his IQ score is more than seventy violated eighth amendment); *Thompson* v. *Oklahoma*, supra, 487 U.S. 838 (declaring as unconstitutional death penalty for offender who was under sixteen years old when he committed capital offense). Indeed, there are numerous cases in which that court and other federal and state courts have held democratically

enacted criminal sanctions to be devoid of penological value, and thus unconstitutionally excessive, without relying on any predicate finding that those sanctions had lost their popular support. See, e.g., *Solem* v. *Helm*, 463 U.S. 277, 281, 292–94, 303, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983) (concluding that courts are competent to apply "generally accepted criteria" to assess independently relative severity of criminal offenses and sentences for purposes of eighth amendment proportionality analysis, and holding that sentence of life imprisonment for writing $100 check with intent to defraud was unconstitutionally excessive); *Furman* v. *Georgia*, supra, 408 U.S. 239–40 (holding death penalty unconstitutional as then applied in Georgia and Texas, even though forty-one state legislatures had approved of its use and polling data was mixed); *Robinson* v. *California*, 370 U.S. 660, 667, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962) (holding that California statute authorizing jail sentence for narcotics addiction inflicted cruel and unusual punishment in violation of eighth and fourteenth amendments); *Weems* v. *United States*, supra, 217 U.S. 357–58, 367, 377 (concluding that traditional Philippine punishment of years of hard and painful labor was unconstitutionally excessive punishment for crime of falsifying public document, even if punishment conformed to customs, habits, and prejudices of resident population, and that punishment would have been excessive even if authorized by federal law); *People* v. *Anderson*, supra, 6 Cal. 3d 641 (holding that capital punishment violated state constitution and explaining that court "would abdicate [its] responsibility to examine independently the question were [its] inquiry to begin and end with the fact that statutory provisions authorizing [the] imposition of the death penalty have been recently enacted"); see also *Kennedy* v. *Louisiana*, supra, 554 U.S. 461 (Alito, J., dissenting) (indicating that court had exercised its own independent judgment in holding that death penalty was excessive and disproportionate penalty for rape of child); *Kennedy* v. *Louisiana*, 554 U.S. 945, 129 S. Ct. 1, 171 L. Ed. 2d 932 (2008) (Scalia, J., respecting the denial of rehearing) (observing that court in *Kennedy* had exercised its own judgment while noting that parties had failed to call court's attention to fact that Congress and the president recently had reauthorized death penalty for military personnel convicted of child rape). Despite her attempt to distinguish each of these cases, Chief Justice Rogers simply cannot wipe away a century of eighth amendment jurisprudence.

Nor has the United States Supreme Court ever reviewed an eighth amendment challenge under the highly deferential rational basis standard that Chief Justice Rogers would apparently have this court apply. As Justice White explained in *Furman*, "[j]udicial review, by definition, often involves a conflict between judicial and legislative judgment as to what the [c]onstitution means or requires. . . . It seems conceded by all that

. . . there are punishments that the [eighth] [a]mendment would bar whether legislatively approved or not. Inevitably, then, there will be occasions when [the court] will differ with Congress or state legislatures with respect to the validity of punishment." *Furman* v. *Georgia*, supra, 408 U.S. 313–14 (White, J., concurring). Chief Justice Rogers may not agree that courts should play such a critical role in securing the people's freedom from cruel and unusual punishment, but that is the law of the land. See *Glossip* v. *Gross*, supra, 135 S. Ct. 2776 (Breyer, J., dissenting) (court, not legislature, ultimately must determine whether capital punishment comports with evolving standards of decency because "[these] are quintessentially judicial matters . . . [that] concern the infliction—indeed the unfair, cruel, and unusual infliction—of a serious punishment [on] an individual").

Finally, it would be difficult to imagine a case in which the argument for legislative deference is weaker than in the present case. The death penalty is a punishment that Connecticut has imposed on fewer than two dozen occasions over the past one-half century, and it has been carried out only once during that time frame. The penalty has been abolished by most of our neighboring states, and, after years of repeal efforts, our legislature and governor have now followed suit, abolishing it for all future crimes. Capital punishment has been preserved, then, only on a provisional basis, and only for a handful of current death row inmates. Moreover, the legislative history suggests that many legislators would have supported a full repeal and that those who voted to retain the death penalty on a retroactive basis may well have done so in the belief that this court would not permit any further executions to be carried out, as this state's chief prosecutor himself predicted. See part II B of this opinion; see also footnotes 1, 59 and 60 of this opinion and accompanying text. In short, the legislature could not have come any closer to fully abolishing capital punishment without actually doing so. We perceive no ringing legislative endorsement of the death penalty in Connecticut.

## V

## CONCLUSION

In prospectively abolishing the death penalty, the legislature did not simply express the will of the people that it no longer makes sense to maintain the costly and unsatisfying charade of a capital punishment scheme in which no one ever receives the ultimate punishment. Public Act 12-5 also held a mirror up to Connecticut's long, troubled history with capital punishment: the steady replacement by more progressive forms of punishment; the increasing inability to achieve legitimate penological purposes; the freakishness with which the sentence of death is imposed; the rarity with which it is carried out; and the racial, ethnic, and socio-economic

biases that likely are inherent in any discretionary death penalty system. Because such a system fails to comport with our abiding freedom from cruel and unusual punishment, we hold that capital punishment, as currently applied, violates the constitution of Connecticut.

The judgment is reversed with respect to the imposition of a sentence of death and the case is remanded with direction to impose a sentence of life imprisonment without the possibility of release; the judgment is affirmed in all other respects.

In this opinion NORCOTT, EVELEIGH and McDONALD, Js., concurred.

* This opinion supplements the opinion of this court in *State* v. *Santiago*, 305 Conn. 101, 49 A.3d 566 (2012) (*Santiago I*), which was released on June 12, 2012. The judgment rendered herein, however, supersedes the judgment in *Santiago I*.

** The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] In March, 2009, when he testified before the Judiciary Committee as to the constitutionality of a bifurcated, prospective only repeal, Kane stated that "[t]he [s]tate could not and would not, could not constitutionally and would not as a matter of public policy seek to execute somebody for a crime they committed today when they could not be executed for committing the same crime tomorrow. I don't think that would stand up as a matter of constitutional law. I don't think the courts would permit that . . . ." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2009 Sess., p. 2403. "[I]f this [legislature] decides to abolish the death penalty for a crime that's committed later on," he continued, "I think the Connecticut Supreme Court would decide . . . in effect that the community standard is such that this is now cruel and unusual punishment." Id., p. 2412. For that reason, Kane advised the legislature that the passage of a prospective only repeal "would actually nullify the death penalty for anybody who has not yet been executed." Id., p. 2403. Kane's substantially similar 2012 testimony regarding the constitutional defects inherent in a prospective only repeal is discussed in part II B of this opinion.

[2] Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2009 Sess., p. 2716.

[3] Hereinafter, all references to § 53a-54b are to the 1999 revision, unless otherwise noted.

[4] The jury also found the defendant guilty of one count each of murder, felony murder, conspiracy to commit murder, stealing a firearm, and larceny in the sixth degree, and two counts each of burglary in the first degree and conspiracy to commit burglary in the first degree. The murder and felony murder counts were merged with the capital felony count for purposes of sentencing.

[5] In addition to the sentence of death, the trial court also imposed a total effective term of imprisonment of forty-five years and ninety days on the remaining charges of which the defendant was convicted; see footnote 4 of this opinion; to run consecutive to the death sentence.

[6] Our determination that the defendant must be sentenced on the capital felony count to life imprisonment without the possibility of release has no bearing on the sentence imposed by the trial court on the remaining charges. See footnote 5 of this opinion.

[7] In a footnote, the author of the majority opinion in *Santiago I*, Justice Norcott, expressed that he maintained his long-standing belief that the death penalty is a violation of the state constitution, and that he was able to author the majority opinion only because there was a possibility that, on remand, the defendant would not be sentenced to death. *State* v. *Santiago*, supra, 305 Conn. 307 n.166.

[8] Thereafter, we granted permission to a group of experts on international human rights and comparative law, a group of legal historians and scholars, and the American Civil Liberties Union Foundation of Connecticut to file amicus briefs in support of the defendant's position, and permission to the Criminal Justice Legal Foundation to file an amicus brief in support of the state's position. We also issued an order requesting supplemental briefs from the parties to address a then unpublished paper in which the author

asserted that the death penalty may be imposed for crimes committed before April 25, 2012, as provided in P.A. 12-5. See K. Barry, From Wolves, Lambs: The Case for Gradual Abolition of the Death Penalty (preliminary working draft), subsequently published at K. Barry, "From Wolves, Lambs (Part I): The Eighth Amendment Case for Gradual Abolition of the Death Penalty," 66 Fla. L. Rev. 313 (2014). The defendant filed a second supplemental brief addressing the paper, but the state declined to do so.

[9] The defendant also claims that imposing the death penalty on a person, such as the defendant, who committed a capital felony before April 25, 2012, would (1) be arbitrary, in violation of General Statutes § 53a-46b (b), (2) violate the equal protection guarantees of the federal and state constitutions, (3) violate the substantive due process guarantees of the federal and state constitutions, (4) violate the federal constitutional prohibition against bills of attainder, (5) violate the federal constitutional prohibition against ex post facto laws, and (6) violate the provision of article first, § 9, of the constitution of Connecticut barring punishments "except in cases clearly warranted by law." Because we conclude that the state constitutional prohibition against cruel and unusual punishment no longer permits the imposition of the death penalty, we need not address these claims. Certain of these claims are addressed, however, in Justice Eveleigh's concurring opinion and Chief Justice Rogers' dissenting opinion.

[10] We address certain other, more specific objections of the dissenting justices throughout this opinion.

[11] It has been argued that, when an appellant challenges a statute or practice under both the state and federal constitutions, this court should first consider the state claims, turning to the federal claim only after determining that the appellant's state constitutional challenges will not succeed. See W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 37. This approach is particularly apt when, as in the present case, the claim is one of first impression under both the federal and state constitutions. Accordingly, we will evaluate and resolve the defendant's claim under the state constitution. Because the legal framework that we apply with respect to allegedly cruel and unusual punishments is not fundamentally distinct from that adopted by the United States Supreme Court, we have no reason to believe that the eighth amendment would compel a different result. In any event, because the defendant prevails under the state constitution, we need not speculate as to how that court might resolve his federal claims or decide whether the state constitution provides broader protection than the federal constitution in this regard.

[12] The relevant portions of article first, §§ 8 and 9, of the Connecticut constitution of 1965 are derived almost verbatim from article first, §§ 9, 10 and 13, of the Connecticut constitution of 1818. See *State* v. *Joyner*, 225 Conn. 450, 486 and n.5, 625 A.2d 791 (1993) (*Berdon, J.*, dissenting) (comparing article first, §§ 8 and 9, of Connecticut constitution of 1965 with article first, §§ 9 and 10, of Connecticut constitution of 1818); see also Conn. Const. (1818), art. I, § 13.

Article first, § 8, of the Connecticut constitution of 1965, as amended by article seventeen of the amendments, provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . ."

Although article twenty-nine of the amendments amended article seventeen of the amendments in 1996, article twenty-nine did not amend the foregoing language.

Article first, § 9, of the Connecticut constitution of 1965 provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[13] This ordering of the *Geisler* factors reflects the order in which we consider them for purposes of the present case and does not necessarily reflect their relative importance generally.

[14] In some of our decisions, we have utilized the multifactor *Geisler* analysis to flesh out the general nature and parameters of the state constitutional provision at issue. Having done so, we proceeded to resolve the appellant's particular constitutional challenge according to the legal test and framework relevant and suited to that area of the law, rather than performing the substantive legal analysis under the somewhat artificial auspices of the six *Geisler* factors. See, e.g., *State* v. *Linares*, 232 Conn. 345, 379–87, 655 A.2d 737 (1995) (concluding, on basis of *Geisler* factors, that state constitution affords expansive protection to free speech in public places but then concluding that challenged statute did not infringe impermissibly on those protec-

tions under facts presented). In other cases, by contrast, we have used the *Geisler* framework to perform the actual substantive legal analysis. See, e.g., *State* v. *Rizzo*, 303 Conn. 71, 135–45, 31 A.3d 1094 (2011) (*Rizzo II*) (evaluating challenges to death penalty according to six *Geisler* factors), cert. denied,     U.S.    , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012); see also *State* v. *Ross*, supra, 230 Conn. 249–51. In the present case, we follow the former approach because, as we explain more fully hereinafter, the constitutionality of a criminal sanction, like the constitutionality of a limitation on the free expression at issue in *Linares*, is governed by its own distinct legal rules and standards. Accordingly, assuming that the *Geisler* framework is even applicable to the ultimate question of whether the death penalty now constitutes excessive and disproportionate punishment following the enactment of P.A. 12-5; cf. *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 227, 957 A.2d 407 (2008) (undertaking *Geisler* analysis following conclusion that plaintiffs met state constitutional standard applicable for determining quasi-suspect class status); our consideration of the relevant *Geisler* factors is interwoven into our application of the legal framework that properly governs such challenges. See parts II and III of this opinion.

[15] The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The cruel and unusual punishments clause of the eighth amendment is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See *Robinson* v. *California*, 370 U.S. 660, 666–68, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962).

[16] In addition, some members of the United States Supreme Court have suggested that a punishment may be so unusual that it runs afoul of the eighth amendment on that basis alone. See, e.g., *Furman* v. *Georgia*, 408 U.S. 238, 331, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Marshall, J., concurring); *Weems* v. *United States*, 217 U.S. 349, 390, 30 S. Ct. 544, 54 L. Ed. 793 (1910) (White, J., dissenting). For the most part, however, the court has treated the term "unusual" as little more than constitutional surplussage. See, e.g., *Furman* v. *Georgia*, supra, 276–77 n.20 (Brennan, J., concurring) (meaning of term is of minor significance); *Trop* v. *Dulles*, 356 U.S. 86, 100 n.32, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion) ("[o]n the few occasions [the] [c]ourt has had to consider the meaning of the phrase ['unusual'], precise distinctions between cruelty and unusualness do not seem to have been drawn").

[17] It is well established, however, that "[t]he adoption of federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution." *State* v. *Lamme*, supra, 216 Conn. 184. Accordingly, we are not necessarily bound, for state constitutional purposes, to reach the same conclusions as the United States Supreme Court has with regard to any particular punishment or legal challenge.

As we previously indicated; see footnote 11 of this opinion; because the present appeal presents an issue that, to our knowledge, is a question of first impression not only in Connecticut but also for the federal courts, we need not determine, in resolving the defendant's state constitutional claims, whether the state constitution affords broader protections against cruel and unusual punishment than does the eighth amendment. Even if those protections are merely coextensive, however, we note that, in another case, this court nevertheless might conclude that practices and punishments that the United States Supreme Court has expressly approved are nevertheless unconstitutionally cruel and unusual in Connecticut. This might be true either because our state's contemporary standards of decency differ from those of the nation as a whole, or because this court simply reaches a different conclusion when applying to the relevant constitutional facts, as a matter of state constitutional law, standards similar or even identical to those that the United States Supreme Court has articulated.

[18] Some justices of the United States Supreme Court have suggested that these considerations—whether a punishment is excessive or disproportionate, whether it comports with contemporary standards of decency and dignity, and whether it satisfies any legitimate penological goals—represent three distinct elements or prongs of the eighth amendment analysis. See, e.g., *Furman* v. *Georgia*, 408 U.S. 238, 330–32, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Marshall, J., concurring). Whether these considerations are treated as distinct elements or merely as distinct components of a common

element, however, is merely semantic and ultimately immaterial, because it is clear that a sentence's failure to satisfy any of these requirements would render it unconstitutional under the eighth amendment.

[19] In *Davis* v. *Connecticut*, 408 U.S. 935, 92 S. Ct. 2856, 33 L. Ed. 2d 750 (1972), and *Delgado* v. *Connecticut*, 408 U.S. 940, 92 S. Ct. 2879, 33 L. Ed. 2d 764 (1972), both memorandum decisions, the United States Supreme Court struck down a prior incarnation of Connecticut's capital punishment scheme as facially unconstitutional because it failed to comply with these requirements.

[20] See footnote 44 of this opinion (noting cases in which this court has permitted citation to extra-record reference materials, including state histories, as evidence of contemporary societal norms or to advocate for new interpretation of state constitution).

[21] With respect to the Connecticut constitution of 1965, see footnote 31 of this opinion.

We acknowledge that both the 1818 and 1965 Connecticut constitutions make express reference to capital punishment and that such punishment no doubt was considered constitutional at the time of their adoption. In part IV B of this opinion, we explain why that historical acceptance does not alter our conclusion that capital punishment no longer comports with contemporary standards of decency or serves a legitimate penological purpose in Connecticut.

[22] This provision was retained in the 1702 laws; see Acts and Laws, of His Majesties Colony of Connecticut in New-England (1702) p. 98; but was left out of the 1784 laws in keeping with the general sentiment of that time that such protections were not properly the subject of written legal codes.

[23] In addition to recognizing the freedom from cruel, inhuman, and barbarous punishments, the 1672 code also guaranteed those accused of capital offenses the right to a trial by jury and provided for a special jury of life and death. See W. Holdsworth, supra, p. 581.

[24] In her dissenting opinion, Chief Justice Rogers chides our use of terms such as "progress" and "progressive," implying that we improperly have exceeded our constitutional mandate and embraced a progressive sociopolitical viewpoint. (Internal quotation marks omitted.) Footnote 12 of Chief Justice Rogers' dissenting opinion. Nothing could be further from the truth. The United States Supreme Court has instructed, on literally dozens of occasions, that, in construing the eighth amendment, courts must look to "the evolving standards of decency that mark the *progress* of a maturing society." (Emphasis added; internal quotation marks omitted.) *Hall* v. *Florida*, supra, 134 S. Ct. 1992; accord *Trop* v. *Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) (plurality opinion); see also *Weems* v. *United States*, 217 U.S. 349, 378, 30 S. Ct. 544, 54 L. Ed. 793 (1910) ("[the eighth amendment] in the opinion of the learned commentators may be therefore *progressive*, and is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice" [emphasis added]). Indeed, Chief Justice Rogers acknowledges shortly thereafter in her dissenting opinion that this is the governing federal standard. See text accompanying footnote 15 of Chief Justice Rogers' dissenting opinion. Furthermore, in more than twenty of our cases, including four capital appeals, this court has recognized that "our state constitution is an instrument of *progress* . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Rizzo*, supra, 266 Conn. 207; accord *State* v. *Webb*, 238 Conn. 389, 411, 680 A.2d 147 (1996); *State* v. *Ross*, supra, 230 Conn. 248; *State* v. *Dukes*, 209 Conn. 98, 115, 547 A.2d 10 (1988). Both state and federal constitutional jurisprudence, then, has been marked by the use of such language. In the present case, we likewise use the term "progressive" in its established constitutional, rather than political, sense. We do agree with Chief Justice Rogers, however, that, although the arc of our history in this regard is both clear and profound, there is no constitutional mandate that our state's criminal law become increasingly compassionate.

[25] For nearly one century after the adoption of the English Declaration of Rights of 1689, for instance, "the law of Great Britain condemned a prisoner who refused to plead to be slowly pressed to death by weights placed [on] his chest." Judicial and Civil History of Connecticut (D. Loomis & J. Calhoun eds., 1895) p. 63; see also W. Holdsworth, supra, p. 356 (mutilating punishments were imposed far less frequently in seventeenth century Massachusetts and, especially, in Connecticut, than in England); W. Holdsworth, supra, p. 361 (England permitted more extensive and more brutal corporal punishment than Connecticut in mid-seventeenth century); W. Holdsworth, supra, pp. 431–32, 568 (capital punishment was considerably rarer in New England than in England, where theft of as little as one shilling constituted capital crime); W. Holdsworth, supra, p. 569 ("[t]he courts and legislatures of Connecticut and New Haven succeeded in creating a more equitable and

less brutal system of criminal justice than that of England").

[26] For example, a second wave of immigration brought new residents to Connecticut during this period, significantly expanding the colonial population. These immigrants did not share the founding generation's vision of Connecticut as a "new Israel under a new covenant," committed to observing and strictly enforcing the judicial laws of Moses. W. Holdsworth, supra, p. 124; see id., pp. 532–34, 579–81. Whereas their predecessors were preoccupied with the moral aspects of sinfulness, the new citizens were more concerned with addressing the practical consequences of crime. See id., p. 518. This "erosion of moral outrage" left the public less convinced of the need for strict punishment in many cases and resulted in more lenient public sentiment toward a number of crimes. Id., p. 518; see id., p. 576.

[27] In 1666, for example, a special court of assistants at Governor Winthrop's urging overruled Hannah Hackleton's death sentence for blasphemy. See W. Holdsworth, supra, p. 381. The same year, in the case of Elizabeth Seager, Governor Winthrop himself directly overturned a capital sentence, this time for witchcraft, and ordered the defendant freed. See id., pp. 519–20. Seager is believed to have been the first convicted witch to have escaped the gallows in Connecticut. See id., p. 520. Four years later, a specially appointed court released another woman who had been sentenced to die for witchcraft. See id., pp. 520–21. Katherine Harrison's case is noteworthy as the first instance in which a Connecticut court reversed a jury conviction in a capital case. See id., p. 521.

[28] That such punishments had come to be seen as cruel in Connecticut is apparent from the case of Polly Rogers, a Native American who petitioned the legislature for redress in 1815 after having been convicted of adultery and sentenced to whipping and branding. L. Goodheart, supra, p. 78. "In keeping with the sensibility of the age," Professor Lawrence B. Goodheart recounts, "she protested the 'cruel punishment of being branded with a hot iron.' " Id. The legislature granted her request and spared her. Id.

Moreover, although Newgate hardly would have met modern standards for the treatment of inmates, records from Connecticut's preconstitutional period clearly indicate that the legislature was concerned that prisoners not be treated cruelly. In 1809, the legislature appointed a committee that considered, and ultimately enacted, the governor's recommendation that the prisoners in Newgate would benefit from religious instruction. See 1 Crimes and Misdemeanors, 2d Series (1809) pp. 95a–96a. The following year, a second committee was appointed to evaluate the condition of the prison's inmates. See 1 Crimes and Misdemeanors, 2d Series (1810) p. 97a. On the basis of the resulting report, the legislature directed Newgate's overseers to provide the prisoners with a more diverse diet and to ensure that suitable bathing places were provided. See id., pp. 99d–99e, 99z, 100a. At the same time, the legislature resolved to prohibit "unnecessary and cruel punishments" within the facility. Id., p. 100a. In 1815, just three years before the adoption of the state constitution, a legislative committee went even further, condemning the practice of whipping at Newgate as "incompatible with . . . decency and humanity," and beginning to plan for the construction of a new state prison. 1 Crimes and Misdemeanors, 2d Series (1815) pp. 153a, 154c; see also 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) pp. 268–69 ("and though the law invests [jailers] with all the powers necessary for the interest of the commonwealth, yet they are not to behave with the least degree of wanton cruelty to their prisoners").

[29] The fact that Swift later repudiated some of his more progressive penological views is of little moment. Swift did not begin to author his Digest of the Laws of the State of Connecticut until after he stepped down as Chief Justice in 1819; P. O'Sullivan, "Biographies of Connecticut Judges I: Zephaniah Swift," 19 Conn. B.J. 181, 190–91 (1945); and it was in that work that he embraced a more severe philosophy of punishment. Indeed, in *State* v. *Ellis*, 197 Conn. 436, 497 A.2d 974 (1985), we recognized that it was Swift himself who, having inveighed against the barbaric and medieval forms of punishment of the past; id., 450 n.13; impressed on the legislature in the early 1820s to adopt "more rational and consistent laws" that would "proportion the punishment according to the nature and grade of the crime . . . ." (Internal quotation marks omitted.) Id., 451 n.13.

[30] Justice Zarella is simply incorrect, then, when, in his dissenting opinion, he contends that "[w]hat is striking thing about this case . . . is the lack of any suggestion by the legislature . . . that the imposition of the death penalty was wrong."

[31] Although we look primarily to our state's preconstitutional traditions and the history and intent of the drafters of the 1818 constitution to parse

the meanings of article first, §§ 8 and 9; see *State* v. *Joyner*, 225 Conn. 450, 486–87, 625 A.2d 791 (1993) (*Berdon, J.*, dissenting); it also may be appropriate to consider how the 1818 provisions were interpreted in 1965, when they were incorporated into the state's present constitution. See W. Horton, The Connecticut State Constitution (2d Ed. 2012) pp. 33–34. By that time, attitudes toward the purpose and permissible scope of punishment in Connecticut had, of course, evolved even further, in ways that are too numerous to count. Perhaps the clearest example of this evolution may be seen in the state prison in Somers, which replaced the Wethersfield facility shortly before the new constitution was adopted. See G. Demeusy, "State Dedicates New Prison with Note of Hope for Future," Hartford Courant, February 16, 1964, p. 15B; G. Demeusy & J. Tucker, "400 Convicts Are Moved to New Somers Prison," Hartford Courant, November 6, 1963, p. 1. At a dedication ceremony in 1964, the new facility was described as "a symbol of progress, a gateway to penal reform . . . ." (Internal quotation marks omitted.) "Penal Outlook Hailed at State Prison Ceremony," Hartford Courant, February 15, 1964, p. 4. Speaking at the dedication, Warden Frederick G. Reincke hailed the Somers prison as "the beginning of a new era . . . primarily devoted to preparing inmates for adjusting to community living and responsibility when they are released." (Internal quotation marks omitted.) Id. According to Reincke, "[t]he days of revenge imprisonment in Connecticut [were] over." Id.

The chairman of the prison's board of directors, Charles Stroh, concurred, explaining that "we . . . have launched a rehabilitation [facility] that centers not around retribution and punishment, but the individual training and treatment of inmates." (Internal quotation marks omitted.) G. Demeusy, supra, p. 15B. This new penal philosophy, he explained, reflected an emerging public "realization that there's something more to penology than simply locking up the lawbreakers." Id. Stroh further explained: "There is punishment—but it's punishment for a purpose and it is accepted by the inmates as a part of their rehabilitation . . . ." (Internal quotation marks omitted.) Id. For his part, Governor John Dempsey opined that the new state prison was "wholly in keeping with modern penology, [and] maintain[ed] Connecticut's reputation as a state that is forward-looking and progressive in all fields of human endeavor." (Internal quotation marks omitted.) Id. To the extent that conceptions of cruel and unusual punishment prevalent at the drafting of the 1965 state constitution are relevant to the *Geisler* analysis, then, there is no doubt that our state's understanding of the permissible nature and purposes of punishment had undergone a thorough transformation.

[32] Connecticut ultimately approved the federal Bill of Rights in 1939, 150 years after its submission to the states for ratification in 1789. P. Maier, Ratification: The People Debate the Constitution, 1787–1788 (2010) p. 459.

[33] The opinions of the dissenting justices reveal the prescience of these fears.

[34] In *State* v. *Rizzo*, 303 Conn. 71, 142, 31 A.3d 1094 (2011) (*Rizzo II*), cert. denied,     U.S.     , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012), we therefore identified *Rizzo I* as a case, albeit a rare one, in which we had treated the state constitution as providing greater protection to capital defendants than the federal constitution in concluding that the jury must find beyond a reasonable doubt that the aggravating factors outweigh mitigating factors in order for the death penalty to be imposed. Several members of this court, in dissent, also have determined that the state constitution affords broader protection from cruel and unusual punishment. See, e.g., *State* v. *Santiago*, supra, 305 Conn. 309 (*Harper, J.*, concurring in part and dissenting in part); *State* v. *Rizzo*, supra, 303 Conn. 202–203 (*Norcott, J.*, dissenting); *State* v. *Peeler*, 271 Conn. 338, 464, 857 A.2d 808 (2004) (*Katz, J.*, dissenting), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005); *State* v. *Webb*, 238 Conn. 389, 551, 680 A.2d 147 (1996) (*Berdon, J.*, dissenting). As we have explained, however, the present case does not require that we determine whether the state constitution affords greater protection than the federal constitution with respect to cruel and unusual punishment.

[35] In his dissenting opinion, Justice Zarella refuses to acknowledge that, in *Rizzo II*, we adopted and applied the federal courts' eighth amendment framework for evaluating challenges to the death penalty and other allegedly cruel and unusual punishments. He does so despite language in that decision that clearly indicates our adherence to the federal framework. See, e.g., *State* v. *Rizzo*, supra, 303 Conn. 191 ("[a]lthough the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures . . . *Atkins* v. *Virginia*, supra, 536 U.S. 312;

in assessing whether a punishment is constitutionally sound, it also is appropriate for us to consider what is occurring in actual practice" [internal quotation marks omitted]).

[36] In *Watson*, the Supreme Judicial Court of Massachusetts struck down that state's death penalty as impermissibly cruel under the state constitution. *District Attorney* v. *Watson*, supra, 381 Mass. 650. In the November, 1982 election, Massachusetts voters approved a referendum amending the state constitution to permit the state legislature to reinstate capital punishment. See *Commonwealth* v. *Colon-Cruz*, 393 Mass. 150, 152, 470 N.E.2d 116 (1984). No such statute is currently in place.

[37] In *Anderson*, the California Supreme Court struck down that state's death penalty as both cruel and unusual. See *People* v. *Anderson*, supra, 6 Cal. 3d 651, 656–57. In the November, 1972 election, California voters passed a ballot initiative amending the California constitution and reinstating capital punishment. See *People* v. *Frierson*, 25 Cal. 3d 142, 173, 599 P.2d 587, 158 Cal. Rptr. 281 (1979).

[38] We emphasize that we are not, as Justice Zarella suggests, in any way conflating the sociological considerations encompassed by the sixth *Geisler* factor with the standards by which federal courts have evaluated claims that a particular punishment is excessive or disproportionate, namely, that the punishment offends contemporary standards of decency or fails to accomplish legitimate penological purposes. Those standards are, rather, the substantive test according to which both this court and the federal courts evaluate such claims. The *Geisler* "test," by contrast, is merely a scheme by which we organize and review, for purposes of state constitutional challenges, the various types of considerations that may bear on any question of first impression.

[39] Although Chief Justice Rogers, in her dissenting opinion, suggests that, because the federal constitution makes express reference to capital offenses, it is an open question as to whether the federal courts ever would find the death penalty unconstitutional per se under the evolving standards of decency rubric, we disagree. In *Gregg* v. *Georgia*, supra, 428 U.S. 153, the United States Supreme Court made clear that even claims that capital punishment is categorically unconstitutional are to be evaluated according to that rubric, and that the constitutional text is not dispositive. See id., 176–87 (opinion announcing judgment).

[40] The majority specifically stated: "The first five factors do not support the . . . argument [of the defendant, Michael B. Ross]. In article first, § 8, and article first, § 19, our state constitution makes repeated textual references to capital offenses and thus expressly sustains the constitutional validity of such a penalty in appropriate circumstances. Connecticut case law has recognized the facial constitutionality of the death penalty under the eighth and fourteenth amendments to the federal constitution. . . . Federal constitutional law does not forbid such a statute outright. . . . Courts in the overwhelming majority of our sister states have rejected facial challenges to the death penalty under their state constitutions. Finally, Connecticut's history has included a death penalty statute since 1650, when it was incorporated into Ludlow's Code . . . and such a penalty was considered constitutional at the time of the adoption of the constitution of 1818." (Citations omitted; footnotes omitted.) *State* v. *Ross*, supra, 230 Conn. 249–50.

[41] We note that the dissenting justices, while criticizing our departure from the court's discussion of capital punishment in *Ross*, make no attempt to defend the adequacy of the analysis therein.

[42] In *Webb*, this court did consider and reject an alternative argument: that capital punishment violates the social compact clause of article first, § 1, of the state constitution. *State* v. *Webb*, supra, 238 Conn. 406–12.

[43] We do not disagree with Chief Justice Rogers that the last two factors— the laws and practices of other jurisdictions, and the opinions and recommendations of professional associations—are of less importance, and we agree that those considerations alone would constitute an insufficient basis for deeming a punishment cruel and unusual in the absence of any evidence that it has come to be so *in Connecticut*. We do, however, disagree with Chief Justice Rogers' suggestion in her dissenting opinion that the defendant has asked that we consider the constitutional implications of the adoption of P.A. 12-5 in a complete factual and jurisprudential vacuum, ignoring any and all other evidence that capital punishment no longer comports with contemporary standards of decency in Connecticut, even insofar as that evidence pertains to the defendant's claim that the death penalty is now unconstitutional in light of P.A. 12-5. In fact, in his brief to this court, the

defendant expressly asked us to consider previous decisions of this court that explored all of these factors in substantial depth.

[44] We previously have permitted citation to extra-record reference materials as evidence of contemporary societal norms or to advocate for a new interpretation of the state constitution. See, e.g., *State* v. *Rizzo*, supra, 303 Conn. 184 n.81; see also *Hall* v. *Florida*, supra, 134 S. Ct. 1993–96 (relying on medical and psychological research in concluding that eighth amendment does not permit states to adopt rigid rule that individuals with intelligence quotient [IQ] test scores higher than 70 are precluded from offering other evidence of mental disability). Notice also may be taken in this context of treatises reporting the public history of Connecticut. See 1 B. Holden & J. Daly, Connecticut Evidence (1988) § 31, pp. 128–29. More generally, it is well established that an appellate court may take notice of "legislative facts," including historical sources and scientific studies, "which help determine the content of law and policy," as distinguished from the "adjudicative facts," which concern "the parties and events of a particular case." (Internal quotation marks omitted.) *Moore* v. *Moore*, 173 Conn. 120, 122, 376 A.2d 1085 (1977); accord *State* v. *Rizzo*, supra, 303 Conn. 184 n.81.

[45] See Association for the Study of Connecticut History, 2012 Award Recipients (announcing Goodheart as recipient of 2012 Homer D. Babbidge, Jr., Award for best monograph on significant aspect of Connecticut's history published in calendar year), available at http://asch-cthistory.org/awards/2012-recipients (last visited July 27, 2015).

[46] Goodheart distinguishes infanticide from homicide in that, from 1699 to 1808, an unmarried woman who lost her infant during childbirth was legally presumed to have killed the baby to conceal her shame. See L. Goodheart, supra, p. 20. This presumption of infanticide could be rebutted if a witness to the birth testified that the baby was stillborn. See id.

[47] There is no precedent for Chief Justice Rogers' contention that legislative enactments are relevant indicia of evolving standards of decency only to the extent that they accurately reflect popular opinion. See footnote 33 of Chief Justice Rogers' dissenting opinion. On the contrary, the United States Supreme Court repeatedly has instructed that, for purposes of the eighth amendment, social mores are to be measured by the legislation enacted by the elected branches of government, and *not* according to the shifting winds of public sentiment. See, e.g., *Penry* v. *Lynaugh*, 492 U.S. 302, 335, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (conflicting public sentiment, as expressed in polls and resolutions, does not evidence contemporary values until expressed in legislative action), overruled on other grounds by *Atkins* v. *Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); cf. *Furman* v. *Georgia*, supra, 408 U.S. 362 (Marshall, J., concurring).

[48] Although Justice Marshall appears to have coined the phrase "machinery of death" in *Rumbaugh* v. *McCotter*, 473 U.S. 919, 921, 105 S. Ct. 3544, 87 L. Ed. 2d 668 (1985) (Marshall, J., dissenting from the denial of certiorari), it is widely attributed to Justice Blackmun's famous declaration, shortly before his retirement from the United States Supreme Court in 1994, that, "[f]rom this day forward, I no longer shall tinker with the machinery of death. For more than [twenty] years I have endeavored—indeed, I have struggled—along with a majority of [the] [c]ourt, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. Rather than continue to coddle the [c]ourt's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed. It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies. The basic question—does the system accurately and consistently determine which defendants deserve to die?—cannot be answered in the affirmative." (Footnote omitted; internal quotation marks omitted.) *Callins* v. *Collins*, 510 U.S. 1141, 1145, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994) (Blackmun, J., dissenting from the denial of certiorari).

[49] We fail to understand how Chief Justice Rogers could translate Senator Kissel's clear, unequivocal statement about P.A. 12-5 to mean nothing more than that he thought that "there was no reliable way to predict the outcome" of this court's review. (Internal quotation marks omitted.) Footnote 26 of Chief Justice Rogers' dissenting opinion. If there was any ambiguity in Senator Kissel's statement, it surely was resolved by his statement, during a Judiciary Committee hearing on the proposed repeal legislation, that "[e]very expert that I have asked . . . has stated that the evolving societal standards evinced by a change in the law form . . . very solid grounds under the

cruel and unusual punishment portion of the constitution to support repeal of [the] death [penalty] for folks sitting on death row when a prospective bill is passed." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2549–50.

[50] See, e.g., 55 S. Proc., Pt. 2, 2012 Sess., pp. 532–33, 593–95, remarks of Senator Eric D. Coleman; 55 S. Proc., Pt. 3, 2012 Sess., pp. 661–62, remarks of Senator Coleman; 55 S. Proc., Pt. 3, 2012 Sess., pp. 670–71, remarks of Senator Edward Meyer; 55 S. Proc., Pt. 3, 2012 Sess., p. 765, remarks of Senator Steve Cassano; 55 S. Proc., Pt. 3, 2012 Sess., pp. 776–77, remarks of Senator Anthony J. Musto; 55 S. Proc., Pt. 3, 2012 Sess., pp. 781–82, remarks of Senator Edith Prague; 55 S. Proc., Pt. 3, 2012 Sess., pp. 782–86, remarks of Senator Gayle Slossberg; 55 S. Proc., Pt. 3, 2012 Sess., pp. 790–91, remarks of Senator Joseph J. Crisco, Jr.; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1136–37, remarks of Representative Patricia M. Widlitz; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1250–52, remarks of Representative Roland J. Lemar; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1256–57, remarks of Representative Michael L. Molgano; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1258–60, remarks of Representative Gary A. Holder-Winfield; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1280–81, remarks of Representative Richard A. Smith; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1282–86, remarks of Representative Daniel S. Rovero; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1292–94, remarks of Representative Auden C. Grogins; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1295–96, remarks of Representative John F. Hennessy; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1310–12, remarks of Representative Linda M. Gentile; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1313–16, remarks of Representative Patricia B. Miller; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1317–19, remarks of Representative Lile R. Gibbons; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1340–42, remarks of Representative Philip J. Miller; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1375–76, remarks of Representative Patricia A. Dillon; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2557–59, remarks of Senator Martin M. Looney; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2514–16, 2523, remarks of Senator Donald E. Williams, Jr.; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2690–92, remarks of Representative Charlie L. Stallworth.

[51] See, e.g., 55 S. Proc., Pt. 2, 2012 Sess., pp. 593–94, remarks of Senator Eric D. Coleman; 55 S. Proc., Pt. 3, 2012 Sess., pp. 672–73, remarks of Senator Edward Meyer; 55 S. Proc., Pt. 3, 2012 Sess., p. 752, remarks of Senator Edwin A. Gomes; 55 S. Proc., Pt. 3, 2012 Sess., p. 769, remarks of Senator Bob Duff; 55 S. Proc., Pt. 3, 2012 Sess., p. 772, remarks of Senator Carlo Leone; 55 S. Proc., Pt. 3, 2012 Sess., pp. 781–82, remarks of Senator Edith Prague; 55 S. Proc., Pt. 3, 2012 Sess., pp. 782–83, remarks of Senator Gayle Slossberg; 55 S. Proc., Pt. 3, 2012 Sess., pp. 801–803, remarks of Senator Martin M. Looney; 55 S. Proc., Pt. 3, 2012 Sess., p. 812, remarks of Senator Donald E. Williams, Jr.; 55 H.R. Proc., Pt. 3, 2012 Sess., p. 1002, remarks of Representative Gerald M. Fox III; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1049–50, remarks of Representative Terry Backer; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1090–91, remarks of Representative Mary Mushinsky; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1115–16, remarks of Representative John W. Thompson; 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1280, remarks of Representative Richard A. Smith; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1291–94, remarks of Representative Auden C. Grogins; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1314–15, remarks of Representative Patricia B. Miller; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2514–15, remarks of Senator Williams; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2690, remarks of Representative Charlie L. Stallworth; see also 55 S. Proc., Pt. 3, 2012 Sess., pp. 792–93, remarks of Senator Coleman (possibility of error is reason many legislators supported repeal).

[52] See, e.g., 55 S. Proc., Pt. 2, 2012 Sess., p. 594, remarks of Senator Eric D. Coleman; 55 S. Proc., Pt. 3, 2012 Sess., p. 784, remarks of Senator Gayle Slossberg; 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1376, remarks of Representative Patricia A. Dillon; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2515–16, 2527, remarks of Senator Donald E. Williams, Jr.; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2622, remarks of Senator Edwin A. Gomes; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2691, remarks of Representative Charlie L. Stallworth; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2843–44, remarks of Representative Gary A. Holder-Winfield.

[53] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., p. 745, remarks of Senator Terry B. Gerratana; id., p. 751, remarks of Senator Edwin A. Gomes; id., p. 769,

remarks of Senator Bob Duff; id., pp. 772–73, remarks of Senator Carlo Leone; id., p. 790, remarks of Senator Joseph J. Crisco, Jr.; 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1256, remarks of Representative Michael L. Molgano; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2516, 2517, remarks of Senator Donald E. Williams, Jr.; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2517, remarks of Senator Edward Meyer; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2629–30, remarks of Representative Richard A. Smith.

[54] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., p. 747, remarks of Senator Len Suzio (stating that all members would agree that P.A. 12-5 concerns morality, not finances); id., p. 757, remarks of Senator Paul R. Doyle ("I consider this a vote of consci[ence] for all of us"); id., p. 804, remarks of Senator John McKinney ("[t]his is in many ways a vote of conscience, a vote of where your moral compass leads you"); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1381, remarks of Representative Lawrence F. Cafero, Jr. (prospective repeal implies that "it is no longer the policy of the [s]tate of Connecticut to take a life"); see also 55 S. Proc., Pt. 2, 2012 Sess., p. 593, remarks of Senator Coleman (observing that capital punishment is matter of principle for many legislators); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1385, remarks of Representative J. Brendan Sharkey (debate is about profound moral and ethical questions). Importantly, although some opponents of P.A. 12-5 chided supporters for what the opponents characterized as the inconsistency of prospectively repealing capital punishment while retaining it for those already on death row, they consistently characterized this dichotomy as a *moral* inconsistency rather than a merely pragmatic decision. See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., pp. 747–48, remarks of Senator Suzio.

[55] Ignoring Senator Kissel's explanation that members of the legislature have indicated over the course of many years their moral opposition to the death penalty, Chief Justice Rogers queries "how Kissel could have known that." Footnote 26 of Chief Justice Rogers' dissenting opinion. The relevant question, rather, is on what basis Chief Justice Rogers would purport to know better than a twelve term senator and ranking member of the Judiciary Committee what lies in the hearts and minds of his colleagues.

[56] See 55 S. Proc., Pt. 2, 2012 Sess., pp. 583–84, remarks of Senator Carlo Leone; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1373–74, remarks of Representative Juan R. Candelaria.

Chief Justice Rogers also takes out of context public testimony by Professor Kevin Barry, which she offers as evidence that support for P.A. 12-5 was driven primarily by financial considerations. See footnote 19 of Chief Justice Rogers' dissenting opinion; see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2765–66. In fact, in the quoted testimony, Barry is speaking about the decision of the *New Mexico* legislature to repeal that state's death penalty on a prospective only basis. Id., p. 2765. Specifically, Barry refers to evidence that New Mexico's repeal was motivated in large part by that state's pending budget crisis. Id. Although Barry does propose that the state might try to make a similar argument in Connecticut, he provides no support for the proposition that cost considerations were of comparable importance for the legislators who supported P.A. 12-5. Indeed, his statements amount to little more than a recommended litigation strategy for those who would seek to preserve the death penalty retroactively.

[57] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., pp. 781–82, remarks of Senator Edith Prague (opposing capital punishment out of moral concern that innocent not be wrongly executed, but favoring retroactivity out of respect for survivors of victims of capital felonies committed before 2012); id., p. 662, remarks of Senator Andrew W. Roraback ("I have long believed that the [s]tate shouldn't be in the business of taking life. And as strongly as I believe that, I believe even more strongly that the [s]tate shouldn't be in the business of breaking its commitment to victims of crime.").

[58] We do not share Chief Justice Rogers' conviction that those legislators who believed capital punishment to be indecent or unjustified, and yet who held out for a prospective only repeal in order to honor the state's prior commitments to the families of murder victims, are somehow illogical or "morally incoherent . . . ." Footnote 22 of Chief Justice Rogers' dissenting opinion. There are, no doubt, opponents of the death penalty whose principled opposition is so staunch and so unyielding that they would not countenance its use under any circumstances. We are equally certain, however, that there are people of good faith and clear mind who, although they have come to believe that, on balance, state sanctioned killing is impermissibly excessive, or arbitrary, or subject to error, are not so stridently opposed that their opposition cannot yield to countervailing moral commitments. Each day, legislators, no less than judges, must balance conflicting moral

principles and commitments: between free expression and national security; between environmental conservation and the fruits of economic development; between a right to life and a freedom of choice. Why Chief Justice Rogers believes that opposition to the death penalty, alone among principled beliefs, must be uncompromising simply eludes us. See generally K. Barry, "From Wolves, Lambs (Part I): The Eighth Amendment Case for Gradual Abolition of the Death Penalty," 66 Fla. L. Rev. 313 (2014) (articulating principled defense of prospective only repeal of capital punishment on moral grounds).

[59] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., p. 743, remarks of Senator Kissel; id., pp. 748–49, remarks of Senator Len Suzio; id., pp. 795–96, remarks of Senator Leonard A. Fasano; 55 H.R. Proc., Pt. 4, 2012 Sess., pp. 1381–82, remarks of Representative Lawrence F. Cafero, Jr.

[60] See, e.g., 55 S. Proc., Pt. 3, 2012 Sess., pp. 795–96, remarks of Senator Leonard A. Fasano (many legal scholars believe retroactive component of bill is unconstitutional); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1354, remarks of Representative John W. Thompson ("it seems the consensus here that nobody on death row will now be executed"); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2485, remarks of Representative Al Adinolfi (numerous attorneys believe that prospective repeal will render retroactive application unconstitutional); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2507–2508, remarks of Representative Richard A. Smith (many legislators are concerned that inmates on death row will be removed therefrom upon prospective repeal); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2534, remarks of Representative Arthur J. O'Neill ("there seems to be pretty much a consensus by both the prosecutor and the defense people here in Connecticut most familiar with death penalty issues that that's going to be a very difficult hill for the prosecutors to climb in terms of defending the existing sentences and that we should expect that if we repeal with so-called prospective only language, that as a practical matter, no one will have the death penalty imposed [on] them in the state of Connecticut"); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2549–50, remarks of Senator Kissel ("[e]very expert that I have asked . . . has stated that the evolving societal standards evinced by a change in the law form . . . very solid grounds under the cruel and unusual punishment portion of the constitution to support repeal of [the] death [penalty] for folks sitting on death row when a prospective bill is passed").

[61] Kane's statements on the question are no less unambiguous than those of Senator Kissel; see text accompanying footnote 49 of this opinion; see also footnote 1 of this opinion; and Chief Justice Rogers' insistence that Kane expressed no opinion on the matter is equally puzzling. See footnote 28 of Chief Justice Rogers' dissenting opinion.

[62] It bears noting that senators rejected an amendment crafted to ensure that capital punishment would be retained for those already on death row in the event that a court declared P.A. 12-5 unconstitutional. The proposed amendment provided that, if a court were to conclude that a bifurcated, prospective only repeal of the death penalty was unconstitutional, the repeal would be nullified, and the state's capital felony statutes would revert to their pre-2012 status. See 55 S. Proc., Pt. 3, 2012 Sess., pp. 652–53, 662–64, remarks of Senator Roraback; see also id., p. 669 (vote on amendment).

We are perplexed by Chief Justice Rogers' suggestion that it is improper for us to conclude that some legislators, in supporting a prospective only appeal, may have acted in part out of political motivations. That conclusion, Chief Justice Rogers contends, violates what she refers to as the "constitutional principle that this court must presume that the legislature has acted for legitimate reasons . . . ." Text accompanying footnote 23 of Chief Justice Rogers' dissenting opinion. We have no quarrel with this principle generally, but Chief Justice Rogers' reliance on it in the present case is misplaced. First, there is nothing improper about a legislator acting on the basis of political considerations. Moreover, Chief Justice Rogers' argument improperly conflates equal protection and eighth amendment principles. As she asserts; see text accompanying footnote 93 of Chief Justice Rogers' dissenting opinion; when a statutory classification is challenged on equal protection grounds, but the classification does not involve a fundamental right or suspect class, such as race or national origin, it will be evaluated under the highly deferential "rational basis" standard of review. (Internal quotation marks omitted.) *Contractor's Supply of Waterbury, LLC* v. *Commissioner of Environmental Protection*, 283 Conn. 86, 93, 925 A.2d 1071 (2007). Under rational basis review, a statutory classification will be upheld, as long as it is supported by some plausible legitimate rationale, regardless of whether the legislature actually had that rationale in mind when enacting

the legislation. See id. This unremarkable legal principle is, however, wholly irrelevant to the question before us. Under the eighth amendment and the corresponding provisions of the state constitution, the issue is not whether there is any legitimate justification for a statutory classification but, rather, what a penal statute *actually indicates* about contemporary social mores. It is no more improper for a court to consider the legislative calculations involved in the crafting of such a statute than in any other situation in which we look to legislative history to help discern the meaning of a statute. See, e.g., *Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers* v. *Crowley*, 467 U.S. 526, 542 n.17, 104 S. Ct. 2557, 81 L. Ed. 2d 457 (1984) ("[t]he legislation contains more than its share of problems for judicial interpretation because . . . many sections contain calculated ambiguities or political compromises essential to secure a majority" [internal quotation marks omitted]); *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 205 n.45 (concluding "that the disclaimer set forth in [General Statutes] § 46a-81r [1] was a political compromise designed to assure persons opposed to homosexual conduct of this state's unwillingness to approve or condone such conduct"); see also *Griswold Inn, Inc.* v. *State*, 183 Conn. 552, 561–62, 441 A.2d 16 (1981) (court is not bound to accept most constitutionally favorable interpretation of state action).

[63] Among the many steps that the legislature could have taken in this regard include habeas corpus reform, the allocation of additional resources for the purpose of expediting the lengthy appeals process for this state's capital cases, simplification of our death penalty statutes, and streamlining the procedures applicable to capital cases.

[64] See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2594–95, remarks of Chief State's Attorney Kane; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2741–42, remarks of Robert Fromer.

[65] Once again, Chief Justice Rogers begs the question in assuming that Governor Malloy's opposition to a retroactive repeal precluded him from supporting P.A. 12-5 out of a sincere belief that the death penalty is a punishment unbecoming a modern, enlightened state. In fact, Governor Malloy's signing statement, in which he makes it abundantly clear that his opposition to capital punishment *is* principled rather than pragmatic, notwithstanding his stated preference for a prospective only repeal, offers perhaps the clearest and most powerful refutation of Chief Justice Rogers' interpretation of P.A. 12-5. Nor would we join Chief Justice Rogers in labeling the governor's stated beliefs logically and morally "incoherent." Footnote 22 of Chief Justice Rogers' dissenting opinion. What is illogical, rather, is the assumption that one cannot believe that something is indecent or unacceptable unless one is prepared to reject it categorically, under every possible circumstance.

[66] Death Penalty Information Center, "Death Sentences in the United States from 1977 by State and by Year," available at http://www.deathpenalty info.org/death-sentences-united-states-1977-2008 (last visited July 27, 2015).

[67] See Amnesty International, "Death Penalty Trends," available at http://www.amnestyusa.org/our-work/issues/death-penalty/us-death-penalty-facts/death-penalty-trend (last visited July 27, 2015).

[68] Death Penalty Information Center, "States with and without the Death Penalty," available at http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited July 27, 2015); see also Death Penalty Information Center, "Crimes Punishable by the Death Penalty," available at http://www.deathpenaltyinfo.org/crimes-punishable-death-penalty#BJS (last visited July 27, 2015). Besides Connecticut (2012) and Nebraska (2015), the others are New York (2007), New Jersey (2007), New Mexico (2009), Illinois (2011), and Maryland (2013). Death Penalty Information Center, "States with and without the Death Penalty," supra.

[69] Death Penalty Information Center, "States with and without the Death Penalty," available at http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited July 27, 2015).

[70] Death Penalty Information Center, "Executions by Year Since 1976," available at http://www.deathpenaltyinfo.org/executions-year (last visited July 27, 2015).

[71] Death Penalty Information Center, "Execution List 2014," available at http://www.deathpenaltyinfo.org/execution-list-2014 (last visited July 27, 2015).

[72] Death Penalty Information Center, "Death Sentences in the United States from 1977 by State and by Year," available at http://www.deathpenalty info.org/death-sentences-united-states-1977-2008 (last visited July 27, 2015).

[73] Death Penalty Information Center, "Death Sentences in the United States

from 1977 by State and by Year," available at http://www.deathpenalty info.org/death-sentences-united-states-1977-2008 (last visited July 27, 2015).

[74] See "Gov. Jay Inslee Announces Capital Punishment Moratorium" (February 11, 2014), available at http://www.governor.wa.gov/news-media/gov-jay-inslee-announces-capital-punishment-moratorium (last visited July 27, 2015).

[75] A. Blinder, "Life Sentences for Last Four Facing Death in Maryland," N.Y. Times, January 1, 2015, p. A12.

[76] Death Penalty Information Center, "Number of Executions by State and Region Since 1976," available at http://www.deathpenaltyinfo.org/number-executions-state-and-region-1976 (last visited July 27, 2015).

[77] Death Penalty Information Center, "Number of Executions by State and Region Since 1976," available at http://www.deathpenaltyinfo.org/number-executions-state-and-region-1976 (last visited July 27, 2015).

[78] The thirteen states are Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

[79] Death Penalty Information Center, "Number of Executions by State and Region Since 1976," available at http://www.deathpenaltyinfo.org/number-executions-state-and-region-1976 (last visited July 27, 2015).

[80] Death Penalty Information Center, "Number of Executions by State and Region Since 1976," available at http://www.deathpenaltyinfo.org/number-executions-state-and-region-1976 (last visited July 27, 2015).

[81] Death Penalty Information Center, "Number of Executions by State and Region Since 1976," available at http://www.deathpenaltyinfo.org/number-executions-state-and-region-1976 (last visited July 27, 2015).

[82] Death Penalty Information Center, "Number of Executions by State and Region Since 1976," available at http://www.deathpenaltyinfo.org/number-executions-state-and-region-1976 (last visited July 27, 2015).

[83] Death Penalty Information Center, "States with and without the Death Penalty," available at http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited July 27, 2015).

[84] Death Penalty Information Center, "New Hampshire," available at http://deathpenaltyinfo.org/new-hampshire-1 (last visited July 27, 2015).

[85] Death Penalty Information Center, "New Hampshire," available at http://deathpenaltyinfo.org/new-hampshire-1 (last visited July 27, 2015). In May 2014, the New Hampshire House of Representatives approved a bill that would have repealed the death penalty, but the New Hampshire Senate deadlocked. See Death Penalty Information Center, "News," available at http://deathpenaltyinfo.org/news/past/99/2014 (last visited July 27, 2015).

[86] Some scholars have gone so far as to suggest that these pronounced geographic disparities in the legality and use of the death penalty may be more than mere happenstance. See C. Steiker & J. Steiker, supra, pp. 28–29 (referencing "broad scholarly literature . . . point[ing] to the fact that executions are overwhelmingly confined to the South [and states bordering the South], the very same jurisdictions that were last to abandon slavery and segregation, and that were most resistant to the federal enforcement of civil rights norms").

[87] In *Rizzo II*, the defendant, Todd Rizzo, offered public opinion polling data for this court's consideration as another purported source of evidence regarding contemporary standards of decency. See *State* v. *Rizzo*, supra, 303 Conn. 194–95. Chief Justice Rogers, writing for the court in that case, properly rejected the relevance of such information, "recogniz[ing] the weaknesses inherent in public opinion polls as objective measures of the popular psyche . . . ." Id., 195.

Now, in a stark about-face, Chief Justice Rogers criticizes the majority for not focusing on the question of whether a majority of Connecticut citizens, *as gauged by public opinion polls*, currently believe that the death penalty is immoral. She then proceeds to cite to various opinion polls, polls that demonstrate, at best, that a slim and shrinking majority of Connecticut registered voters continue to support the death penalty. See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2623, remarks of Senator Edwin A. Gomes (reciting polling data and concluding therefrom that "[t]he public [has] . . . soured on the death penalty").

Chief Justice Rogers simply ignores the fundamental principle that "[t]he right to be free [from] cruel and unusual punishments, like the other guarantees of the Bill of Rights, may not be submitted to vote . . . . The very purpose of a [b]ill of [r]ights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied

by the courts." (Internal quotation marks omitted.) *Furman* v. *Georgia*, supra, 408 U.S. 268–69 (Brennan, J., concurring). "The [f]ramers were well acquainted with the danger of subjecting the determination of the rights of one person to the tyranny of shifting majorities." (Internal quotation marks omitted.) *Immigration & Naturalization Service* v. *Chadha*, 462 U.S. 919, 961, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983) (Powell, J., concurring in the judgment). That same principle animates article first of the constitution of Connecticut. It never has been the practice of this court to define the scope of our fundamental liberties according to a "popularity contest," and we will not begin to do so now. See *Volusia County Kennel Club, Inc.* v. *Haggard*, 73 So. 2d 884, 898 (Fla.) ("If popularity contests ever become the criteria for determining the validity of law, the uncontrolled will of the mob will become the substitute for constitutional government. It seems superfluous to say that a poll to ascertain public opinion should never be the necessary prerequisite to a judicial opinion under our constitutional system for the administration of [j]ustice."), cert. denied sub nom. *Lane* v. *Volusia County Kennel Club, Inc.*, 348 U.S. 865, 75 S. Ct. 87, 99 L. Ed. 681 (1954); *Gillis* v. *Yount*, 748 S.W.2d 357, 369 (Ky. 1988) (Leibson, J., concurring) ("[c]onstitutional validity is not decided by a popularity contest").

[88] As we have recognized, society's standards of decency need not always evolve in the same direction. We express no opinion as to the circumstances under which a reviewing court might conclude, on the basis of a revision to our state's capital felony statutes or other change in these indicia, that capital punishment again comports with Connecticut's standards of decency and, therefore, passes constitutional muster. See *Fleming* v. *Zant*, supra, 259 Ga. 690 (conclusion that prospective repeal of death penalty as to mentally disabled offenders rendered execution of such individuals impermissibly cruel and unusual punishment did not amount to "per se" prohibition).

[89] In her dissenting opinion, Chief Justice Rogers accuses the majority of, among other things, cherry picking its sources, improperly advocating for certain political agendas, imposing its personal moral beliefs and policy preferences on the people of Connecticut, disregarding this court's precedents, and usurping the legislature's power. If Chief Justice Rogers truly believes that we have arrived at this conclusion by "relying solely on [our] own views" about capital punishment; footnote 33 of Chief Justice Rogers' dissenting opinion; and merely because "it offends [our own] subjective sense of morality," it is only because she herself has refused either to consider or to recognize the import of the words of our elected officials, the actions of our jurors and prosecutors, the story of our history, the path trodden by our sister states, and the overwhelming evidence that our society no longer considers the death penalty to be necessary or appropriate. In any event, we do not question the sincerity or good faith of Chief Justice Rogers' views, and we find it unfortunate that she deems it necessary to question ours. Although it should go without saying, we feel compelled to emphasize that we, no less than the dissenting justices, have decided this case on the basis of our understanding of and dedication to the governing legal principles, and our decision should in no way be taken as an indication of our personal views with respect to the morality of capital punishment.

[90] There is presumably some de minimus incapacitative value to the death penalty in that one in prison for life may still escape or offend against other inmates and prison staff.

[91] Public Act 12-5 simultaneously abolished the death penalty for all crimes committed on or after April 25, 2012, while preserving it for identical crimes committed prior to that date. The act contains no statement of policy or underlying findings purporting to explain the rationale therefor.

[92] As authority for this theory, Chief Justice Rogers relies on public statements made by Professor Barry, as well as a brief, conclusory citation to *People* v. *Floyd*, 31 Cal. 4th 179, 191, 72 P.3d 820, 1 Cal. Rptr. 3d 885 (2003). There is no indication what empirical evidence, if any, supports this novel theory of deterrence.

[93] See, e.g., I. Ehrlich, "The Deterrent Effect of Capital Punishment: A Question of Life and Death," 65 Am. Econ. Rev. 397, 397–98 (1975); M. Frakes & M. Harding, "The Deterrent Effect of Death Penalty Eligibility: Evidence from the Adoption of Child Murder Eligibility Factors," 11 Am. L. & Econ. Rev. 451, 494–95 (2009); C. Sunstein & A. Vermeule, "Is Capital Punishment Morally Required? Acts, Omissions, and Life-Life Tradeoffs," 58 Stan. L. Rev. 703, 706 (2005).

[94] See generally J. Donohue & J. Wolfers, "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stan. L. Rev. 791 (2005) (ques-

tioning reliability of existing data on deterrence); J. Fagan, "Death and Deterrence Redux: Science, Law and Causal Reasoning on Capital Punishment," 4 Ohio St. J. Crim. L. 255 (2006) (concluding that there is no reliable evidence of deterrence and that studies demonstrating deterrent effect are fraught with error); M. Radelet & T. Lacock, "Do Executions Lower Homicide Rates?: The Views of Leading Criminologists," 99 J. Crim. L. & Criminology 489 (2009) (overwhelming consensus among criminologists is that death penalty does not add any significant deterrent effect above that of long-term imprisonment).

[95] See Death Penalty Information Center, "Execution List 2014," available at http://www.deathpenaltyinfo.org/execution-list-2014 (last visited July 27, 2015); see also B. Newton, supra, 13 J. App. Prac. & Process 42 (average time from sentencing to execution is close to twenty years when postappeal resentencings are taken into account).

[96] To the extent that the dissenting justices contend that such delays are constitutionally irrelevant because they are the fault of criminal defendants, who improperly delay their executions by filing frivolous appeals and post-conviction challenges, we cannot agree. As Justice Breyer explained in his dissenting opinion in *Glossip* v. *Gross*, supra, 135 S. Ct. 2726, between 1973 and 1995, state and federal courts found errors in more than two thirds of the capital cases that they reviewed. Id., 2771 (Breyer, J., dissenting). Delays, then, are indispensable if the ultimate punishment is to be reliably applied, and, if the constitution did not mandate such close scrutiny, the execution of innocent persons would inevitably result. See id., 2771–72 (Breyer, J., dissenting); see also *Kyles* v. *Whitley*, 514 U.S. 419, 422, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) ("[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case" [internal quotation marks omitted]).

[97] See Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2783, remarks of Representative Arthur J. O'Neill ("the record here was replete with the proponents of getting rid of capital punishment saying it has no deterrent effect"); see also 55 S. Proc., Pt. 2, 2012 Sess., p. 595, remarks of Senator Coleman; 55 S. Proc., Pt. 3, 2012 Sess., p. 670, remarks of Senator Edward Meyer; 55 S. Proc., Pt. 3, 2012 Sess., pp. 764–65, remarks of Senator Steve Cassano; 55 S. Proc., Pt. 3, 2012 Sess., p. 769, remarks of Senator Bob Duff; 55 S. Proc., Pt. 3, 2012 Sess., p. 775, remarks of Senator Anthony J. Musto; 55 S. Proc., Pt. 3, 2012 Sess., p. 783, remarks of Senator Gayle Slossberg; 55 S. Proc., Pt. 3, 2012 Sess., p. 813, remarks of Senator Donald E. Williams, Jr.; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2515, remarks of Senator Williams; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2546, remarks of Senator Martin M. Looney; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2622, remarks of Senator Edwin A. Gomes; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2660–61, remarks of Hartford Police Chief Daryl K. Roberts; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2687, remarks of Professor Khalilah Brown Dean; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., p. 2825, remarks of Representative Gary A. Holder-Winfield.

[98] Although concededly somewhat anecdotal, it bears mention that the one execution that was carried out in Connecticut over the past fifty years does not appear to have had any beneficial impact on the state's murder rate. In fact, the opposite may be true. In the three years prior to Ross' 2005 execution, an average of 102 murders were committed annually in Connecticut, a figure that is actually inflated by virtue of the inclusion of sixteen deaths resulting from a single nursing home arson. Crimes Analysis Unit, Department of Emergency Services & Public Protection, "Crime in Connecticut: January–December 2011" (2013) p. 11, available at http://www.dpsdata.ct.gov/dps/ucr/data/2011/Crime%20In%20Connecticut%20-COMPLETE%202011.pdf (last visited July 27, 2015). By contrast, from 2006 through 2008, an average of 124 murders were committed per annum; id.; a 22 percent increase.

We also note that murder rates actually fell in the wake of the mid-2012 abolition of the death penalty. The number of reported murders in the state's largest urban areas fell by more than 33 percent in the first half of 2013, as compared to the first half of 2012. See Federal Bureau of Investigation, "Crime in the United States 2013: January-June Preliminary Semiannual Uniform Crime Report," Table 4, available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/preliminary-semiannual-uniform-crime-report-january-june-2013/tables/table-4-cuts/table_4_offenses_reported_to_

law_enforcement_by_state_colorado_through_idaho_2013.xls (last visited July 27, 2015). In fact, the most recent available statewide statistics indicate that the rates of every major category of violent crime declined from 2012 to 2013. See Federal Bureau of Investigation, "Crime in the United States 2013," Table 4, available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.2013/tables/4tabledatadecoverviewpdf/table_4_crime_in_the_united_states_by_region_geographic_division_and_state_2012-2013.xls (last visited July 27, 2015).

[99] See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., pp. 2664–66, remarks of Anne Stone; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2835–37, remarks of Dawn Mancarella; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2845–47, remarks of Gail Canzano; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2861–63, remarks of Walter H. Everett; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2865–66, remarks of Victoria Coward; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 9, 2012 Sess., pp. 2867–69, remarks of Jane Caron.

[100] See Governor's Statement, supra ("I [have seen] people wrongly accused or mistakenly identified"); footnote 51 of this opinion and accompanying text.

[101] It is perfectly reasonable to believe, however, that more than a few innocent defendants have been executed throughout our state's history. See, e.g., W. Holdsworth, supra, p. 519 (as many as eleven people were hanged as witches in seventeenth century Connecticut).

[102] We note that P.A. 12-5 does not prevent the state from seeking the death penalty for any future defendant who is accused of having committed a capital felony prior to April 25, 2012, and one defendant, Richard Roszkowski, was in fact sentenced to death in May, 2014; A. Griffin, "New Death Sentence," Hartford Courant, May 23, 2014, pp. A1, A5; approximately two years after the enactment of P.A. 12-5.

[103] In *Ross*, we adopted these principles under the due process clauses of the state constitution. See *State* v. *Ross*, supra, 230 Conn. 252 (principles articulated by United States Supreme Court "require, as a constitutional minimum, that a death penalty statute, on the one hand, must channel the discretion of the sentencing judge or jury so as to [ensure] that the death penalty is being imposed consistently and reliably and, on the other hand, must permit the sentencing judge or jury to consider, as a mitigating factor, any aspect of the individual defendant's character or record as well as the circumstances of the particular offense"); see also *State* v. *Rizzo*, supra, 266 Conn. 227 (same).

[104] Justice Norcott has long expressed his profound concern that, "[a]s long as racial prejudice is a factor in our lives, and it is an undeniable factor in every facet of American life, there can be no place for a capital penalty in our society." *State* v. *Webb*, supra, 238 Conn. 570 (*Norcott, J.*, dissenting); see also *State* v. *Cobb*, supra, 251 Conn. 545–46 (*Norcott, J.*, dissenting) ("I am convinced that the arbitrariness inherent in the sentencer's discretion is intensified by the issue of race"). In their concurring opinion, Justices Norcott and McDonald refer to what now appears to be strong evidence demonstrating that impermissible racial and ethnic disparities have, in fact, permeated this state's capital sentencing scheme. We decline to address or resolve such claims, however, because they are not before us at this time.

[105] We fail to discern the contradiction that Chief Justice Rogers apparently sees in recognizing that the citizens of Connecticut, as a people, have traditionally been at the forefront in adopting a more modern and humane system of criminal justice; see part I B of this opinion; while at the same time acknowledging that the decisions of individual jurors and prosecutors may at times be tainted by the same sorts of subconscious biases and prejudices with which all of us wrestle. Cf. *United States* v. *Mulkis*, 39 F.3d 664, 664 (W.D. Wn. 1930) ("surely there is not a righteous man [on] earth that doeth good and sinneth not" [internal quotation marks omitted]).

[106] See J. Donohue, "Capital Punishment in Connecticut, 1973–2007: A Comprehensive Evaluation from 4686 Murders to One Execution," pp. 130–31, 143, available at http://works.bepress.com/cgi/viewcontent.cgi?article=1095&context=john_donohue (last visited July 27, 2015).

[107] Once again, these concerns were at the forefront for the legislators who supported P.A. 12-5; see footnote 50 of this opinion and accompanying text; and for Governor Malloy when he signed the act. See Governor's Statement, supra ("In the trenches of a criminal courtroom, I learned firsthand that our system of justice is very imperfect. While it's a good system

designed with the highest ideals of our democratic society in mind, like most of human experience, it is subject to the fallibility of those who participate in it. I saw people who were poorly served by their counsel. I saw people wrongly accused or mistakenly identified. I saw discrimination. In bearing witness to those things, I came to believe that doing away with the death penalty was the only way to ensure it would not be unfairly imposed.").

[108] Legislators who supported P.A. 12-5 and those who opposed it agreed that public outrage at the perpetrators in the Cheshire case in particular was a primary reason the act was drafted to retain the death penalty retroactively. See, e.g., 55 S. Proc., Pt. 2, 2012 Sess., p. 539, remarks of Senator Kissel ("there's no political will to abolish the death penalty because of those two"); 55 S. Proc., Pt. 3, 2012 Sess., p. 675, remarks of Senator Toni Boucher ("the Petit family . . . is behind the whole rational[e] for making this prospective"); 55 S. Proc., Pt. 3, 2012 Sess., p. 743, remarks of Senator Kissel ("Hayes and . . . Komisarjevsky . . . [are] why it's almost impossible to get a bill through this [l]egislature right now that would repeal the death penalty across the board"); 55 S. Proc., Pt. 3, 2012 Sess., p. 746, remarks of Senator Len Suzio ("some members actually changed their vote only a year ago in response to the horrible [Petit] tragedy"); 55 S. Proc., Pt. 3, 2012 Sess., p. 781, remarks of Senator Edith Prague (opposed repeal out of respect for William Petit); 55 H.R. Proc., Pt. 3, 2012 Sess., p. 1043, remarks of Representative Lawrence F. Cafero, Jr. ("It is no secret that what is weighing over all of us is the Petit murders. . . . In fact, it was widely reported that one of the reasons this General Assembly didn't take this bill up earlier was because of the freshness of those awful crimes."); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1063, remarks of Representative Al Adinolfi ("many people in this room . . . have changed . . . their vote to abolish the death penalty rather than vote against abolishing the death penalty based on [those] . . . who are on death row being executed, especially, Komisarjevsky and Hayes"); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1209, remarks of Representative Themis Klarides ("[I]f anyone deserves the death penalty, those two guys deserve the death penalty because what they did [was] so bad. We don't really support it for anybody else going forward [however] . . . ."); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1305, remarks of Representative Ernest Hewett (addressing "members who are voting for a prospective bill so they can make sure that Hayes and Komisarjevsky get the death penalty"); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1317, remarks of Representative Lile R. Gibbons ("[i]n the wake of the terrible Petit murders, it's very hard for any of us to want to vote to repeal the death penalty"); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1337, remarks of Representative Robert C. Sampson ("We've talked a lot tonight about the murders in Cheshire. The two people—the two men that committed those acts of violence are not men at all. They are animals. And I don't want to let them off the hook . . . ."); 55 H.R. Proc., Pt. 4, 2012 Sess., p. 1383, remarks of Representative Lawrence F. Cafero, Jr. ("in many respects it's because of [Hayes and Komisarjevsky] that we have the bill that we have before us"); Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 2012 Sess., p. 2544, remarks of Senator Martin M. Looney (legislature deferred consideration of repeal in 2011 due to Cheshire case).

By contrast, every legislator whom Chief Justice Rogers cites as having been equally committed to executing the other residents of death row voted *against* P.A. 12-5, and would have retained the death penalty both retroactively and prospectively. Their principled views, while no less deserving of respect, are simply not relevant to the question before us: whether those legislators who voted to *abolish* capital punishment only on the condition that it be retained for those already occupying death row did so out of a principled belief in the appropriateness of the death penalty or, rather, to satisfy a public or private call for vengeance against the perpetrators in the Cheshire case.

[109] B. Connors, "Prague: 'Hang the Animal By His . . .'," NBC Connecticut (May 12, 2011), quoting Senator Edith Prague, available at http://www.nbcconnecticut.com/news/local/Prague-Hang-the-Animal-by-His-121670559.html (last visited July 27, 2015).

[110] Because we conclude both that the continued imposition of the death penalty in Connecticut following the enactment of P.A. 12-5 offends contemporary standards of decency and that it fails to satisfy any legitimate penological objective, we need not determine whether it has come to be so rarely imposed that it also violates the state constitutional prohibition on unusual punishment. As we discussed; see footnote 16 of this opinion; the United States Supreme Court has at times suggested that the eighth amendment may contain an independent prohibition against punishments that are

unusual, even if they are not cruel. Recent scholarship supports this interpretation and suggests that, especially in light of the enactment of P.A. 12-5, the death penalty in Connecticut has become impermissibly unusual. See R. Casale & J. Katz, "Would Executing Death-Sentenced Prisoners after the Repeal of the Death Penalty Be Unusually Cruel under the Eighth Amendment?," 86 Conn. B.J. 329, 341, 344–45 (2012). For example, Professor John F. Stinneford has observed that, under the original meaning of unusual punishment, "when a traditional [common-law] punishment falls completely out of usage, it loses the presumption of validity that comes with being usual," and attempts to reintroduce it would be met with as much or more scrutiny as entirely novel punishments. J. Stinneford, "The Original Meaning of 'Unusual': The Eighth Amendment as a Bar to Cruel Innovation," 102 Nw. U. L. Rev. 1739, 1746, 1813 (2008). This reflects the principle that, "[a]s courts decide cases year after year and century after century, impractical and unjust legal practices fall away like dross, while practical and just ones survive"; J. Stinneford, supra, 1775; and may apply with equal force to punishments eliminated by legislative reform. See id., 1814. This interpretation of the constitutional ban on unusual punishment also is consistent with Connecticut common law in the years leading up to the adoption of the 1818 constitution. See, e.g., *State* v. *Smith*, supra, 5 Day (Conn.) 178–79 (reviewing claim that punishment was new or "novel, without precedent"); L. Goodheart, supra, pp. 68, 76–77 (in 1808, legislature voted to commute death sentence of Clarissa Ockry, who otherwise would have been first woman executed in Connecticut for infanticide since 1753).

[111] Although Justice Zarella contends otherwise, we disagree for the reasons stated in this opinion.

[112] Although it might have been helpful for the defendant himself to review the additional historical information that has come to light over the past several years, his failure to do so does not preclude our consideration of information revealed from our own independent research. See part IV A 3 of this opinion.

[113] See part IV C of this opinion.

[114] To respond that appellate courts simply should refuse to consider or address any questions of legislative fact that have not already been fully vetted by the parties at the trial level is to miss the point. When a court considers a legislative fact, it typically is because that fact is central to a question of policy the necessary determination of which will broadly impact persons who are *not* parties to the immediate dispute. To turn a blind eye to relevant and well established scientific or sociological knowledge that the parties may have overlooked or decided to leave unearthed, whether for strategic or financial reasons, would unjustly and unwisely subject the public at large to the results of an ill-informed decision.

[115] Of course, if the citizens of Connecticut wish to reinstate the death penalty, they may always amend the state constitution, as the citizens of California and Massachusetts did, to clarify that the punishment is and will remain constitutional notwithstanding any evolution in the state's standards of decency.

[116] See footnote 89 of this opinion.